UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


TENNESSEE CLEAN WATER NETWORK,
and TENNESSEE SCENIC RIVERS
ASSOCIATION,

Plaintiffs,

     v.

TENNESSEE VALLEY AUTHORITY,

Defendant.

No. 3:15-cv-00424
Judge Haynes
Magistrate Judge Griffin

---

## BRIEF IN SUPPORT OF TVA'S MOTION TO DISMISS

---

Edwin W. Small, Deputy General Counsel
Maria V. Gillen, Senior Attorney
David D. Ayliffe, Senior Attorney
TVA GENERAL COUNSEL'S OFFICE
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Telephone 865.632.7741

Attorneys for Tennessee Valley Authority

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................2

    Statutory and Regulatory Background..............................................................................2

    Factual Background ..........................................................................................................4

    Procedural Background—State and Federal Lawsuits ......................................................6

ARGUMENT .......................................................................................................................10

    I.      Standard of Review.............................................................................................10

    II.    Citizens' Claim B ("Improper Use of Sinking Creek, A Water of the United States, as a Wastewater Treatment Facility") is an Impermissible Collateral Attack on Gallatin's NPDES Permit......................................................................11

    III.   The State of Tennessee's Pending Enforcement Action Precludes this Court from Exercising Jurisdiction Over Citizens' Lawsuit...........................................15

    IV.   In the Alternative, the Court Should Abstain From Adjudicating Citizens' Complaint...........................................................................................................20

CONCLUSION....................................................................................................................22

## INTRODUCTION

The "citizen suit provision" of the Clean Water Act ("Act") allows concerned citizens to participate in enforcement of a state's water discharge limits only if a state's enforcement of those limits is not adequate. Yet, even when permissible under the Act, citizen involvement in state enforcement actions is not without limit. Citizen suits are meant to "supplement not supplant" a state's enforcement efforts because, under the Act, the states are the primary regulators of sources within state borders. This "interstitial not intrusive" role for citizens is designed to avoid the "obvious danger that unlimited public actions might disrupt the implementation of the act and overburden the courts" by subjecting a defendant to multiple suits and potentially conflicting orders. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60-61 (1987); *accord Friends of the Earth v. Consol. Rail Corp.*, 768 F.2d 57, 63 (2d Cir. 1985) (quoting *Natural Res. Def. Council v. Train*, 510 F.2d 692, 699 (D.C. Cir. 1975)).

Here, the State of Tennessee is diligently prosecuting an enforcement action against TVA in Davidson County Chancery Court for alleged discharge violations at TVA's Gallatin Fossil Plant ("Gallatin"), and Tennessee Clean Water Network and Tennessee Scenic Rivers Association ("Citizens") ***are actively participating as Intervenors*** in the state enforcement action. Notwithstanding the ongoing state enforcement action and the Citizens' active involvement in it, Citizens filed this duplicative federal lawsuit, which is an impermissible attempt to circumvent the State of Tennessee's regulatory authority under the Act. This type of end run around the clear provisions of the Act should not be tolerated by this Court. Citizens' lawsuit should be dismissed.

Case 3:15-cv-00424   Document 13   Filed 06/15/15   Page 3 of 25 PageID #: 256

# BACKGROUND

## Statutory and Regulatory Background

The Clean Water Act, 33 U.S.C. § 1251 et seq., is a "comprehensive [statutory] program for controlling and abating water pollution." *Train v. City of New York*, 420 U.S. 35, 37 (1975). The Act's regulatory scheme is one of "cooperative federalism," in which "states . . . play the primary role in developing the regulations by which a particular source will be bound." *Bell v. Cheswick Generating Station*, 734 F.3d 188, 196 (3d Cir. 2013); *see also Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992) ("The Clean Water Act anticipates a partnership between the States and the Federal Government, animated by a shared objective[.]").

The Act prohibits the discharge of pollutants from a point source to waters of the United States except in compliance with, among other conditions, a National Pollutant Discharge Elimination System ("NPDES") permit.  In keeping with its cooperative federalism scheme, the Act allows states to establish NPDES permit programs, 33 U.S.C. § 1342(b), and "a state may administer the NPDES permit program within its borders if [EPA] determines that the state program meets federal criteria set forth in the [Act] and implementing regulations." *S. Ohio Coal Co. v. Office of Surface Mining*, 20 F.3d 1418, 1420 (6th Cir. 1994).  "States issuing permits pursuant to § 1342(b) stand in the shoes of [EPA]" in prescribing effluent limits in NPDES permits.[1] *Natural Res. Def. Council, Inc. v. EPA*, 859 F.2d 156, 183 (D.C. Cir. 1988). Compliance with a NPDES permit is deemed compliance with the Act.  33 U.S.C. § 1342(k).

---

[1]     Once EPA approves a state's NPDES program, EPA suspends its own authority to issue permits in that state.  *Lake Cumberland Trust, Inc. v. EPA*, 954 F.2d 1218, 1221 (6th Cir. 1992); *Cleveland Elec. Illuminating Co. v. EPA*, 603 F.2d 1, 2 (6th Cir. 1979); 40 C.F.R. § 123.1(d)(1).

EPA has authorized TDEC to issue NPDES permits.[2] *United States v. Holden*, 557 F.3d 698, 701 (6th Cir. 2009). Tennessee promulgated the Tennessee Water Quality Control Act in 1977 (Tenn. Code Ann. § 69-3-101 et seq.), and TDEC issues NPDES permits pursuant to its authority under the Tennessee Water Quality Control Act. *Tenn. Envtl. Council, Inc. v. Tenn. Water Quality Control Bd.*, 254 S.W.3d 396, 400 n.2 (Tenn. Ct. App. 2007). Tennessee also has enacted regulations governing water pollution and the issuance of NPDES permits. *See* Tenn. Comp. R. & Regs. 0400-40-01 et seq.

