# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| TENNESSEE CLEAN WATER NETWORK and TENNESSEE SCENIC RIVERS ASSOCIATION, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | NO. 3:15-cv-00424 |
| | ) | JUDGE CRENSHAW |
| TENNESSEE VALLEY AUTHORITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

The Tennessee Clean Water Network and Tennessee Scenic Rivers Association ("Plaintiffs") have filed a Complaint against the Tennessee Valley Authority ("TVA") alleging numerous violations of the Clean Water Act ("CWA") related to TVA's operation of a coal-fired power plant about five miles south of the city of Gallatin, Tennessee ("Gallatin Plant"). (Doc. No. 1.) TVA has filed a Motion to Dismiss for Failure to State a Claim (Doc. No. 12), a Motion to Dismiss Plaintiffs' Claim for Civil Penalties and Plaintiffs' Jury Demand (Doc. No. 28), a Motion for Judgment on the Pleadings as to All Plaintiffs' Claims Regarding Seeps (Doc No. 51), a Motion for Summary Judgment on Plaintiffs' Claim B (Doc. No. 57), and a Motion for Judgment on the Pleadings as to Plaintiffs' Claim E (Doc. No. 102). Plaintiffs have filed a Motion for Partial Summary Judgment. (Doc. No. 106.) TVA has also filed a Request for Judicial Notice regarding two exhibits. (Doc. No. 136.)

## I. BACKGROUND

Plaintiffs are two Tennessee conservation organizations claiming individual members who variously use, paddle, fish in, enjoy, and otherwise live, work, and recreate on the portion of the

Cumberland River in the vicinity of and downstream from the Gallatin Plant. (Doc. No. 1 at ¶¶ 22, 29, 31.) TVA is a corporate agency and instrumentality of the United States created by the Tennessee Valley Authority Act of 1933, see 16 U.S.C. § 831–831ee, that operates electricity-generating facilities including the Gallatin Plant. (Id. at ¶ 2.)

A. The Gallatin Plant & Ash Ponds

The Gallatin Plant is a four-unit, coal-fired power plant on Odom's Bend Peninsula, adjacent to the portion of the Cumberland River known as Old Hickory Lake. (Doc. No. 87 at ¶ 1.) Old Hickory Lake is a reservoir created by the construction of the Old Hickory Lock and Dam downstream from the location of the Gallatin Plant. (Doc. No. 125 at ¶¶ 2–3.) Both the Lock and Dam and the Plant were constructed during the 1950s, through cooperation between TVA and the Army Corps of Engineers. (Doc. No. 87 at ¶¶ 11–14.) The Gallatin Plant now burns approximately four million tons of coal each year, generating both wanted electricity and unwanted waste byproducts, in particular coal ash. The Plant can create as much as 235,000 tons of coal ash annually. (Doc. No. 1 at ¶ 49; Doc. No. 14 at ¶ 49.) The Plant removes its coal ash by mixing the ash with water and sluicing it to a series of unlined coal ash ponds that are separated from the Cumberland River by "earthen dikes." (Doc. No. 14 at ¶¶ 49–50.)

Until around 1970, the Plant used a series of ash ponds now known as Non-Registered Site #83-1324 ("Non-Registered Site"). Around 1970, when the Non-Registered Site reached capacity, the Plant stopped using the site for coal ash disposal, but the pond area—which, TVA admitted in its Answer, measures approximately 73 acres—still contains an unknown amount of coal ash. (Id. at ¶¶ 79–81.) In or around 1997, the Tennessee Department of Environment & Conservation ("TDEC") asked TVA to formulate a closure plan for the Non-Registered Site, which it did. As

part of the closure plan, TVA began monitoring the area's groundwater for coal ash contamination in 2000. (Id. at ¶¶ 82–83.)

TVA now sluices its ash-water mixture to a different series of ponds ("Ash Pond Complex"). (Doc. No. 125 at ¶ 35.) Plaintiffs have identified the Ash Pond Complex as consisting of five ponds: Ash Pond A; Ash Pond E; and Stilling Ponds B, C, and D. (Doc. No. 134 at SOF 36.) Coal ash waste begins its passage through the complex in either Ash Pond A or E, where some ash is allowed to settle before the water is sent to the stilling ponds. In the stilling ponds, more ash is allowed to settle, before the water is finally discharged into the Cumberland River. (Doc. No. 1 at ¶¶ 55–56; Doc. No. 14 at ¶¶ 55–56.) In its Answer, TVA admits that, while the amount of coal ash produced by the Gallatin Plant varies from year to year, it annually sluices about 230,000 tons of ash into Ash Pond A. (Doc. No. 1 at ¶ 101; Doc. No. 14 at ¶ 101.) Wastewater then passes from Ash Pond A to Stilling Pond B, from there to Stilling Pond C, and from there to Stilling Pond D. (Doc. No. 125 at ¶¶ 39–41.) Stilling Pond D discharges effluent into the Cumberland River at a site known as Outfall 001. (Doc. No. 125 at ¶ 41.) Although TVA no longer sluices ash into Ash Pond E, that pond continues to contain what Plaintiffs allege to be roughly five million cubic yards of coal ash. (Doc. No. 1 at ¶ 103; Doc. No. 14 at ¶ 103; Doc. No. 125 at ¶ 38.) Wastewater passes from Ash Pond E to Stilling Pond C, and from there to Stilling Pond D, where it joins the water being discharged into the river at Outfall 001. (Doc. No. 125 at ¶¶ 39–41).

Somewhat complicating matters, Plaintiffs dispute that the Ash Pond Complex is merely a manmade wastewater treatment system that discharges into the Cumberland River. Rather, citing United States Geological Survey maps that pre-date the creation of the Ash Pond Complex, Plaintiffs allege that a portion of the area on which the ponds were built had been covered by a

stream known as "Sinking Creek" that connected to the river. (Doc. No. 1 at ¶ 107.) Sinking Creek, Plaintiffs argue, was and continues to be a water of the United States.[1] Under such a reading, at least portions of the Ash Pond Complex, in particular Ash Ponds A and E, would themselves be waters of the United States, because they are inseparable from Sinking Creek itself. (Id. at 164–166.)

B. The Gallatin Plant's NPDES Permit

The CWA "anticipates a partnership between the States and the Federal Government, animated by a shared objective: 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'" Arkansas v. Oklahoma, 503 U.S. 91, 101 (1992) (quoting 33 U.S.C. § 1251(a)). The bedrock of the CWA is "a default regime of strict liability," whereby the discharge of any covered pollutant into the Nation's waters amounts to a violation of the statute unless subject to a specific exception. Sierra Club v. ICG Hazard, LLC, 781 F.3d 281, 284 (6th Cir. 2015) (quoting Piney Run Preservation Ass'n v. Cty. Comm'rs of Carroll Cty., 268 F.3d 255, 268–69 (4th Cir. 2001)). The chief means for qualifying for an exception to the CWA's strict liability regime is compliance with a permit issued under the National Pollutant Discharge Elimination System ("NPDES"). Id. "Generally speaking, the NPDES requires dischargers to obtain permits that place limits on the type and quantity of pollutants that can be released into the Nation's waters." S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians, 541 U.S. 95, 102 (2004). Discharge of pollutants into the waters of the United States without an NPDES permit, or

---

[1] Congress has defined the jurisdiction of the CWA as reaching all "waters of the United States, including the territorial seas." 33 U.S.C.A. § 1362. Federal rules have defined "waters of the United States" to "encompass not only traditional navigable waters of the kind susceptible to use in interstate commerce, but also tributaries of traditional navigable waters and wetlands adjacent to covered waters." United States v. Cundiff, 555 F.3d 200, 206 (6th Cir. 2009)

4

in violation of the terms of an NPDES permit, is typically a violation of the CWA. 33 U.S.C. §§ 1311(a), 1342(a), 1365(f)(6).

"The Environmental Protection Agency (["EPA"]) initially administers the NPDES permitting system for each State, but a State may apply for a transfer of permitting authority to state officials." Nat'l Ass'n of Home Builders v. Defs. of Wildlife, 551 U.S. 644, 650 (2007) (citing 33 U.S.C. §§ 1251(b), 1342). In December of 1977, the EPA authorized the State of Tennessee to issue some types of NPDES permits, which the State grants and enforces through TDEC. See 56 Fed. Reg. 21, 376 (1991). In 1986, the EPA expanded that authorization to include the authority to issue and oversee permits for federal facilities such as the Gallatin Plant. 51 Fed. Reg. 32, 834 (1986). The parties agree that the discharge of pollutants from the Gallatin Plant to the Cumberland River is authorized and governed by TDEC-issued NPDES Permit No. TN0005428 ("NPDES Permit"), which TDEC most recently reissued in 2012. (Doc. No. 1 at ¶ 5; Doc. No. 1-2; Doc. No. 15 at ¶ 5.) Plaintiffs allege that the NPDES Permit authorizes the discharge of wastewater pollutants from the ash ponds only through a single point source: Outfall 001. A discharge to the waters of the United States through any other point source, they argue, would be a violation of the CWA. (Doc. No. 1 at ¶¶ 46, 57.)

## C. Alleged Unauthorized Discharges

The Gallatin Plant is located in an area with what is known as "karst" topography. Karst topography is "formed over limestone or dolomite, and characterized by sinkholes, caves, and underground drainage." (Doc. No. 1 at ¶ 68; Doc. No. 14 at ¶ 68.) Plaintiffs allege that TVA has long known that the ash ponds' construction and the area's topography would be expected to, and in fact have, resulted in contamination of the Cumberland River both through direct leaks from the ponds to the river as well as through leaks into groundwater that is hydrologically connected to the

river.  (Doc. No. 1 at ¶¶ 60–65.)  In 1977, for example, TVA prepared a report titled "Magnitude of Ash Disposal Pond Leakage Problem: Gallatin Steam Plant," that Plaintiffs contend identified sinkhole-related leakages so great that the leakage rate was equal to the rate of the inflow of wastewater itself.  (Id. at ¶¶ 69–72.)  Plaintiffs allege that sinkholes caused illegal discharges in at least 2005 and 2010 as well.  (Id. at ¶ 73.)