Additionally, although the Clean Water Act includes a citizen suit provision, the provision is designed to supplement, not supplant federal or state enforcement. *Gwaltney v. Chesapeake Bay Found.*, 484 U.S. 49, 50 (1987); *see* 33 U.S.C. § 1365(a), (b). Indeed, because states have "the primary responsibility and right[] to prevent, reduce and eliminate pollution," 33 U.S.C. § 1251(b), Congress imposed two regulatory "brakes" on the ability of citizens to enforce the Act. First, citizens must give sixty days' notice to the alleged violator as well as the state and federal agencies of their intention to sue. 33 U.S.C. § 1365(b)(1)(A). The purpose of this 60-day notice period is to obviate the need for a citizen suit. This can happen in one of two ways. The alleged violator may use the notice period as "an opportunity to bring itself into complete compliance with the Act and thus . . . ***render unnecessary a citizen suit***." *Gwaltney*, 484 U.S. at 60 (emphasis added). Or, under the second "brake," known as the diligent

---

[2] Since 1977, TDEC has been authorized to issue NPDES permits generally, *see* 42 Fed. Reg. 57,156 (Nov. 1, 1977) (acknowledging receipt of Tennessee's request for State program approval); 49 Fed. Reg. 45,654, 45,655 (Nov. 19, 1984) (citing December 28, 1977 letter from EPA Administrator Douglas M. Costle to Governor Ray Blanton approving Tennessee's NPDES program); 46 Fed. Reg. 51,644 (Oct. 21, 1981) ("On December 28, 1977, the State of Tennessee was approved to administer the NPDES program within its borders."); 56 Fed. Reg. 21,376 (May 8, 1991), and since 1986, TDEC has been authorized to issue NPDES permits to federal facilities such as Gallatin, 51 Fed. Reg. 32,834 (Sept. 16, 1986) (approving Tennessee's request for authority to administer the NPDES program with respect to federal facilities).

prosecution bar, 33 U.S.C. § 1365(b)(1)(B), the state "commences enforcement action within that 60-day period, [and] *the citizen suit is barred*, presumably because governmental action has *rendered it unnecessary*." *Gwaltney*, 484 U.S. at 59 (emphases added).

**Factual Background**

TVA, an executive branch corporate agency and instrumentality of the United States, is tasked by Congress to advance the social and economic well-being of the Tennessee Valley region, and it maintains one of the largest electric power systems in the Nation in support of its statutory mission. *Nat'l Parks Conservation Ass'n, Inc. v. TVA*, No. 3:01-CV-71, 2010 WL 1291335, at *6 (E.D. Tenn. Mar. 31, 2010). TVA's power system serves more than nine million people in parts of seven states, including almost all of Tennessee. *See* TVA, at http://www.tva.com/abouttva/index.htm.[3]

Gallatin is located in Sumner County, Tennessee, on the Cumberland River. It has four coal-fired generating units and eight combustion turbines which generate about 7 billion kilowatt-hours of electricity in a typical year. *See* TVA, at http://www.tva.gov/sites/gallatin.htm; *see also Tenn. Envtl Council v. TVA*, 32 F. Supp. 3d 876, 880 (E.D. Tenn. 2014). Gallatin's first NPDES permits were issued by EPA Region IV, but after Tennessee was delegated authority under the Clean Water Act in 1986 to administer the NDPES permit program in Tennessee with respect to federal facilities, TDEC began issuing Gallatin's NPDES Permits. TDEC issued NPDES permits, including modifications, to Gallatin in 1993, 1995, 1999, 2006, and 2008.

---

[3] Judicial notice may be taken of public records and government documents available from reliable sources on the Internet. *Mitchell v. TVA*, No. 3:14-cv-360-TAV-HBG, 2015 WL 1962203, at *4 n.2 (E.D. Tenn. Apr. 30, 2015) (taking judicial notice of information on TVA's website); *Arvest Bank v. Byrd*, 814 F. Supp. 2d 775, 787 n.4 (W.D. Tenn. 2011). Additionally, "[t]he basic facts as to the activities of TVA, including the development of its power program and other statutory programs, are matters of public record and common knowledge . . . and are judicially known[.]" *U.S. ex rel. TVA v. Easement & Right-of-way Over Two Tracts of Land*, 246 F. Supp. 263, 269 (W.D. Ky. 1965), *aff'd*, 375 F.2d 120 (6th Cir. 1967).

Case 3:15-cv-00424   Document 13   Filed 06/15/15   Page 6 of 25 PageID #: 259

TDEC issued Gallatin's currently operative NPDES permit in June 2012, following an opportunity for public comment. (Compl., Doc. 1 at Ex. 2.)

Gallatin's NPDES permit regulates effluent discharges from Gallatin's operations through three external outfalls to the Cumberland River: coal combustion waste and other wastes through Outfall No. 001, cooling water and storm water runoff through Outfall No. 002, and intake screen backwash water and intake building sump discharge through Outfall No. 004. (Compl., Doc. 1 at Ex. 2.) The focus of the State's and Citizens' complaints is the coal combustion wastes that are permitted to be discharged through Outfall 001. Those components of coal combustion waste, known as fly ash and bottom ash, are sluiced to Ash Pond A, the first pond in a series of ponds, and the sluice water is then treated as it passes through the pond system—from Ash Pond A through buried pipes to Stilling Pond B, then to Stilling Pond C, then to Stilling Pond D, before the sluice water is discharged to the Cumberland River through permitted Outfall 001. According to EPA, there are 584 similar coal ash treatment facilities in use throughout the country. 75 Fed. Reg. 35,128, 35,149 (June 21, 2010).