According to Plaintiffs, TVA's monitoring wells have shown that groundwater in and around the Ash Pond Complex is contaminated by pollutants including aluminum, cobalt, manganese, and sulfate, in concentrations above relevant state and federal standards.  (Id. at ¶ 116.)  In addition to the groundwater contamination, Plaintiffs contend that TVA has identified and actively monitored numerous "seeps" through which wastewater passed directly from the ponds into the Cumberland River.  (Id. at ¶ 117.)  "Seep," as Plaintiff uses the term, refers to "slow pore-space seepage of contaminants," as opposed to "conduit flow through fissures and sinkholes that provides rapid connectivity with little to no pollutant attenuation." [2]  (Doc. No. 1 at ¶ 152.)  Plaintiffs claim to have documented four additional seeps that TVA had not previously identified, which Plaintiffs have dubbed Seeps A, B, C, and D.  (Id. at ¶ 118.)  Plaintiffs' allegations tie the seeps directly to TVA's failure to adequately inspect, monitor, and maintain the ponds, and suggest that seeps represent not only unlawful discharges of pollutants but also potential signs that the structural integrity of the ponds might become compromised.  (Id. at ¶ 119–24.)

---

[2]  TVA has similarly defined "seeps" as follows: "leachate from landfills or surface impoundments containing combustion residuals" and "composed of liquid . . . that has *percolated* through waste or other materials emplaced in a landfill, or that passes through the surface impoundment's containment structure (e.g., bottom, dikes, berms)." (Doc. No. 52 at 2 n.1 (quoting 42 C.F.R. § 423.11(r) (emphasis added)).)  For the purposes of evaluating the pleadings, what is important is that "seeps" is not a catchall term encompassing all leaks, and the Complaint alleges both seeps and leaks that could not be characterized merely as seeps.

6

The alleged contamination that Plaintiffs have identified is not limited to the still active Ash Pond Complex. Plaintiffs allege that, by at least 2002, TVA's groundwater monitoring around the no longer active Non-Registered Site revealed beryllium, cadmium, and cobalt in excess of the EPA's maximum contaminant levels ("MCLs") for groundwater protection, and that a 2012 TVA study found that groundwater discharging into the Cumberland River from beneath the Non-Registered Site contained beryllium, cadmium, nickel, and zinc at levels that may pose a risk to aquatic life. (Id. at ¶¶ 84, 90.) Plaintiffs further claim that independent testing at locations on the Cumberland River shore adjacent to the Non-Registered Site in February of 2015 found levels of arsenic, copper, nickel, and zinc in excess of EPA Region 4 (Southeast) screening values. (Id. at ¶ 93.) The Non-Registered Site's alleged discharges into the groundwater render it, in Plaintiffs' words, "essentially a closed, but leaking[,] wastewater facility." (Id. at ¶ 95.)

D. Plaintiffs' Notice to Regulators

"Although the primary responsibility for enforcement [of the CWA] rests with the state and federal governments, private citizens provide a second level of enforcement and can serve as a check to ensure the state and federal governments are diligent in prosecuting Clean Water Act violations." Sierra Club v. Hamilton Cty. Bd. Of Cty. Comm'rs, 504 F.3d 634, 637 (6th Cir. 2007). In furtherance of that role, a citizen may file a suit to enforce the CWA against an alleged polluter if certain procedural requirements are met. 33 U.S.C. § 1365. Before filing suit alleging a CWA violation, the citizen must provide sixty days' notice to the alleged violator, the EPA, and the State in which the alleged violation occurred. 33 U.S.C. § 1365(b)(1)(A). "The 60-day notice provides federal and state governments with the time to initiate their own enforcement actions." Hamilton Cty. Bd. Of Cty. Comm'rs, 504 F.3d at 637. If the United States or relevant state government does commence proceedings, the proposed citizen suit may be blocked by what is known as the

7

"diligent prosecution" bar of 33 U.S.C. § 1365(b)(1)(B). The diligent prosecution bar provides that a citizen may not file suit to enforce a standard, order, or limitation that is already subject to an enforcement action that is being diligently prosecuted, in court, by the EPA or a state. 33 U.S.C. § 1365(b)(1)(B). If the government-initiated suit is in federal court, however, the citizen may still participate by intervening as a matter of right. Id. Whether intervention is possible in a state court action will, of course, depend on state procedural law.

On November 10, 2014, counsel for Plaintiffs sent a Notice of Violation letter to TVA, TDEC, and the EPA. (Doc. No. 1-3.) The letter informed the recipients that the Plaintiffs had "identified serious and ongoing unpermitted violations of the CWA at the Gallatin Plant," and that the Plaintiffs intended to sue TVA if it did not bindingly agree to appropriate remedial steps within sixty days of its receipt of the letter. (Id. at 2.) The letter alleged that both the Ash Pond Complex and Non-Registered Site had resulted in leakage of wastewater and pollutants into the surrounding groundwater and the Cumberland River through a number of leaks in the ponds, including ten TVA-identified seeps. (Id. at 6.) Plaintiffs cited both independent testing and TVA's own testing showing that groundwater in the area contained a number of pollutants in amounts exceeding relevant EPA limits. (Id. at 7–16.)

E. State Enforcement Action

On January 7, 2015, the State of Tennessee filed an original enforcement action against TVA in Davidson County Chancery Court under the Tennessee Solid Waste Disposal Act ("SWDA"), Tenn. Code Ann. §§ 68-211-101 to -124, the Tennessee Water Quality Control Act of 1977 ("TWQCA"), Tenn. Code Ann. §§ 69-3-101 to -137, and regulations promulgated thereunder ("State Enforcement Action"). (Doc. No. 13-5.) The complaint in the State Enforcement Action expressly identifies itself as having been filed "in response to" the Plaintiffs' notice letter. (Id. at

8

2.)  The State's complaint alleges that TVA's groundwater monitoring around the Non-Registered Site suggest that "solid waste has been repeatedly discharged from the [Non-Registered Site] into the groundwater in and around" the Gallatin Plant, giving rise to causes of action under both the SWDA and TWQCA.  (Id. at ¶¶ 40, 43, 48.)  With regard to the Ash Pond Complex, the complaint claims that ten seeps identified by the TVA "each constitut[es] a potential unpermitted discharge from the impoundment ponds," in violation of Parts II.A.4.a and II.C.1 of its NPDES permit and the TWQCA.  (Id. at ¶¶ 37, 51–53.)  The Plaintiffs filed a Motion to Intervene in the State Enforcement Action on February 5, 2015, and the State of Tennessee and TVA stipulated to their intervention pursuant to Tenn. R. Civ. P. 24.01(3).  (Doc No. 42-2 at ¶ 10.)

On January 21, 2016, the Davidson County Chancery Court entered an Agreed Temporary Injunction between the State of Tennessee and TVA, requiring TVA to "develop an Environmental Investigation Plan (EIP) for the [Gallatin Plant] and submit it to TDEC within 60 days of the entry of this Order."  (Doc. No. 42-2 at 4.)  TVA was directed to include in the EIP "a schedule of the work to be performed to fully characterize the hydrology and geology of the [Gallatin Plant] and identify the extent of soil, surface water, and groundwater contamination by CCR [Coal Combustion Residual] material."  (Id. at 4.)  The court also wrote that "[i]n signing this Agreed Temporary Injunction, the Court does not intend for this agreed order to have an effect on the progression of the pending federal lawsuit" in this Court.  (Id. at 7.)  Shortly after entering the Agreed Temporary Injunction, the court also directed the parties to provide periodic status updates every seventy-five days.  (Doc. No. 77-1 at 2.)  The status reports in that matter show that TVA circulated its first proposed EIP in March of 2016, and the parties, including Plaintiffs in their capacity as plaintiff-intervenors, have been meeting and communicating in efforts to agree upon an appropriate EIP.  (Doc. No. 77-2; Doc No. 109-2.)

F. Federal Complaint

Plaintiffs filed their Complaint in this case on April 14, 2015. (Doc. No. 1.) In the Complaint, Plaintiffs allege that the State Enforcement Action omitted a number of alleged CWA violations covered by their 60-day notice letter:

> The State Complaint did not include multiple ongoing violations of the Clean Water Act, including: (1) multiple permit violations alleged by the Conservation Groups in the 60-day notice; (2) that TVA is unlawfully discharging pollutants into the surface water of the Cumberland River, as opposed to the groundwater beneath the Gallatin Plant coal ash facility only; and (3) that TVA unlawfully discharged, and continues to unlawfully discharge, coal ash into Sinking Creek, a water of the United States.

(Doc. No. 1 at ¶ 20.) TVA has conceded that the third of these allegations—that TVA unlawfully discharged pollutants into Sinking Creek—was not covered by its State complaint, but disputes the contention that it failed to include any other relevant allegations. (Doc. No. 14 at ¶ 20.)