The Gallatin NPDES permit includes a monthly average concentration limit of 28 mg/l and a daily maximum concentration of 93 mg/l for Total Suspended Solids; a monthly average concentration limit of 14 mg/l and a daily maximum concentration of 18 mg/l for oil and grease; and requires pH to be within the range of 6.0 and 9.0 for Outfall 001. (Compl., Doc. 1 at Ex. 2.) The permit further requires monthly reporting of certain metals discharged through Outfall 001, including arsenic, mercury, and selenium. (Compl., Doc. 1 at Ex. 2.) TDEC also requires TVA to conduct whole effluent toxicity testing, which determines if discharges from Gallatin are having impacts on aquatic organisms, and requires TVA to reduce the toxicity of Gallatin's discharges if unacceptable impacts are occurring. (Compl., Doc. 1 at Ex. 2.)

## Procedural Background—State and Federal Lawsuits

In July 2012, prior to initiating the current lawsuit, Plaintiff Tennessee Clean Water Network (along with two other environmental advocacy groups which are not parties here) filed a petition for statutory appeal with the Tennessee Water Quality Control Board. In that state administrative challenge, Tennessee Clean Water Network alleged that the NPDES permit issued to Gallatin by TDEC (the very same permit at issue in this lawsuit and the State's enforcement action) was deficient for numerous reasons, including a failure to include technology-based limitations on the discharge of certain pollutants, failure to impose effluent limitations on thermal discharges, failure to impose sufficiently stringent effluent limits to maintain applicable water quality criteria for certain constituents, and failure to impose effluent limitations on the discharge of pollutants through "seeps" at Gallatin's ash ponds. (Am. Petition, Attach. 1.) After discovery and briefing before an Administrative Law Judge, Tennessee Clean Water Network and the other two petitioners voluntarily dismissed without prejudice all but the claim alleging that TDEC should have imposed "best available technology-based effluent limits" on Gallatin's discharges. Thereafter, the parties stipulated to the dismissal of that one remaining claim because it was governed by a prior decision of the Water Board. (Tenn. Water Bd. Final Order of Dismissal, Attach. 2.) Petitioners appealed that dismissal to Tennessee Chancery Court, which affirmed the dismissal of the permit appeal. (Chancery Ct. Final Order of Dismissal, Attach. 3.) An appeal of the Chancery Court affirmance is currently pending in the Tennessee Court of Appeals. (Notice of Appeal to Tenn. Ct. of Appeals, Attach. 4)

Citizens sent their 60-day Notice of Violation letter in this federal action on November 10, 2014. (Doc. 1-3.) The letter alleged the following violations of the Clean Water Act: (1) unauthorized discharges into the Cumberland River from seeps through the dikes of Gallatin's ash ponds; (2) discharges in violation of the "removed substances" provision of the

permit by way of seeps through the dikes of the ash ponds and leakage from the ash ponds into groundwater and into the Cumberland River; (3) discharging wastewater by way of leakage through groundwater into the Cumberland River from the ash ponds and Non-Registered Site # 83-1324 that is detrimental to human, aquatic and animal life; (4) failure to properly operate and maintain Gallatin's ash ponds in violation of Part II.A.4.a of the permit as a result of seeps through the ash pond dikes and leakage to groundwater and the Cumberland River; (5) improperly using a water of the United States (Sinking Creek/Old Hickory Lake) as a wastewater treatment facility by virtue of the location of the ash ponds; (6) violation of the "sanitary sewer overflow" provision of the permit by way of seeps through the dikes of the ash ponds and leakage from the ash ponds into groundwater; (7) illegal discharges to groundwater by way of leakage form the ash ponds; and (8) failing to report permit non-compliance resulting from leakage to groundwater.

On January 7, 2015, the State of Tennessee filed an original enforcement action under the Tennessee Solid Waste Disposal Act and the Tennessee Water Quality Control Act in Davidson County Chancery Court, which "serve[d] as the State's commencement of an action in response to the Citizens' Groups' 60-day Notice of Violation letter." (Compl., Doc. 1 at ¶ 15; *Tennessee v. TVA*, No. 15-23-IV[4] (Chancery Ct. Davidson Co.), Attach. 5) The State of Tennessee's complaint alleged the following violations of the Tennessee Water Quality Control Act: (1) unpermitted discharges from Gallatin's ash ponds to the Cumberland River through seeps in the pond dikes; (2) unpermitted discharges from Gallatin's ash ponds and Non-Registered Site # 83-1324 by way of leakage to groundwater; (3) failure to properly operate and maintain Gallatin's ash ponds in violation of Part II.A.4.a of the permit as a result of these

---

[4]     The state case, originally assigned to Part II, was later transferred to Part IV.

unpermitted discharges; and (4) violation of Part II.C.1 of the permit which requires "[a]ll discharges shall be consistent with the terms and conditions" of the permit. TVA filed its answer to the State's Complaint on March 9, 2015. (*Tennessee v. TVA*, No. 15-23-IV, TVA Answer, Attach. 6.)

Citizens were granted the right to intervene in the State of Tennessee's lawsuit by stipulation on February 25, 2015. (*Tennessee v. TVA*, No. 15-23-IV, Order Granting Intervention, Attach. 7.) Citizens filed their Complaint in Intervention on February 27, 2015. (*Tennessee v. TVA*, No. 15-23-IV, Compl. in Intervention, Attach. 8.)