The federal Complaint pleads five claims, the last of which consists of five separate sub-claims. Claim A asserts that TVA unlawfully discharged pollutants into the waters of the United States through hydrologically connected groundwater discharges. (Doc. No. 1 at ¶¶ 151–161.) Claim B is premised on Plaintiffs' contention that TVA improperly used Sinking Creek, a water of the United States, as a wastewater treatment facility. (Id. at ¶¶ 162–171.) Claim C alleges CWA violations based on "contamination of the Cumberland River from the [Non-Registered Site]." (Id. at ¶ 173.) Claim D similarly alleges violations based on "contamination of the Cumberland River from the Ash Pond Complex." (Id. at ¶ 178.) Finally, Claims E.a through E.e are based on violations of various provisions of the NPDES permit: Claim E.a is premised on subsection I.A.b; Claim E.b is premised on subsection I.A.c; Claim E.c is premised on subsection II.A.4.a; Claim E.d is premised on subsection II.C.2; and Claim E.e is premised on subsection II.C.3. (Id. at ¶¶ 181–208.)

10

The parties have continued to litigate this case and the State Enforcement Action, and have filed the various aforementioned motions in this Court. The Court will deal with the motions, as necessary, in turn.

## II. MOTIONS TO DISMISS & FOR JUDGMENT ON THE PLEADINGS

TVA has filed four different motions raising various arguments that all or part of the Plaintiffs' claims should be dismissed pursuant to Rule 12(b)(6) or 12(c) of the Federal Rules of Civil Procedure. (Doc. No. 12; Doc No. 28; Doc. No. 51; Doc. No. 102.) Because the arguments of these motions frequently overlap, the Court will consider them together.

A. Standard of Review

For purposes of a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), the Court must take all the factual allegations in the complaint as true. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. Id. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Id. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. Id. at 679. A legal conclusion couched as a factual allegation need not be accepted as true on a motion to dismiss, nor are recitations of the elements of a cause of action sufficient. Fritz v. Charter Twp. Of Comstock, 592 F.3d 718, 722 (6th Cir. 2010). "A court that is ruling on a Rule 12(b)(6) motion may consider materials in addition to the complaint if such materials are public records or are otherwise appropriate for the taking of judicial notice." New England Health Care

11

Emps. Pension Fund v. Ernst & Young, LLP, 336 F.3d 495, 501 (6th Cir. 2003) (citing Jackson v. City of Columbus, 194 F.3d 737, 745 (6th Cir. 1999)).

"The standard of review for entry of judgment on the pleadings under Rule 12(c) is indistinguishable from the standard of review for dismissals based on failure to state a claim under Rule 12(b)(6)." Jackson v. Heh, 215 F.3d 1326 (table), 2000 WL 761807, at *3 (6th Cir. June 2, 2000). Whether a motion proceeds under Rule 12(c) or 12(b)(6) is merely a function of its timing relative to the defendant's filing of its answer. See Satkowiak v. Bay Cty. Sheriff's Dep't, 47 F. App'x 376, 377 n.1 (6th Cir. 2002).

## B. Diligent Prosecution Bar

TVA first asks the Court to dismiss this action altogether under the CWA's diligent prosecution bar. (Doc. No. 12.) Any citizen with constitutional standing to do so may file an action "against any person . . . who is alleged to be in violation of . . . an effluent standard or limitation" of the CWA. 33 U.S.C. § 1365(a)(1). Under the diligent prosecution bar, however, a citizen cannot file an enforcement suit "if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order" on which the violation is premised. 33 U.S.C. § 1365(b)(1)(B). TVA argues that the Court must dismiss the federal Complaint because the State Enforcement Action represents the State of Tennessee's diligent enforcement of the same standard or limitation as that on which Plaintiffs rely. Plaintiffs argue that the diligent prosecution bar does not apply to this case because: (1) Tennessee's statutes are not comparable to the CWA; (2) Plaintiffs' claims are tailored to target alleged violations that were omitted from the State Enforcement Action; (3) the State's actions do not amount to diligent prosecution; and (4) the Tennessee statutory regime itself permits parallel prosecution.

12

<u>1. Comparability</u>

Plaintiffs argue first that the diligent prosecution bar does not apply in this case because the TWQCA is insufficiently comparable to the relevant provisions of the CWA. In so arguing, Plaintiffs rely in significant part on the Sixth Circuit's *en banc* opinion in <u>Jones v. City of Lakeland, Tennessee</u>, 224 F.3d 518, 521 (6th Cir. 2000). In <u>Jones</u>, riparian landowners sued the City of Lakeland alleging violations of its NPDES permit, and the city argued that the action was barred because the matter was already the subject of an administrative proceeding under the TWQCA. The court concluded that the diligent prosecution bar of 33 U.S.C. § 1365(b)(1)(B) did not apply because the state proceeding was administrative only and no lawsuit had been filed. <u>Id.</u> at 522. The court instead considered whether the case was foreclosed by the similar bar—specific only to situations where the pending action is one for administrative penalties—to be found in 33 U.S.C. § 1319(g)(6)(A). That provision provides that "any violation . . . with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection . . . shall not be the subject of a civil penalty action under . . . section 1365 of this title."[3] The *en banc* court concluded that the bar did not apply because the TWQCA's administrative enforcement scheme did not afford sufficient opportunities for citizen participation and therefore was not comparable to the CWA. <u>Id.</u> at 524–25.

As TVA correctly points out, however, 33 U.S.C. § 1365(b)(1)(B), unlike 33 U.S.C. § 1319(g)(6)(A), does not include any language requiring that the relevant state law be "comparable" to the CWA. <u>Jones</u> is clear that the two bars, though similar, are separate limitations with boundaries that will not necessarily be identical. Moreover, 33 U.S.C. § 1365(b)(1)(B) appears to

---

[3] TVA has conceded the inapplicability of the 33 U.S.C. § 1319(g)(6)(A) bar to this case. (Doc. No. 24 at 4.)

expressly acknowledge that citizens may not be able to intervene as a matter of right in a state suit, providing that "in any such action in a court of the United States any citizen may intervene as a matter of right." (Emphasis added.) Congress could have limited 33 U.S.C. § 1365(b)(1)(B) to cases where enforcement was taking place in a federal court, or to cases where the citizen was permitted to intervene, but it did not. In any event, the Complaint concedes that "[i]t is the state's policy under these circumstances to allow citizen groups . . . to intervene by stipulation in the state court enforcement action." (Doc. No. 1 at ¶ 19.) The TWQCA's imperfect comparability to the CWA therefore does not prevent the application of the diligent prosecution bar here.[4] What is determinative is the degree to which both actions are premised on the violation of the same standard or limitation, namely the NPDES Permit.

### 2. Scope of Allegations

Plaintiffs next argue that their Complaint should not be dismissed because it targets different violations than the State Enforcement Action. "[A] diligent prosecution bar only applies to those issues sought to be addressed in a citizen action that overlap with those issues sought to be addressed by the government's suit." United States v. Bd. of Cty. Comm'rs of Hamilton Cty., Ohio, No. 1:02 CV 00107, 2005 WL 2033708, at *11 (S.D. Ohio Aug. 23, 2005) (citing Frilling v. Vill. of Anna, 924 F. Supp. 821, 836 (S.D. Ohio 1996)). Without such a limitation, the diligent prosecution bar would mean that a government enforcement action premised on even a single violation would prevent citizen suits for all, even wholly unrelated, violations. Plaintiffs contend

---

[4] That is not to say, however, that differences between a state statutory cause of action and the CWA will always be immaterial to the question of whether 33 U.S.C. § 1365(b)(1)(B) should apply. The Court's opinion in this matter does not foreclose the possibility that, in some cases, the procedural inadequacies of a state statute will be so great that they are incompatible with the very concept of diligent prosecution. Here, however, particularly in light of the State's policy of allowing citizen groups to intervene, that does not appear to be the case.

that they carefully drafted their Complaint in this action not to overlap with the State's. TVA argues, in response, that the appropriate test for determining overlap between this case and the State Enforcement Action is not whether a technical distinction can be drawn between the pleadings, but whether they seek to abate and remediate the same issues. See, e.g., Karr v. Hefner, 475 F.3d 1192, 1199 (10th Cir. 2007) (applying diligent prosecution bar despite consent decree's omission of several specific violations alleged by citizen because the consent decree had "as its underlying purpose the resolution of all claims").

Plaintiffs have identified five sets of allegations raised by their Complaint that are, they contend, omitted from the State Enforcement Action. The first four cite specific types of unlawful discharge of pollutants:

> (1) unauthorized discharges through hydrologic flow into waters of the United States ([Doc. No. 1] at ¶¶ 151–161); (2) improper use of Sinking Creek, a water of the United States, as a wastewater treatment facility (id. at ¶¶ 162–171); (3) unlawful contamination of the groundwater and Cumberland River from the Abandoned Ash pond (id. at ¶¶ 172–175) ("Because the State complaint does not include claims for contamination of the Cumberland River from the Abandoned Ash Pond [rather than just the groundwater], the Conservation Groups are enforcing these violations of the Clean Water Act in this Complaint"); [and] (4) unlawful contamination of the groundwater and Cumberland River from the Ash Pond Complex (id. at ¶¶ 176–180) ("Because the State Complaint does not include claims for contamination of the Cumberland River from the Ash Pond Complex, the Conservation Groups are enforcing these violations of the Clean Water Act in this Complaint") . . . .

(Doc. No. 19 at 10–11.) Finally, Plaintiffs point out that their Complaint alleges violations based on a number of provisions of the NPDES Permit that the State did not cite in its own complaint. (Id. at 11.)

Plaintiffs are correct that its Sinking Creek allegations are nowhere to be found in the State Enforcement Action. Similarly, a review of the State's complaint confirms that, with regard to the Non-Registered Site, the State Enforcement Action is targeted at groundwater contamination, not

15

contamination of the Cumberland River through either seeps or any other leaks or hydrologic connections. (See Doc. No. 13-5 at ¶¶ 20–21.) The Court therefore agrees that discharges from the Non-Registered Site to the Cumberland, either directly or otherwise, represent a discrete set of allegations raised by Plaintiffs in this Court that are not barred by the pendency of the State Enforcement Action.