Citizens filed their citizen suit in this Court on April 14, 2015. Their Complaint alleges the following violations of the Clean Water Act: (A) unauthorized discharges to the Cumberland River through hydrologic flow from the ash ponds through groundwater; (B) improper use of Sinking Creek/Old Hickory Lake as a wastewater treatment facility by virtue of the location of the ash ponds; (C) unpermitted discharges from the Non-Registered Site to the Cumberland River through groundwater; (D) unpermitted discharges from Gallatin's ash ponds to the Cumberland River through groundwater; and (E) violations of Gallatin's NDPES permit, including (a) Part I.A.b as a result of discharges of wastewater into groundwater and into the Cumberland River that is detrimental to human, aquatic and animal life, (b) Part I.A.c. ("removed substances" provision) as a result of seeps through the ash pond dikes and leakage from the ash ponds into groundwater that it hydrologically connected to waters of the United State, (c) Part II.A.4(a) as a result of failure to properly operate and maintain the ash ponds evidenced by seeps from the ash ponds dikes and leakage into groundwater and the Cumberland River, (d) Part II.C.(2) as a result of failure to report permit non-compliance stemming from leakage to groundwater, and (e) Part II.C. as a result of a "sanitary sewer overflows" through

seeps in the ash pond dikes and leakage into groundwater from the ash ponds and the Non-Registered Site.

Concurrent with the Citizens' filing of this federal lawsuit, discovery is proceeding in the State's lawsuit. On April 21, 2015, the State sent TVA a discovery request which included 37 separate requests for various documents, including, among other things, aquatic life study reports, groundwater studies and monitoring logs, dike stabilization assessments and engineering reports, seep logs, and water quality assessments. (State of Tennessee's Request for Documents/Information, Attach. 9.) TVA began its production of responsive documents to the State and Citizens on June 9, 2015, and intends to continue its production of responsive documents on a "rolling basis" to all parties in the State's enforcement action. (TVA Letter Attaching First Production of Responsive Documents, Attach. 10.)

On May 19, 2015, Citizens served their first discovery requests to TVA in the State's enforcement action, which included 21 interrogatories, 47 requests for documents, and 17 requests for admissions. (Plaintiff-Intervernors' First Set of Interrogatories, Requests for the Production of Documents and Requests for Admissions, Attach. 11.) Citizens' document requests included, among other things, aquatic life study reports, groundwater studies and monitoring logs, seep/leak logs, dike stabilization assessments and engineering reports, and pond siting documents.[5] The documents produced by TVA on June 9, 2015 in response to the State's requests also are responsive to many of the Citizens' document requests.

---

[5] These requests were in addition to similar requests that Citizens sent TVA under the Freedom of Information Act ("FOIA") on June 26, 2014; November 19, 2014; December 22, 2014; and January 5, 2014. Because of the breadth of the FOIA requests, TVA responded to them on a rolling basis by producing non-exempt requested records in electronic format. (*See* Collective exhibit of Citizens' FOIA requests and responses, Attach. 12.)

## ARGUMENT

**I.      Standard of Review.**

TVA has moved to dismiss Citizens' suit pursuant to Federal Rule of Civil Procedure 12(b)(6) in its entirety because it is barred under 33 U.S.C. § 1365(b)(1)(B) ("the diligent prosecution" bar), and Citizens' Claim B ("Improper Use of Sinking Creek, A Water of the United States, as a Wastewater Treatment Facility") because it is an impermissible collateral attack on the NPDES permit issued to Gallatin by the Tennessee Department of Environment and Conservation. *See, e.g., Louisiana Envtl Action Network v. City of Baton Rouge*, 677 F.3d 737, 745-49 (5th Cir. 2012) (holding the diligent prosecution bar was a type of "claim-processing rule" properly dismissed under Rule 12(b)(6)); *Borough of Upper Saddle River, New Jersey v. Rockland Co. Sewer Dist. #1*, 16 F. Supp. 3d 294, 318 (D.N.J. 2014) (same); *cf. Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 491-92 (7th Cir. 2011) (concluding the analogous provision in the Resource Conservation and Recovery Act was not jurisdictional).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court should construe the complaint in the light most favorable to the plaintiff. *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). The complaint's allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## II.	Citizens' Claim B ("Improper Use of Sinking Creek, A Water of the United States, as a Wastewater Treatment Facility") is an Impermissible Collateral Attack on Gallatin's NPDES Permit.

Citizens allege that the Gallatin "NPDES Permit treats the discharges of . . . waste streams from the coal ash lagoons into Sinking Creek as internal outfalls within a waste treatment system," which, according to Citizens, results in the authorization of toxic discharges into a water of the United States in violation of the Clean Water Act and therefore renders the NPDES Permit invalid. (Compl. ¶¶ 162-171.) Even assuming that this allegation is factually correct, which it is not, it is not the proper subject of a citizen suit and should be dismissed.

The ability to bring a citizen suit under the Act is limited to actions: "(1) against any person . . . who is alleged to be *in violation of* (A) *an effluent standard or limitation* under this chapter." 33 U.S.C. § 1365(a)(1), (2) (emphasis added). Although these provisions allow for citizen suits alleging violations of an NPDES permit, they do not allow a citizen to bring a suit collaterally attacking the terms of an NPDES permit. Citizens' Claim B allegation does not assert a violation of an effluent standard or limitation in TVA's NPDES permit; rather, it attacks TDEC's permitting decision and the validity of the permit itself. The citizen suit provision of the Act does not permit citizens to lodge such challenges; instead, the appropriate means to challenge the validity of an NPDES permit is to appeal the permitting decision. *See* Tenn. Code Ann. § 69-3-105(i).