With regard to the Ash Pond Complex, however, the State's complaint can plausibly be read to refer to both groundwater and surface water contamination. Specifically, the State's complaint pleads violations of the TWQCA arising out of "[a]reas in the dikes where impounded wastewater may [sic] or is escaping from the Ash Pond Complex[,] generally referred to as seeps," without limiting its allegations to groundwater only. (Id. at ¶¶ 35–37, 51.) Nothing in the State's complaint suggests that its claims related to seeps do not contemplate discharges into the Cumberland River as well as the groundwater. Accordingly, the Court agrees with TVA that this action overlaps, at least in part, with the State Enforcement Action with regard to both ground and surface water contamination from the Ash Pond Complex.

The Court agrees with Plaintiffs, however, that their decision to craft their federal Complaint to reach all hydrologic connections, not merely seeps, results in their having pled farther-reaching allegations than the State raised in the Chancery Court. At least as it pertains to the Ash Pond Complex, the State's complaint appears to limit itself to leaks that can be characterized as seeps. Plaintiffs' federal Complaint, in contrast, contemplates both leaks that are purely seeps and leaks based entirely or in part on faster-moving conduit flows, such as through sinkholes and fissures. (Compare Doc. No. 1 at ¶ 152 with Doc. No. 13-5 at ¶¶ 35–37, 51.) The Court therefore concludes that Plaintiffs' allegations that involve forms of wastewater flow other than seeps alone do not overlap with the State Enforcement Action.

16

As for the permit violations, the State's complaint expressly alleges violations of Parts II.A.4.a and II.C.1, but also makes broader reference to "unpermitted discharges," a phrase that, albeit not grounded in a specific citation to NPDES subsections, can be fairly read to encompass the terms of the permit as a whole. (Doc. No. 13-5 at ¶¶ 51–53.) The appropriate test for determining which permit-based claims overlap with the State Enforcement Action therefore is not to mechanically check off which provisions the State has cited, but to look to the substance of the underlying allegations. With regard to alleged unauthorized discharges, it is the view of the Court that the distinctions raised in the preceding paragraphs adequately cover where the respective complaints do and do not overlap.

While the State's complaint was in some ways crafted narrowly, the Complaint in this action was crafted broadly, with references to many alleged violations that plainly overlap with the State Enforcement Action. Plaintiffs, however, have fairly pled some allegations that do not overlap: unlawful use of Sinking Creek as a wastewater treatment facility; unauthorized discharge to the Cumberland River from the Non-Registered Site; and discharge to the Cumberland River from the Ash Pond Complex through hydrologic connections that cannot be characterized solely and exclusively as seeps alone. These conceptually distinct allegations are, contrary to TVA's argument, simply not the "same issues" being pursued by the State (Doc. No. 24 at 5). TVA's conclusory assertion that the State Enforcement Action will remediate issues that are not named in the State's complaint is insufficient to deprive this Court of its jurisdiction to consider those allegations.

### 3. Lack of Diligent Prosecution

Plaintiffs argue that none of their claims should be dismissed under the diligent prosecution bar, because that State's prosecution has not been diligent. The standard for determining whether an action is being diligently prosecuted, however, has been described as "quite deferential," requiring a plaintiff to "meet a high standard to demonstrate that [the government] has failed to prosecute a violation diligently." Karr, 475 F.3d at 1198. "[A] CWA enforcement action will be considered diligent where it is capable of requiring compliance with the Act and is in good faith calculated to do so." The Piney Run Pres. Ass'n v. The Cty. Comm'rs Of Carroll Cty., Md., 523 F.3d 453, 460 (4th Cir. 2008) (citation omitted). "Section 1365(b)(1)(B) does not require government prosecution to be far-reaching or zealous. It requires only diligence. Nor must an agency's prosecutorial strategy coincide with that of the citizen-plaintiff." Karr, 475 F.3d at 1197.

Plaintiffs' argument that the State Enforcement Action is not being prosecuted diligently consists in large part of Plaintiffs protesting the pace and aggressiveness of the State's litigation efforts. Plaintiffs take particular issue with three features of the State Enforcement Action: first, that TDEC Commissioner Robert Martineau allegedly publicly acknowledged that TVA would "rather be dealing with [TDEC] than a federal judge" (Doc. No. 1-6 at 3); second, that the State did not act diligently to advance the litigation in the months immediately following the filing of its complaint (Doc. No. 19 at 12); and third, that the agreed injunctive order currently in place in the State Enforcement Action does not itself require TVA to come into compliance with the CWA (Doc. No. 111 at 2).

On close examination, however, nothing Plaintiffs have identified rises to the level of showing bad faith or suggesting that the State Enforcement Action is incapable of bringing about compliance with the underlying standards. Insofar as Martineau's statement to the press would be appropriate for the Court's consideration, it is clear from the context of the statement that

Martineau was (1) merely attempting to restate something that a TVA representative had allegedly said and (2) the issue was posed to Martineau by a reporter in reference to TVA's alleged lesser exposure to penalties in a state, rather than federal, action. (Doc. No. 1-6 at 3) Even if TVA *would* prefer to be in State court, and even if the State is aware of that preference, that alone would not amount to a showing of bad faith. As to the delay early in the State Enforcement Action litigation, the experience of the Court is that comparable delays are not so unusual to give rise to an inference of a lack of diligence. Finally, it is unsurprising that the agreed injunctive order in the State Enforcement Action does not itself require compliance, because it does not purport to be a final resolution of the State's allegations. Rather, it appears to be an ordinary intermediate mechanism for managing the flow of the case and the underlying fact finding. (Doc. No. 42-2 at 3–4.) Entering such an order is in no way incompatible with—and may, in some instances, be evidence of— diligent prosecution. Although this Court agrees with Plaintiffs that their federal Complaint includes some allegations that the State is not prosecuting at all, there is no basis for concluding that, for the claims the State is prosecuting, it is not prosecuting them diligently.

### 4. State Law

Plaintiffs finally argue that the diligent prosecution bar should not apply, because the TWQCA itself includes language to the effect that the Act is not intended to estop efforts by any party, such as Plaintiffs, to abate pollution. See Tenn. Code Ann. § 69-3-118(b). Plaintiffs' argument misunderstands the relationship between the TWQCA and the CWA. The diligent prosecution bar is a limitation imposed by federal law and enjoying the authority granted it under the Supremacy Clause, U.S. Const. art. VI, cl. 2. The TWQCA can no more render the diligent prosecution bar inapplicable than the State of Tennessee can repeal the CWA altogether.

### 5. Application of the Bar

19

At the time Plaintiffs filed their Complaint, the Gallatin Plant was already the subject of a pending enforcement action brought by the State, and, because that State-initiated action has been litigated in apparent good faith and diligence, Plaintiff's claims must be dismissed insofar as they overlap with the allegations at issue in the State's complaint. Some of Plaintiffs' allegations, however, are not barred because, at the time this case was brought, they were not at issue in the State matter. The Court is well aware that the non-overlapping allegations are still closely connected, and that the crisscrossing tracks of the cases will undoubtedly give rise to complications and redundancies. The alternative, though, is to treat the State's decision to proceed narrowly as an absolute bar on citizen enforcement against violations that the State complaint does not even consider. Such a holding would run counter to the well-recognized role of citizen suits in supplementing government authority under the CWA. Accordingly, the Court will grant TVA's Motion (Doc. No. 12) only in part and will dismiss the Plaintiffs' Claims A, C, D, and E under the diligent prosecution bar only insofar as they pertain to violations other than the following: unlawful discharge of pollutants into Sinking Creek; unlawful discharge of pollutants into the Cumberland River from the Non-Registered Site; and unlawful discharge of pollutants from the Ash Pond Complex through hydrologic flows that cannot be characterized as consisting of seeps alone. Any claim premised on one of those three classes of allegation— whether based on statute, rule or permit—survives the diligent prosecution bar.

C. Abstention

In its motion seeking dismissal under the diligent prosecution bar (Doc. No. 12), TVA suggests that, if the Court does not dismiss this matter outright, it should abstain from proceeding

under Colorado River Water Conservation District v. United States, 424 U.S. 800 (1976). Pursuant to the Supreme Court's holding in Colorado River, "a federal court may, in certain limited circumstances, decline to adjudicate a claim that is already the subject of a pending state-court case." RSM Richter, Inc. v. Behr Am., Inc., 729 F.3d 553, 556 (6th Cir. 2013). A court called upon to consider Colorado River abstention must engage in a two-step process: first, the Court must determine if the State and federal proceedings are "actually parallel" to one another; and then, only if the threshold requirement of parallelism is met, the Court will engage in a multi-factor balancing analysis to decide whether to abstain. Romine v. Compuserve Corp., 160 F.3d 337, 339–41 (6th Cir. 1998). Underlying this analysis is the fundamental principle that "federal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress." Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716 (1996) (citing Colorado River, 424 U.S. at 821). Accordingly, "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule." Colorado River, 424 U.S. at 813. Because abstention is an "extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it," the Court will only abstain in cases presenting "the clearest of justifications" for doing so. Rouse v. DaimlerChrysler Corp., 300 F.3d 711, 715 (6th Cir. 2002).