If allowed, such collateral attacks would render the protections of an NPDES permit meaningless, 33 U.S.C. § 1342(k), and would eliminate the certainty that such permits provide to permit holders in operating their facilities. *See, e.g.*, 45 Fed. Reg. 33,290, 33,311 (May 19, 1980) (permit holders that comply with their NPDES permits have "the security of knowing that [they] will not be enforced against for violating some requirement of the [CWA] which was not a requirement of the permit"); 49 Fed. Reg. 37,998, 38,045 (Sept. 26, 1984) ("In general, [NPDES]

11

permits are not modified to incorporate changes made in regulations during the term of the permit. This is to provide some measure of certainty to both the permittees and the Agency during the term of the permits."). In rejecting a similar collateral attack, the Seventh Circuit held, "consistent with the requirements of due process," permit holders cannot be penalized "for complying with what [the state] deemed a valid [N]PDES permit." *Wis. Res. Prot. Council v. Flambeau Mining Co.*, 727 F.3d 700, 707 (7th Cir. 2013).

This principle was upheld in *National Parks Conservation Association, Inc. v. TVA*, 175 F. Supp. 2d. 1071, 1078 (E.D. Tenn. 2001). There, the court dismissed claims similar to those brought in this case finding they were collateral attacks on a valid permit issued to TVA under the Clean Air Act.[6] The plaintiff in that case alleged that TVA had violated emission limits in its air permit, even though the emissions were contemplated under provisions of the permit allowing for certain "de minimis" exceedences for up to 2% of the time each calendar year and for certain excused periods like during plant start up and shut down. *Id*. The court concluded:

> [I]t is clear that plaintiff is not alleging that TVA violated any of the terms of the TDEC permits, but rather is attacking the legality of the permits issued by the Tennessee state enforcement agency. As such, plaintiff's lawsuit is in effect a collateral attack on a facially valid permit issued by the state enforcement agency.

*Id*. Myriad courts have found similarly that citizen suits collaterally attacking permit terms are not permitted. *See, e.g., Pub. Interest Research Grp. of New Jersey v. Powell Duffryn Terminals, Inc.*, 913 F.2d 63, 78 (3d Cir. 1990) (holding party loses "forever the right" to challenge permit term if it fails to raise the challenge in the state administrative process); *Friends of the Earth, Inc. v. Laidlaw Envtl Servs. (TOC), Inc.*, 956 F. Supp. 588, 597 (D.S.C. 1997) ("Congress

---

[6]  The Clean Air Act's citizen suit provision was the model for the citizen suit provisions in several environmental statutes that were enacted subsequently, including the Clean Water Act. Thus, the provisions of the citizen suit provisions in those statutes are interpreted and applied similarly. *See National Parks*, 175 F. Supp. 2d. at 1077; *Natural Res. Def. Council, Inc. v. Train*, 510 F.2d 692, 702 n.55 (D.C. Cir. 1975).

intended to preclude untimely challenges to permit requirements in enforcement proceedings."), *vacated on other grounds*, 149 F.3d 303 (4th Cir. 1998), *rev'd and remanded*, 528 U.S. 167 (2000); *United States v. Solar Turbines. Inc.*, 732 F. Supp. 535, 539-40 (M.D. Pa. 1989) (holding that EPA may not pursue an enforcement action against a permittee acting in accordance with a facially valid permit); *Conn. Fund for the Env't v. Job Plating Co.*, 623 F. Supp. 207, 216 (D. Conn. 1985) (holding citizens were barred from alleging a permit deficiency in federal lawsuit that they did not challenge in state administrative process).

Citizen-Plaintiff Tennessee Clean Water Network is familiar with the proper process for making challenges to the terms of NPDES permits, as it has pursued and *is continuing to pursue* this process with regard to the very permit at issue here. *See Tenn. Clean Water Network, et al. v. Tenn. Bd. of Water Quality, Oil and Gas, et al.*, No. 14-1577-I (Chancery Ct. Davidson Co.), *on appeal*, M2015-00576-COA-R3-CV (Tenn. Ct. App.). Notably, Tennessee Clean Water Network did not raise any allegations of improper use of waters of the United States at any stage of its challenge to Gallatin's NPDES permit. Thus, Citizens' attempt to raise this allegation in a citizen suit is an impermissible collateral attack on TDEC's permitting decision. *See, e.g., Amigos Bravos v. Molycorp. Inc.*, 166 F.3d 1220, 1998 WL 792159 (10th Cir. Nov. 13, 1998); *Nat'l Parks Conservation Ass'n v. TVA*, 175 F. Supp. 2d 1071, 1078 (E.D. Tenn. 2001); *Potter v. Asarco Inc.*, No. 8:96CV555, 1999 WL 33537055 (D. Neb. Apr. 23, 1999).

Citizens' assertion that Gallatin's ponds should be treated as a water of the United States conflicts with the terms of the existing permit. (*See, e.g.*, Compl. ¶ 170 ("It is beyond dispute that an NPDES permit cannot deliberately fail to protect water quality by erroneously declaring a water of the United States to be a waste treatment facility."), *id*. ¶¶ 165, 167 ("Sinking Creek/Old Hickory Lake is a water of the State and a water of the United States subject to the full protections of the CWA . . . Accordingly, TVA's point source discharges into Sinking Creek

from the coal ash ponds . . . are not authorized under the CWA.").)  Such a challenge to the terms

of the permit should have been directed against the permit issuer, TDEC, during the

administrative permitting process rather than in an after-the-fact judicial action against the holder

of the permit three years after the permit was issued and three years after an administrative

challenge to that permit was instituted.