In light of the high standard required to justify abstention, the Court concludes that Plaintiffs' case, as it exists after the application of the diligent prosecution bar, is not sufficiently parallel to justify this Court's inaction under Colorado River. "For the cases to be considered parallel, 'substantially the same parties must be contemporaneously litigating substantially the same issues,' and 'the critical question is whether there is a substantial likelihood that the state litigation will dispose of *all* claims presented in the federal case.'" Summit Contracting Grp., Inc. v. Ashland Heights, LP, No. 3:16-CV-17, 2016 WL 2607056, at *3 (M.D. Tenn. May 6, 2016)

(quoting Capitol Wholesale Fence Co. v. Lumber One Wood Preserving, LLC, No. 3:13-cv-00521, 2014 WL 7336236, at *3 (M.D. Tenn. Dec. 22, 2014) (emphasis added)). TVA has not demonstrated that the State Enforcement Action is substantially likely to dispose of claims arising out of discharges from the Non-Registered Site into the Cumberland River, discharges into Sinking Creek, or discharges from the Ash Pond Complex through leaks that are not seeps. Accordingly, the Court will not abstain in this matter, for the same reasons it did not dismiss the Complaint in full under the diligent prosecution bar.

D. Claims for Penalties

TVA next asks the Court to dismiss Plaintiff's claims for civil penalties because TVA is an agency of the United States entitled to immunity from penalties under United States Department of Energy v. Ohio, 503 U.S. 607, 611 (1992) ("DOE v. Ohio"). (Doc. No. 28.) Plaintiffs argue that TVA is not entitled to sovereign immunity because it is a corporate instrumentality rather than a federal agency, and that, in the alternative, its immunity has been unequivocally waived.

As it concerns the government of the United States, "[s]overeign immunity is the familiar principle that the government cannot be sued except by the consent of Congress." United States v. Droganes, 728 F.3d 580, 589 (6th Cir. 2013) (citing United States v. Testan, 424 U.S. 392, 399 (1976); United States v. Michel, 282 U.S. 656, 659 (1931)). Sovereign immunity extends not only to the United States acting under its own name, but also its agencies. Parrett v. Se. Boll Weevil Eradication Found., Inc., 155 F. App'x 188, 191 (6th Cir. 2005) (citing FDIC v. Meyer, 510 U.S. 471, 475 (1994); United States v. Lee, 106 U.S. 196, 205 (1882)). A waiver of sovereign immunity "must be express, clear and unequivocal." Reed v. Reno, 146 F.3d 392, 398 (6th Cir. 1998) (citing Coleman v. Espy, 986 F.2d 1184, 1189 (8th Cir. 1993)). "Further, the language of any

waiver of sovereign immunity is strictly construed in favor of the United States." Id. (citing Markey v. United States, 27 Fed. Cl. 615, 622 (Fed. Cl.1993)).

In DOE v. Ohio, the Supreme Court held that the terms of the CWA itself do not waive "the National Government's sovereign immunity from liability for civil fines imposed by a State for past violations" of the Act. 503 U.S. at 611. In that case, the State of Ohio had sued the United States Department of Energy ("DOE") alleging that the DOE had violated state and federal antipollution laws including the CWA. The DOE did not dispute that it was obligated to comply with the CWA, or that it was potentially subject to injunctive relief or coercive fines—that is to say, fines intended to induce compliance—under the statute. It argued only that, as a federal defendant, it could not be assessed fines based purely on past violations. Id. at 613–14. The Court agreed, concluding that the CWA's provisions involving federal government entities did not amount to an unequivocal waiver of liability for non-coercive penalties. Id. at 627, 629. At least one Circuit has applied the reasoning of DOE v. Ohio to conclude that punitive fines may not be assessed against TVA. Sierra Club v. TVA, 430 F.3d 1337, 1357 (11th Cir. 2005).

The law of the Sixth Circuit is that "TVA, as an agency of the United States, enjoys sovereign immunity unless Congress specifically waives it." Diversified Energy, Inc. v. TVA, 339 F.3d 437, 444 (6th Cir. 2003). "Congress, however, has waived the sovereign immunity of certain federal entities from the times of their inception by including in the enabling legislation provisions that they may sue and be sued." Loeffler v. Frank, 486 U.S. 549, 554 (1988). TVA is one such entity: pursuant to 16 U.S.C. § 831c(b), TVA "[m]ay sue and be sued in its corporate name." "Courts have read this 'sue or be sued' clause as making the TVA liable to suit in tort, subject to certain exceptions." United States v. Smith, 499 U.S. 160, 168–69 (1991). Unlike more specific waivers of sovereign immunity, a broad waiver pursuant to a sue-and-be-sued clause "should be

23

liberally construed." Loeffler, 486 U.S. at 554 (quoting FHA v. Burr, 309 U.S. 242, 245 (1940)).

Accordingly, the Supreme Court has held that federal "sue-and-be-sued" entities should generally

be held to have a capacity for "liability [that] is the same as that of any other business." Franchise

Tax Bd. of Cal. v. U.S. Postal Serv., 467 U.S. 512, 520 (1984).

In the past, the Sixth Circuit has gone so far as to suggest that "[i]t is clear" under TVA's

sue-and-be-sued clause that "the TVA enjoys *no* sovereign immunity." Queen v. TVA, 689 F.2d

80, 85 (6th Cir. 1982) (emphasis added). In intervening years, though, the Supreme Court has

reemphasized the high bar to be applied to claims that a government has waived its sovereign

immunity,[5] and the Sixth Circuit has more recently taken a comparatively cautious approach to

TVA's waiver. See Diversified Energy, 339 F.3d at 444 (construing TVA's sovereign immunity

in the context of express jurisdictional limitations in the Contract Disputes Act). Nevertheless,

TVA has not identified any intervening precedents to suggest that the Sixth Circuit has wholly

overruled its prior recognition that the sue-and-be-sued clause serves as a broad, general waiver of

sovereign immunity unless there is an applicable exception. See also N.C. ex rel. Cooper v. TVA,

515 F.3d 344, 348 (4th Cir. 2008) ("TVA's 'sue-and-be-sued' clause stands as a broad waiver of

sovereign immunity . . . .").

---

[5] See, e.g., United States v. Bormes, 133 S. Ct. 12, 16 (2012) ("Sovereign immunity shields the United States from suit absent a consent to be sued that is unequivocally expressed." (internal quotation marks and citations omitted)); Sossamon v. Texas, 563 U.S. 277, 287 (2011) ("[W]here a statute is susceptible of multiple plausible interpretations, including one preserving immunity, we will not consider a State to have waived its sovereign immunity."); Lane v. Peña, 518 U.S. 187, 192  (1996) ("A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text . . . ."); United States v. Nordic Vill. Inc., 503 U.S. 30, 33 (1992) ("Waivers of the Government's sovereign immunity, to be effective, must be unequivocally expressed." (internal quotation marks and citations omitted)).

Accordingly, while TVA tries repeatedly to frame the question before the Court as whether the sue-and-be-sued clause "alters" or "transforms" the waiver scheme of the CWA (Doc. No. 29 at 5–6; Doc. No 31 at 2), the appropriate inquiry is the opposite: whether the CWA in some way alters the broad, preexisting waiver to be found in the sue-and-be-sued clause. The Court concludes that it does not. In Loeffler v. Frank, the Supreme Court considered the interplay between a federal cause of action with a limited waiver of sovereign immunity and a federal entity's preexisting, broad sue-or-be-sued waiver. 486 U.S. at 565. In that case, the United States Postal Service was subject to a broad waiver of sovereign immunity under its authorizing statutes. The plaintiff, however, sued under Title VII, which had a narrower waiver of sovereign immunity, in particular with regard to the recovery of prejudgment interest. Id. at 556–59. The Court concluded that the original, broader waiver remained intact, because "neither the language of . . . Title VII nor its legislative history contains an expression that the waiver of sovereign immunity it effected was intended also to narrow the waiver of sovereign immunity of entities subject to sue-and-be-sued clauses." Id. at 562.

The CWA similarly evinces no intent to change the scope of TVA's well-established waiver of sovereign immunity. DOE v. Ohio was not premised on the conclusion that Congress reached an express and deliberate conclusion that government entities should be subject to coercive, but not punitive, CWA fines. Rather, the Supreme Court based its holding on the CWA's silence and ambiguity on the matter. 503 U.S. at 628. Undoubtedly, silence and ambiguity are grounds for concluding that a statute does not itself waive an entity's sovereign immunity. Here, however, the immunity had already been waived. The Court sees no reason to read the CWA's silence and ambiguity as grounds for decreasing the scope of a waiver that already existed. See Good v. Ohio Edison Co., 149 F.3d 413, 418 (6th Cir. 1998) ("[A] waiver of sovereign

immunity in a new cause of action will not be presumed to be exclusive unless such an intention is expressly mandated by Congress.") (citing Loeffler, 486 U.S. at 562)).

Nor is the Court persuaded by TVA's citation to Missouri Pacific Railroad v. Ault, 256 U.S. 554 (1921), and that case's progeny for the proposition that, even when an instrumentality is subject to a broad, general waiver of immunity, a court cannot impose a penalty in the absence of an additional waiver specifically addressing punitive remedies. As the Third Circuit has observed, "Ault concerned the sovereign immunity of the government itself," not the immunity of a Loeffler-type entity that, like TVA, has been "launched . . . into the commercial world." Pennsylvania v. U.S. Postal Serv., 13 F.3d 62, 66 (3d Cir. 1993) (quoting Franchise Tax Bd., 467 U.S. at 520). TVA nevertheless suggests that the Sixth Circuit adopted TVA's preferred rule by applying Ault to the FDIC in Commerce Federal Savings Bank v. FDIC, 872 F.2d 1240, 1247-48 (6th Cir. 1989). TVA is correct that the FDIC, like TVA, is subject to a sue-or-be-sued provision. See 12 U.S.C. 1819(a) ([T]he Corporation . . . shall have power . . . [t]o sue and be sued, and complain and defend, by and through its own attorneys, in any court of law or equity, State or Federal."). TVA is mistaken, though, in arguing that the Sixth Circuit premised its holding on finding an exception or limitation to that provision. The Commerce Federal opinion simply does not discuss, let alone find an exception to, the sue-and-be-sued clause. Rather, the court based its holding on the fact that "the FDIC is clearly an instrumentality of the United States, and . . . the appellant has failed to identify any express Congressional authority permitting imposition of punitive fines or penalties." 872 F.2d at 1258. That rationale is merely a statement of the applicable blackletter law that applies in the absence of a statutory waiver. The Court is therefore not convinced that Commerce Federal should be read as a *sub rosa* reversal of the Circuit's longstanding case law acknowledging the broad, liberal construction of TVA's sue-and-be-sued clause. The Court

26

therefore concludes that Plaintiffs' claims for penalties are permitted under the broad waiver of sovereign immunity found in 16 U.S.C. § 831(c).