Moreover, the allegation that TDEC (and, by extension, EPA before it) improperly

permitted Gallatin's ponds because they are located in waters of the United States, pertains to

ponds that have been in existence since before the Clean Water Act was enacted in 1972.  Thus,

if allowed to proceed, Citizens' collateral attack would upset decades of established and

approved practice.

In an often-cited case addressing the rationale for precluding "collateral attacks" on

validly issued permits, the Seventh Circuit explained:

> [W]e cannot find in the text of the Clean Air Act, or elsewhere, any indication
> that Congress expressly or by implication meant to authorize the EPA to mount a
> collateral attack on a permit by bringing a civil penalty action as many as five
> years after the permit had been granted and the modification implemented, 28
> U.S.C. § 2462, by which time a defendant would have accrued a potential liability
> in excess of $40 million even though it had been operating under a permit valid
> on its face and never before challenged.  That would be a harsh remedy and
> we cannot be confident in the absence of any clues that it was one intended to
> be usable in the circumstances of this case.

*United States v. AM Gen. Corp.*, 34 F.3d 472, 475 (7th Cir. 1994) (affirming dismissal of an

EPA-initiated Clean Air Act enforcement action where EPA did not act until well after the

facility received the permit); *see also Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461,

495 (2004) (approvingly citing AM General as an example of how federal courts should prevent

years-after- the-fact collateral attacks on valid permit decisions).  If Congress did not mean to

"authorize the EPA to mount a collateral attack on a permit," *AM Gen.*, 34 F.3d at 475, then

surely Congress did not intend to authorize citizen groups such as Plaintiffs to mount such a

14

collateral attack here. Citizens' claim that TVA's ash ponds should be treated as a water of the United States is nothing more than a thinly veiled collateral attack on the State's permitting process and the Gallatin NPDES permit. Allowing such a collateral attack to proceed would "lay waste to a source's ability to rely on a permit it has been issued by an authorized state permitting agency." *Solar Turbines*, 732 F. Supp. at 540. Accordingly, the Court should dismiss Citizens' Claim B.

### III.  The State of Tennessee's Pending Enforcement Action Precludes this Court from Exercising Jurisdiction Over Citizens' Lawsuit.

The CWA citizen suit provision provides that a citizen may bring suit for an alleged violation of "an effluent standard or limitation under this chapter[.]" 33 U.S.C. § 1365(a). But no citizen suit may be brought "if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order[.]" *Id*. § 1365(b)(1)(B). This "bar on citizen suits when governmental enforcement action is under way suggests that the citizen suit is meant to supplement rather than to supplant governmental action," and citizen suits are proper only "if the Federal, State, and local agencies fail to exercise their enforcement responsibility." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60 (1987) (internal quotation marks omitted). The underlying purpose of the "diligent prosecution" provision is that "a defendant [should] not be subjected simultaneously to multiple suits, and potentially to conflicting court orders, to enforce the same statutory standards." *Conn. Fund for the Env't v. Contract Plating Co.*, 631 F. Supp. 1291, 1293 (D. Conn. 1986); *accord Friends of the Earth v. Consol. Rail Corp.*, 768 F.2d 57, 63 (2d Cir. 1985) (observing that Congress incorporated restrictions on the citizen suit provision to avoid the "'obvious danger that unlimited public

15

actions might disrupt the implementation of the act and overburden the courts'") (quoting *Natural Res. Def. Council v. Train*, 510 F.2d 692, 700 (D.C. Cir. 1975)).

When assessing the diligence of state enforcement actions, courts must accord states substantial deference, and citizen plaintiffs bear a heavy burden to overcome this presumption of diligence. *Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty., Md.*, 523 F.3d 453, 459 (4th Cir. 2008) ("[D]iligence [of the state] is presumed[.]"). This is true because "[t]he government, representing society as a whole, is usually in the best position to vindicate societal rights and interests." *Williams Pipe Line Co. v. Bayer Corp.*, 964 F. Supp. 1300, 1318 (S.D. Iowa 1997). For example, the agency enforcement action may be diligent without seeking the maximum penalties and compliance measures available, and the government action "need not be far-reaching or zealous." *See Sierra Club v. Two Elk Generation Partners*, 646 F.3d 1258, 1269 (10th Cir. 2011) (internal quotation marks omitted); *Piney Run Pres. Ass'n*, 523 F.3d at 459.[7]

Even if the State of Tennessee's complaint and request for relief do not reflect Citizens' preferred approach to address potential surface water and groundwater issues at or around Gallatin, the State of Tennessee has substantial discretion in carrying out its surface water and groundwater programs and enforcing its requirements. As the Sixth Circuit made clear in a case brought under the analogous citizen suit provision in the Clean Air Act:

---

[7]    The fact that a defendant in a state enforcement action requested the state to bring the lawsuit does not imply that the state enforcement action has been brought in bad faith or is not being diligently prosecuted. *See Piney Run*, 523 F.3d at 460; *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 211 n.4 (2000) (Scalia, J. dissenting) ("[T]here is no incompatibility whatever between a defendant's facilitation of suit and the State's diligent prosecution—as prosecutions of felons who confess their crimes and turn themselves in regularly demonstrate."). Thus, Citizens' allegations concerning interview comments given by the TDEC Commissioner Robert Martineau (Compl. ¶¶ 17-18) suggest no impropriety about the State's lawsuit or indicate anything about its diligence. Indeed, Tennessee has encouraged the Citizens' participation in the State enforcement action.