E. Jury Demand

TVA argues next that the Court should strike Plaintiffs' jury demand because a plaintiff has no right to a jury trial in an action against a federal agency unless expressly granted that right by law. (Doc. No. 28.) Although Plaintiffs do not dispute the general proposition that the right to a jury trial in an action against the United States must be expressly granted, they argue that that rule does not extend to corporate instrumentalities, like TVA, that are the subject of broad sue-and-be-sued clauses. The Sixth Circuit considered these respective arguments, albeit in an unpublished opinion, in Davis v. Henderson, 238 F.3d 420 (table), 2000 WL 1828476 (6th Cir. Dec. 4, 2000). There, the plaintiff postal employee brought suit against the Postmaster General, who was subject to a Loeffler general waiver of sovereign immunity. The court concluded that "Congress has provided for a general waiver of the Postal Service's sovereign immunity, but that general waiver did not create a right to a jury trial." Id. at *2.

The presumption against finding a right to a jury trial in a suit against the United States is founded in part on the protections of sovereign immunity, but also in significant part on the historical understanding of the right to a civil jury trial itself, as codified by the Seventh Amendment. "It has long been settled that the Seventh Amendment right to trial by jury does not apply in actions against the Federal Government." Lehman v. Nakshian, 453 U.S. 156, 160 (1981); see also Galloway v. United States, 319 U.S. 372, 388 (1943) (holding that Seventh Amendment does not apply to actions against the United States because "[i]t hardly can be maintained that under the common law in 1791 jury trial was a matter of right for persons asserting claims against the sovereign"). Accordingly, insofar as any plaintiff has a right to a jury trial

against the United States, it is not because the Seventh Amendment applies to the matter by its own terms, but "because Congress[,] in the legislation cited, has made it applicable."  Galloway, 319 U.S. at 389.  In that regard, a provision granting a jury trial against the United States performs two functions: first, it waives the sovereign immunity that would deprive the courts of jurisdiction over such a case; and second, it creates a procedural right to a jury trial that otherwise would not have existed under the Constitution alone.

The sue-and-be-sued clause, therefore, at best gets Plaintiffs halfway to a jury trial: it may remove the barrier created by sovereign immunity, but nothing in its language suggests that it creates a right to a jury in the first place.   Plaintiffs do not identify any other specific statutory provisions entitling them to a jury trial, relying instead on the Seventh Amendment, as applied to the CWA in Tull v. United States, 481 U.S. 412, 427 (1987).  Plaintiffs argue that the Seventh Amendment's failure to reach actions against the United States should not be read to include corporate instrumentalities such as TVA.  The well-established practice in the Sixth Circuit, however, is to recognize TVA's status as a federal agency, even if it is one that has waived its protection from suit.  See Gillham v. TVA, 488 F. App'x 80, 81 (6th Cir. 2012) ("TVA is a 'wholly-owned corporate agency and instrumentality of the United States.'" (quoting Hill v. U.S. Dep't of Labor, 65 F.3d 1331, 1333 (6th Cir. 1995))); McCarthy v. Middle Tenn. Elec. Membership Corp., 466 F.3d 399, 411 n.18 (6th Cir. 2006) ("[T]here is no question that 'TVA is an agency and instrumentality of the United States.'"); TVA v. Kinzer, 142 F.2d 833, 837 (6th Cir. 1944) ("[TVA] is plainly a governmental agency or instrumentality of the United States.").  The Court therefore will adopt the rule set forth in Davis v. Henderson and strike Plaintiffs' jury demand.

F. Permit Shield

TVA argues next that the CWA's "permit shield" provision, 33 U.S.C. § 1342(k), entitles it to dismissal or judgment on the pleadings with regard to two sets of allegations: (1) all allegations, under any of Plaintiffs' claims, premised on seeps from the ash ponds (Doc. No. 51); and (2) Plaintiffs' Claim B, premised on the improper use of Sinking Creek as a water of the United States (Doc. No. 12). The permit shield provides that "[c]ompliance with a permit issued pursuant to [the NPDES] shall be deemed compliance" with various standards and limitations under the CWA, including those at issue here. Id. The purpose of the permit shield is "to relieve [permit holders] of having to litigate in an enforcement action the question whether their permits are sufficiently strict." Sierra Club v. ICG Hazard, LLC, 781 F.3d 281, 285 (6th Cir. 2015) (quoting E.I. du Pont de Nemours & Co. v. Train, 430 U.S. 112, 138 n.28 (1977)). The Sixth Circuit has adopted a two-pronged analysis for determining whether the permit shield will apply to a particular allegation: "[f]irst, the permit holder must comply with the CWA's reporting and disclosure requirements"; and, "[s]econd, . . . the discharges must be within the permitting authority's 'reasonable contemplation.'" ICG Hazard, 781 F.3d at 286 (quoting Piney Run Pres. Ass'n v. Cty. Comm'rs of Carroll Cty., Md., 268 F.3d 255, 267 (4th Cir. 2001)). The question of "reasonable contemplation" focuses in particular on whether the alleged discharges were "within the reasonable contemplation of the permitting authority *during the permit application process*." Id. (quoting Piney Run, 268 F.3d at 267) (emphasis added).

In Sierra Club v. ICG Hazard, LLC, the Sixth Circuit concluded that discharges of pollutants that are not expressly included in a permit may still be subject to the shield if the pollutants had been within the reasonable contemplation of the permitting agency when the permit was issued. Id. at 286–88. For example, in that case, the defendant was accused of making unlawful discharges of selenium, and the relevant permit did not expressly authorize discharge of

selenium into the relevant waters. The court nevertheless applied the permit shield to selenium discharges, because its review of the permitting process and context revealed that the permitting authority was aware of and had considered the possibility of selenium discharges when it issued the permit. Id. at 290.

While Plaintiffs do not dispute that this rule applies to discharges of unnamed *pollutants*, they urge the Court not to extend it to unnamed outfall locations, or at least not unnamed outfall locations that Plaintiffs argue may be characterized as independent point sources. Such a rule, they argue, is inconsistent with the CWA's provisions requiring an NPDES permit for "all point sources of discharge of pollutants." 33 U.S.C. §1311(e). Nothing in the text of the permit shield provision, however, suggests that it should apply differently to violations based on the location of the discharge than it does to violations based on which pollutants are involved. The determinative issue is whether the party is in "[c]ompliance with" the relevant NPDES permit, 33 U.S.C. § 1342(k), which the Sixth Circuit has read to mean that the discharges at issue were within the reasonable contemplation of the issuing agency. ICG Hazard, 781 F.3d at 286. As this Court reads both the case law and the purposes underlying the "reasonable contemplation" test, the Court should evaluate every feature of an alleged violation to determine if the relevant discharge or possibility thereof was adequately disclosed and reasonably contemplated. That inquiry may lead the Court to examine the pollutants at issue, but also the location of discharge, its magnitude, or any other relevant trait. The Court's analysis will inevitably be closely tied to a review of what the permittee itself disclosed, because "the scope of the permit as well as the discharge limitations contained therein are based largely on information provided by the permit applicant."[6] In Re

---

[6] For this reason, the Court rejects Plaintiffs' argument that the Court should restrict itself to considering only the text of the NPDES Permit under the parol evidence rule. The permit shield rule, as adopted by the Sixth Circuit, requires the Court to look to the permitting process itself to

<u>Ketchikan Pulp Co.</u>, 7 E.A.D. 605, 1998 WL 284964, at *10 (E.P.A. May 15, 1998). The Court now turns to the classes of allegation to which TVA seeks to apply the permit shield.

<u>1. Seeps</u>

TVA argues that all of Plaintiffs' claims based on seeps are categorically barred by the permit shield because seeps were within the reasonable contemplation of TDEC when it issued the NPDES Permit.[7] TVA relies on the fact that, during the comment period for the NPDES Permit, the potential for seeps was brought to TDEC's attention, and TDEC concluded that the permit adequately accounted for that risk. Specifically, after TDEC published its "Permit Rationale" for public comment, it received comments about the possibility of seeps, which TDEC considered and acknowledged. (Doc. No. 1-2 at 48.)

That TDEC contemplated some seeps under the permit, however, does not categorically shield TVA from liability for *all* seeps. TDEC's responses to comments describe the type of seepage that the agency anticipated from the ponds in a number of ways, for example: as having a "flow rate . . . so low as not to be measurable"; as "more similar to a nonpoint source discharge, as it is diffused over a wide area"; and, perhaps most importantly, as resulting in only "*de minimus* [sic]" additional loading of pollutants. (Doc. No. 1-2 at 48.) The permit shield only protects discharges that the permit itself reasonably contemplates, and the NPDES Permit did not contemplate any and all manner of seepage without limitation. Moreover, the permit's toleration of even the contemplated seepage is in the context of TVA's presumed compliance with NPDES

---

determine what manner of discharges were disclosed and reasonably contemplated when the permit was under consideration. <u>ICG Hazard</u>, 781 F.3d at 286 (quoting <u>Piney</u>, 268 F.3d at 267).