> [S]econd-guessing of the EPA's assessment of an appropriate remedy . . . fails to respect the statute's careful distribution of enforcement authority among the federal EPA, the States and private citizens, all of which permit citizens to act where the EPA has "failed" to do so, not where the EPA has acted but has not acted aggressively enough in the citizens' view.

*Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 477 (6th Cir. 2004); *see also Conn. Fund for Env't v. Contract Plating Co.*, 631 F. Supp. 1291, 1293 (D. Conn. 1986) ("[A] federal court ought not to allow a citizens' suit to proceed merely because a prior pending state suit has not alleged as many separate violations of the Act as has the citizens' suit[.]").  The preclusive effect of the State's action does not depend on whether it presses the same exact claims as Citizens' claims but whether the State's suit will adequately achieve the purposes of the Act.  *See, e.g.*, *Hudson River Fishermen's Ass'n v. Cnty. of Westchester*, 686 F. Supp. 1044, 1052 (S.D.N.Y. 1998) ("The thrust of the CWA is to provide *society* with a remedy against [alleged] polluters in the interest of protecting the environment. . . .  If the Government's action achieves that end, the fact that [the plaintiff] is barred from duplicating that effort should hardly seem surprising or harsh.  The Government, of course, as representative of society as a whole, usually is in the best position to vindicate societal rights and interests."); *Conn. Fund for the Env't*, 631 F. Supp. at 1293 ("It appears to have been the intent of Congress to bar a citizens' suit whenever the same purpose could 'adequate[ly]' be achieved by a prior pending state suit regardless of whether the identical violations were asserted or the identical remedy was sought in the two actions.").

The State's and Citizens' complaints both target and seek to remedy the same two fundamental alleged shortcomings: namely, the alleged seepage from the ash pond dikes directly into the Cumberland River and the alleged leakage from the bottom of the ash ponds and the Non-Registered Site into the Cumberland River via groundwater.  A comparison of the complaints bears this out.

17

In its complaint, the State alleges facts regarding discharges to groundwater as a result of leakage from the Non-Registered Site (State Compl. ¶¶19-25, Attach. 5) and regarding discharges to surface water as a result of seeps in the ash pond dikes and to groundwater as a result of leakage from the ash ponds (*Id.* ¶¶ 26-37). These facts form the basis for the State's allegations that TVA violated Tenn. Code Ann. §§ 69-3-114(a) and (b), as well as Parts II.A.4.a. (Proper Operation and Maintenance) and II.C.1. (all discharges must be consistent with the permit) of the NPDES permit for the plant.

In their federal complaint, Citizens similarly allege facts regarding discharges to groundwater as a result of leakage from the Non-Registered Site (Doc. 1, Citizens Compl. ¶¶ 84-94) and regarding discharges to surface water as a result of seeps in the ash pond dikes (*Id.* ¶¶ 65, 117-118) and to groundwater as a result of leakage from the ash ponds (*Id.* ¶¶ 58-64, 116). These facts form the basis for all but one of Citizens' claims.[8] Claims A, C, D, and E(a), (b), (c), (d), and (e) are all based on alleged leakage into groundwater from the ash ponds and/or the Non-Registered Site. Claims E(b), (c), and (e) are also based on alleged seeps in the ash pond dikes. While the phrasing of the discrete claims in the Citizens' complaint differs somewhat from the claims in the State's complaint, the Citizens' complaint targets and seeks remediation of the same alleged "root cause" violations.

> The focus of the statutory bar to citizen's suits is . . . whether corrective action already taken and diligently pursued by the government seeks to remedy the same violations as duplicative civilian action. . . . Duplicative enforcement actions add little or nothing to compliance actions already underway, but do divert State resources away from remedying violations in order to focus on the duplicative effort.

---

[8]     The sole exception is Citizens' Claim B which alleges that Gallatin's permit unlawfully allows the ash ponds to be sited in a "water of the United States." As discussed above, Claim B should be dismissed as an impermissible collateral attack on Gallatin's permit.

*N. & S. Rivers Watershed Ass'n, Inc. v. Town of Scituate*, 949 F.2d 552, 556 (1st Cir. 1991); *see also Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist.*, 556 F.3d 603, 610 (7th Cir. 2009) ("[T]he question is essentially asking if the state . . . achieved what it reasonably believed to be a solution to the problem."); *Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist.*, 382 F.3d 743, 760 (7th Cir. 2004) (internal quotation marks omitted) ("The focus of the diligent prosecution inquiry should be on whether the actions are calculated to eliminate the cause(s) of the violations."); *Sierra Club v. Col. Refining Co.*, 852 F. Supp. 1476, 1483-84 (D. Col. 1994) (dismissing citizens suit because the allegations and relief sought for groundwater contamination duplicated the ongoing federal and state enforcement actions and "attempt[ed] to balkanize federal and state water pollution statutes and the agencies which give them effect").

That the Citizens' suit duplicates the State's action is further demonstrated by the almost complete overlap in the factual allegations in Citizens' Complaint in Intervention filed in the State's enforcement action and Citizens' federal Complaint. The factual allegations in both complaints address the same issue—alleged seepage or leakage from the active ponds and inactive Non-Registered Site into the Cumberland River through groundwater. The State of Tennessee's enforcement action is targeted to those same facts which point to the same issue; thus, Citizens' federal action is duplicative and unnecessary.