[7] Although the Court has concluded that the diligent prosecution bar prevents the Plaintiffs from bringing claims based solely on seeps alone from the Ash Pond Complex, any claims involving seeps from the Non-Registered Site have so far survived TVA's motions.

31

Permit provisions specifically designed to address the risk of seeps. Part III.B.(2) through (4) of the NPDES Permit, for example, require that TVA comply with self-inspection requirements intended to detect, among other things, seepage in the ponds' earthen dikes, and that TVA take timely remediation measures if it discovers any changes indicating a potential compromise in the structural integrity of the impoundment. (Doc No. 1-2 at 26.) Among the failures Plaintiffs allege in their Complaint is that TVA "failed to properly maintain the impoundments to prevent seeps, or to properly inspect, identify, and remediate these seeps." (Doc. No. 1 at ¶ 65.) Finally, the mere fact that TDEC was aware of some seeps or the possibility thereof does not mean that TVA necessarily fully and accurately disclosed all relevant seeps at the time the NPDES Permit was reissued. Among the key allegations in this case is that TVA's actions have been insufficient to adequately identify and monitor the seeps. A permit applicant cannot disclose discharges that it does not know about.

The Court accordingly does not read the NPDES Permit as extending its permit shield protection categorically to any and all seeps. That is not to say that the permit shield may not serve as a defense to specific allegations. If TVA can eventually show that specific seeps were only of the type contemplated by the permit, and that the seeps' detection, monitoring, reporting, disclosure, and, if necessary, remediation, were handled in full compliance with the permit, the permit shield may apply. Such a conclusion, however, cannot be reached on the pleadings alone. TVA's Motion for Judgment on the Pleadings as to All of Plaintiffs' Claims Regarding Seeps (Doc. No. 51) will therefore be denied.

### 2. Sinking Creek

TVA argues next that Plaintiffs' Claim B, which challenges the Gallatin Plant's use of the alleged Sinking Creek area for the Ash Pond Complex, should be dismissed because the use of

Ash Ponds A and E as treatment ponds was contemplated by and in compliance with the NPDES Permit. As the Complaint concedes, "[t]he NPDES Permit treats the discharges of waste streams . . . into Sinking Creek as internal outfalls within a waste treatment system," rather than as discharges into the waters of the United States. (Doc. No. 1 at ¶ 168.) It is clear from the Complaint and the NPDES Permit itself that TVA's use of the Ash Pond Complex as a wastewater treatment facility is central to the overall treatment system that the Permit envisions. (See Doc. No. 1 at ¶ 168; Doc. No. 1-2 at 57 (describing ash ponds)). Nor can it be said that TVA failed to disclose its plans for using the area at issue for its series of Ash Ponds. (See, e.g., Doc. 18-6 at PageID 619 (including map of ash ponds in permit renewal application)). TVA can hardly be blamed for its failure to make further disclosures or reports related to Sinking Creek, given that the NPDES Permit itself had accepted its premise that the Ash Pond Complex was a treatment facility.

As TVA correctly points out, Plaintiffs' Sinking Creek argument is in essence a collateral attack on the permit itself. See Nat'l Parks Conservation Ass'n v. TVA, 175 F. Supp. 2d 1078–79 (E.D. Tenn. 2001) (holding that citizens could not collaterally challenge terms of Clean Air Act permit). Because the flow of contaminants from the Gallatin Plant to Ash Ponds A & E is both disclosed under and reasonably contemplated by the NPDES permit, TVA's Motion to Dismiss for Failure to State a Claim (Doc. No. 12) will be further granted in part and Claim B will be dismissed. The Court's ruling on this issue renders moot TVA's Motion for Summary Judgment on Plaintiffs' Claim B. (Doc. No. 57.)

G. Claims Under Specific Permit Provisions

Finally, TVA seeks judgment on the pleadings with regard to Plaintiffs' Claim E and its subclaims, each arising out of an alleged violation of a different term of the NPDES Permit. (Doc.

33

No. 102.)  With regard to each of the provisions Plaintiff cites, TVA argues either that the provision

is inapplicable or that Plaintiffs have not pled facts setting forth a plausible claim on which relief

can be granted.  Generally speaking, the Court must interpret an NPDES Permit in the same manner

as it would a contract, determining first whether a particular term has an unambiguous meaning,

and, if the meaning is ambiguous, looking to the document as a whole, its underlying purpose, and,

if necessary, appropriate extrinsic evidence to aid the Court's construction.  Piney Run, 268 F.3d

at 269–70.  While the Court's interpretation of the Permit is a question of law, Nw. Envtl.

Advocates v. City of Portland, 56 F.3d 979, 982 (9th Cir. 1995), Plaintiffs' underlying factual

allegations remain entitled to the presumption of truth ordinary to any other motion under Rule

12(c).

1. Subsections I.A.b & c

Plaintiffs' Claims E.a and E.b allege violations of subsections I.A.b and I.A.c of the

NPDES permit, which provide:

Additional monitoring requirements and conditions applicable to Outfalls 001, 002,
and 004 include:

[ . . . . ]

b.      The wastewater discharge shall not contain pollutants in quantities that will
be hazardous or otherwise detrimental to humans, livestock, wildlife, plant
life, or fish and aquatic life in the receiving stream. The discharge activity
shall not cause or contribute to violations of water quality criteria as stated
in the TDEC Rules, Chapter 1200-4-2-.03. Under no circumstances may
discharges create an exceedance of the numeric water quality criteria in the
receiving stream for aquatic and human life as stated in State of Tennessee
Rule 1200-4-3.

c.      Sludge or any other material removed by any treatment works must be
disposed of in a manner, which prevents its entrance into or pollution of any
surface or subsurface waters. Additionally, the disposal of such sludge or
other material must be in compliance with the Tennessee Solid Waste
Disposal Act, TCA § 68-31-101 et seq. and the Tennessee Hazardous Waste
Management Act, TCA 68-46-101 et seq.

34

(Doc. No. 1-2 at 11.) Plaintiffs assert that the Gallatin Plant's alleged unlawful discharges through contaminated groundwater violate subsection I.A.b and that its seeps violate subsection I.A.c. (Doc. No. 1 at ¶ 182–88.)

TVA points out, however, that these provisions are by their own terms only "applicable to Outfalls 001, 002, and 004."[8] The very essence of Plaintiffs' allegations, TVA argues, is that the allegedly unlawful discharges are not happening through authorized outfalls. With regard to subsection I.A.b, the plain language of the permit supports TVA's reading. The express target of subsection I.A.b is "wastewater discharge"; as applied to Outfalls 001, 002, and 004, that language clearly refers to wastewater discharge from those outfalls. TVA's argument is less persuasive, however, with regard to subsection I.A.c. The target of subsection I.A.c is not the wastewater discharge itself but the disposal of "sludge or other material removed by any treatment works." The plain language of the provision clearly encompasses sludge or other material removed by means other than merely through discharge at the named outfalls. "Removal" through seeps or other leaks could therefore theoretically be encompassed by the provision.

TVA argues next that subsection I.A.c does not apply because the wastewater allegedly discharged through its seeps is not sludge. Subsection I.A.c, however, encompasses not only

_____

[8] Plaintiffs suggest that the phrase "applicable to Outfalls 001, 002, and 004" should be read only to refer to "conditions," and not "monitoring requirements," and that subsections I.A.b and I.A.c are therefore generally applicable to all discharges as monitoring requirements. (Doc. No. 119 at 10.) This argument is unavailing for two reasons. First, the paragraph immediately prior to these provisions discusses discharges of certain types of cooling water and concludes, "There are no limits or monitoring requirements for these discharges." (Doc. No. 1-2 at 11.) It is therefore clear that the permit is indeed discussing discharge-specific monitoring requirements as well as conditions. Second, subsections I.A.b and I.A.c are simply not monitoring requirements. Subsections I.A.e and I.A.g, for example, do actually address monitoring and reporting of discharges. Subsections I.A.b and I.A.c are plainly conditions with which the discharges must comply.

sludge but "any other material removed by any treatment works." It is a well established "canon of interpretation that words in a list should be given separate meaning to avoid surplusage." Crossville, Inc. v. Kemper Design Ctr., Inc., No. 2:09-0120, 2010 WL 2650731, at *4 (M.D. Tenn. July 2, 2010) (citing Snodgrass v. Snodgrass, 295 S.W.3d 240, 248 (Tenn. 2009)). Subsection I.A.c therefore should be construed to reach not merely sludge, but *any* material removed by treatment works. Judgment on the pleadings is therefore inappropriate as to Claim E.b.

### 2. Subsection II.A.4.a

NPDES Permit subsection II.A.4.a requires TVA to "at all times properly operate and maintain all facilities and systems (and related appurtenances) for collection and treatment which are installed or used by the permittee to achieve compliance with the terms and conditions of the permit." (Doc. No 1-2 at 19.) Plaintiffs allege that several aspects of TVA's maintenance of the ponds has been inadequate to achieve compliance with the permit. (Doc. No 1 at ¶¶ 189–98.) TVA argues that Plaintiffs' assertion is a legal conclusion masquerading as a question of fact, and that its actions were, as a matter of law, in compliance with subsection II.A.4.a. TVA is mistaken. The question of whether TVA's maintenance of its ponds has been adequate is unavoidably bound up with fact and inappropriate for resolution by the Court on the pleadings alone. For example, as the Court has noted *supra*, the NPDES permit contemplated seepage from the Ash Ponds at levels that, at most, would result in *de minimis* additional pollutant loading. Whether seeps from the Non-Registered Site exceed *de minimis* levels raises factual questions both about the seeps themselves and what would qualify as *de minimis* in the context of coal ash wastewater discharges. Whether TVA's response to the seeps has been sufficient to safeguard the structural integrity of the ponds—as required by the permit (Doc No. 1-2 at 26)—presents another example of a question

36

of fact. While the construction of the Permit's terms presents a question of law, a term like "properly," used in a specialized setting such as this one, sets forth a standard that must be understood and evaluated in a factual context that cannot be gathered solely from the four corners of the document. TVA is not entitled to judgment on the pleadings with regard to claim E.c.