And, of course, because Citizens are integrally involved as parties to the State's enforcement action the congressional purpose behind the Clean Water Act's public participation provisions is being fulfilled. Citizens have the ability to fully prosecute their factual allegations in that suit, and, in fact, are actively doing so. Thus, Citizens have been provided "a genuine opportunity to speak on the issue of protection of [the nation's] waters" and have been invited by the State and TVA into the State's action so that they may "insur[e] a

high level of performance by all levels of government and discharge sources." S. Rep. No. 414, 92d Cong., 1st Sess. 64 (1971), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3738.

The Clean Water Act "was not intended to enable citizens to commandeer the [state] enforcement machinery." *Dubois v. Thomas*, 820 F.2d 943, 949 (8th Cir. 1987). Dismissal of Citizens' suit under the Act's "diligent prosecution" bar is appropriate given the duplicative nature of the Citizens' federal lawsuit and the substantial role Citizens already are playing in the State of Tennessee's diligent enforcement action.

## IV.    In the Alternative, the Court Should Abstain From Adjudicating Citizens' Complaint.

For the same reasons that dismissal is proper under the Clean Water Act's "diligent prosecution" bar, abstention under the principles announced in *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976), is appropriate. In *Colorado River*, the Supreme Court recognized an exception to the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them" where a parallel federal action is filed in the wake of an already pending state action. *Id.* at 813, 817. In such cases, federal abstention is proper in the interest of "'wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'" *Id.* at 817 (quoting *Kerotest Mfg. Co v. C-O Two Fire Equipment Co.*, 342 U.S. 180, 183 (1952)).

Before it applies *Colorado River* abstention, the court must first determine that the concurrent state and federal actions are actually parallel. *Romine v. Compuserve Corp.*, 160 F.3d 337, 339 (6th Cir. 1998) (affirming district court's abstaining under the *Colorado River* doctrine from exercising its jurisdiction over class action arising out of the same securities transaction that was the subject of a parallel action in Ohio state court). Factors which are pertinent to determining whether *Colorado River* abstention is appropriate are: "(1) whether the state court

has assumed jurisdiction over any res or property; (2) whether the federal forum is less convenient to the parties; (3) avoidance of piecemeal litigation; . . . (4) the order in which jurisdiction was obtained[;] (5) whether the source of governing law is state or federal; (6) the adequacy of the state court action to protect the federal plaintiff's rights; (7) the relative progress of the state and federal proceedings; and (8) the presence or absence of concurrent jurisdiction." *Romine v. Compuserve Corp.*, 160 F.3d 337, 340-41 (6th Cir. 1998) (internal citations omitted). These factors are not a "mechanical checklist [but] require 'a careful balancing of the important factors as they apply in a given case' depending on the facts at hand." *Id.* (quoting *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 15-16 (1983)).

Here, six of the eight factors weigh heavily in favor of abstention, while the first factor is inapposite and the second factor is neutral. The state enforcement action began first, Citizens have been admitted as parties, TVA has filed Answers to both the State's complaint and Citizens' Complaint in Intervention, and the parties already are engaged in discovery. As described above, the two suits seek to remedy the exact same issues; thus, the danger of piecemeal litigation with its waste of judicial resources and potentially conflicting results is high. *See Romine*, 160 F.3d at 341 (concluding because both the federal and state actions depended on the resolution of the same issue—whether an IPO prospectus omitted material information so as to violate the Securities Act of 1933—the threat of piecemeal results "is . . . especially high").

The Clean Water Act is premised on a "cooperative federalism" whereby states have the primary responsibility for enforcing the Act within state borders. Here, Tennessee has been authorized by the federal government to administer and enforce the NPDES program since 1977. *See supra* n.2. Thus, not only is there concurrent jurisdiction, the federal Clean Water Act scheme makes the State's enforcement scheme *primary*. *Cf. Romine*, 160 F.3d at 342 ("The source-of-law factor thus has less significance here, especially in light of the fact that the

Securities Act of 1933 . . . provides that federal securities law actions under the 1933 Act may be brought in state courts[.]").  Finally, there can be no question that Citizens' rights can be adequately protected in the state's enforcement action—they are parties in that lawsuit and have already taken an active role by filing their own complaint and seeking extensive discovery.

Thus, in the alternative, this Court could stay proceedings in Citizens' suit by placing it on the Court's administrative docket under the principles of *Colorado River* until such time as the primary enforcer of the Act in this State—the State of Tennessee—has completed its enforcement lawsuit.  This path would fulfill the policies underlying the Act's citizen suit provision, preserve the integrity and primary of the state's enforcement mechanism, and give due regard for the superior position the State Attorney General has to "vindicate societal rights and interests" of Tennesseans.  *See Williams Pipe Line Co. v. Bayer Corp.*, 964 F. Supp. 1300, 1318 (S.D. Iowa 1997).

## CONCLUSION

For the reasons stated and upon the authorities cites, the Court should grant TVA's motion to dismiss because Citizens' complaint is barred by the diligent prosecution bar of the Clean Water Act and because it is an impermissible collateral attack on the NPDES permit issue by the Tennessee Department of Environment and Conservation.

Respectfully submitted,

s/Maria V. Gillen
Edwin W. Small, Deputy General Counsel
Maria V. Gillen, Senior Attorney
David D. Ayliffe, Senior Attorney
TVA GENERAL COUNSEL'S OFFICE
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Telephone 865.632.7741

Attorneys for Tennessee Valley Authority

31350914

**CERTIFICATE OF SERVICE**

I certify that the foregoing document was filed electronically through the Court's ECF system on the date shown in the document's ECF footer. Notice of this filing will be sent by operation of the Court's ECF system to all parties as indicated on the electronic filing receipt. Parties may access this filing through the Court's ECF system.

_s/Maria V. Gillen_____
Attorney for Tennessee Valley Authority