## C. Subsection II.C.2

NPDES Permit subsection II.C.2 creates an obligation to inform regulators within twenty-four hours of certain events:

> In the case of any noncompliance which could cause a threat to public drinking supplies, or any other discharge which could constitute a threat to human health or the environment, the required notice of non-compliance shall be provided to the Division of Water Pollution Control in the appropriate regional Field Office within 24-hours from the time the permittee becomes aware of the circumstances.

(Doc. No. 1-2 at 17.) The Complaint alleges that TVA violated this provision by failing to alert regulators when it became aware that its ash ponds had contaminated the surrounding area through unauthorized discharges. TVA argues that it did not violate the 24-hour notice requirement because its seeps were contemplated by the NPDES Permit itself. This is merely a reiteration of TVA's permit shield argument and fails for the same reason: although the NPDES permit reasonably contemplated some *de minimis* seeps, that reasonable contemplation does not create a shield for any and all manner and volume of seeps possible. Moreover, subsection II.C.2 does not merely reach instances of noncompliance but also "any other discharge which could constitute a threat to human health or the environment." Plaintiffs have adequately pled that the alleged discharges could constitute a threat to human health or the environment, triggering the notice provision. Plaintiffs' Claim E.d therefore cannot be disposed of with judgment on the pleadings.

### 3. Subsection II.C.3

37

NPDES Permit subsection II.C.3.b forbids "Sanitary Sewer Overflows" at the Gallatin Plant, which the permit defines as follows: "'Sanitary Sewer Overflow' means the discharge to land or water of wastes from any portion of the collection, transmission, or treatment system other than through permitted outfalls." (Doc. No.1-2 at 22.) Plaintiffs contend that all discharges of ash pond wastewater other than through Outfall 001 are prohibited sanitary sewer overflows. TVA argues that, in context, the "wastes" mentioned in the definition of "sanitary sewer overflow" refers only to raw sewage from sanitary wastes, and that the Gallatin Plant has a separate system for sanitary waste disposal. TDEC regulations define a "sanitary sewer" as a "conduit intended to carry liquid and water-carried wastes from residences, commercial buildings, industrial plants and institutions together with minor quantities of ground, storm and surface waters that are not admitted intentionally." Tenn. Comp. R. & Regs. 0400-46-02-.02(43). TDEC's reference to "liquid and water-carried wastes" appears, on its face, to be plainly capable of encompassing coal ash wastewater. TVA, however, draws the Court's attention to public EPA documents that appear consistent with the position that "sanitary sewer" is a specialized term that would be inapplicable to wastes other than untreated sewage. See National Pollution Discharge Elimination System (NPDES), <u>Sanitary Sewer Overflow (SSO) Frequent Questions</u>, at https://www.epa.gov/npdes/sanitary-sewer-overflow-sso-frequent-questions#sso (last updated Nov. 16, 2015); EPA Fact Sheet: Why Control Sanitary Sewer Overflows, at 1 (Jan. 11, 2001) ("Sanitary sewer overflows (SSOs) are releases of untreated sewage into the environment."), available at https://www3.epa.gov/npdes/pubs/sso_casestudy_control.pdf. These EPA documents, however, appear to be guides for the edification of a general audience and do not necessarily resolve the question of how the term "sanitary sewer" might apply to the peculiar situation of coal ash wastewater that is sluiced to ponds for treatment.

The Court is therefore unable, at this stage, to conclude, based only on the pleadings and documents appropriate for judicial notice in the Rule 12(c) context, that unauthorized coal ash discharges are, as a matter of law, incapable of qualifying as sanitary sewage overflows. If, once a factual record is developed, TVA has shown that the accepted understanding of the terms make it clear that, in context, the only waste at issue is raw sewage, TVA may be entitled to judgment on this claim. At this stage, however, the request for judgment on the pleadings with regard to Claim E.e will be denied.

### III. MOTION FOR SUMMARY JUDGMENT

Plaintiffs have filed a Motion for Partial Summary Judgment (Doc. No. 106) arguing that it is entitled to summary judgment on several of its claims because the discharges as conceded by the TVA are sufficient to give rise to *per se* violations under the CWA's regime of strict liability.

A. Standard of Review

In reviewing a motion for summary judgment, this Court will only consider the narrow questions of whether there is any "genuine dispute as to any material fact" and whether "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A motion for summary judgment requires that the Court view the "inferences to be drawn from the underlying facts . . . in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)). "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003). After the movant has satisfied this initial burden, the nonmoving party has the burden of showing that a "rational trier of fact [could] find for the non-moving party [or] that there is a

'genuine issue for trial.'" Matsushita, 475 U.S. at 587. If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. Anderson, 477 U.S. at 479-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." Hill v. White, 190 F.3d 427, 430 (6th Cir. 1999) (citing Anderson, 477 U.S. at 247–49).

Related to Plaintiffs' Motion, TVA has filed a Request for Judicial Notice (Doc. No. 136) asking the Court to take notice of documentation related to TVA's NPDES permit for another facility in New Johnsonville, Tennessee. TVA had cited the terms of the New Johnsonville permit as a point of comparison in its argument that Plaintiffs are not entitled to summary judgment. Although the Court is not considering the New Johnsonville plant, and the Court is skeptical of how selective citation to one other NPDES permit will illuminate its consideration of the Gallatin Plant, the Request for Judicial Notice will be granted insofar as the cited materials are relevant to the consideration of the Motion.

## B. Alleged *Per Se* Violations

Plaintiffs argue that they are entitled to summary judgment on several counts because the groundwater discharges and seeps they have identified represent *per se* violations of the Clean Water Act actionable under 33 U.S.C. § 1311(a). A party seeking to establish a Clean Water Act violation generally must establish "five elements . . . : (1) a pollutant must be (2) added (3) to navigable waters (4) from (5) a point source." Nat'l Wildlife Fed'n v. Consumers Power Co., 862 F.2d 580, 583 (6th Cir. 1988) (emphasis omitted). Recovery in this particular case, however, presents a few additional hurdles. First, as the Court has explained, the pending State Enforcement Action prevents the Court from exercising its jurisdiction with regard to some of Plaintiffs'

allegations. The Court must limit its consideration to issues left out of the State's complaint, specifically: discharges from the Non-Registered Site into the Cumberland River; and discharges from the Ash Pond Complex that involve hydrologic flows other than those that can be characterized as seeps alone. Open factual issues exist with regard to the extent of the discharges that fall within these two circumscribed categories. Moreover, TVA has demonstrated that some seeps were contemplated by TDEC at the time of the reissuance of the NPDES Permit in 2012. Therefore, although TVA is not entitled to a blanket judgment on the pleadings under the permit shield defense, there are outstanding issues of fact with regard to that defense that would preclude summary judgment in Plaintiffs' favor. TVA is entitled to an opportunity to demonstrate that the discharges on which Plaintiffs rely were of the type disclosed to and reasonably contemplated by TDEC at the time the NPDES Permit was under consideration.

Because Plaintiffs filed their Motion for Partial Summary Judgment before the Court had ruled on TVA's Motion to Dismiss for Failure to State a Claim (Doc. No. 12) or its Motion for Judgment on the Pleadings as to All of Plaintiffs' Claims Regarding Seeps (Doc. No. 51), Plaintiffs have understandably failed to address these factors in their motion. Even if the Plaintiffs' had had such an opportunity, however, it appears likely to the Court that open questions about the extent of TVA's defenses would likely preclude the Court from granting summary judgment. In any event, Plaintiffs' Motion will be denied, and it is the hope of the Court that the parties will be able to sharpen the focus of this litigation in light of the issues raised in this Memorandum at the forthcoming status conference.

## IV. CONCLUSION

For the foregoing reasons, TVA's Motion to Dismiss for Failure to State a Claim (Doc. No. 12) will be **GRANTED** in part and **DENIED** in part; TVA's Motion to Dismiss Plaintiffs'

Case 3:15-cv-00424   Document 139   Filed 09/09/16   Page 41 of 42 PageID #: 5367

Claim for Civil Penalties and Jury Demand (Doc. No. 28) will be **DENIED** as to civil penalties and **GRANTED** as to Plaintiffs' jury demand, and the Court will **STRIKE** Plaintiffs' demand for a jury; TVA's Motion for Judgment on the Pleadings as to All Plaintiffs' Claims Regarding Seeps (Doc. No. 51) will be **DENIED**; TVA's Motion for Summary Judgment on Plaintiffs' Claim B (Doc. No. 57) will be **DENIED AS MOOT**; TVA's Motion for Judgment on the Pleadings as to Plaintiffs' Claim E (Doc. No. 102) will be **GRANTED** as to Claim E.a and **DENIED** as to all other claims; TVA's Request for Judicial Notice (Doc. No. 136) will be **GRANTED**; and Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 106) will be **DENIED**. Plaintiffs' Claims B and E.a will be **DISMISSED**. Claims A, C, D, E.b, E.c, E.d, and E.e will be **DISMISSED** except insofar as they deal with one or both of the following: discharges from the Non-Registered Site into the Cumberland River; and discharges from the Ash Pond Complex via hydrologic flows that are not seeps alone.

An appropriate order will issue.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE