UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


TENNESSEE CLEAN WATER NETWORK,
and TENNESSEE SCENIC RIVERS
ASSOCIATION,
Plaintiffs,

No. 3:15-cv-00424
v.                                        Judge Crenshaw
                                          Magistrate Judge Holmes
TENNESSEE VALLEY AUTHORITY,
Defendant.

---

## TVA'S POST-TRIAL BRIEF

---

James S. Chase, Associate General Counsel
David D. Ayliffe, Senior Attorney
Lane E. McCarty, Attorney
TVA GENERAL COUNSEL'S OFFICE
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Telephone 865.632.8964

Attorneys for Tennessee Valley Authority

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................. 1

II.   BACKGROUND ................................................................. 1

II.   DISCUSSION OF LAW ....................................................... 4

    A.   Plaintiffs Stand in the Shoes of TDEC. ...................................... 4

    B.   Application of the CWA's Diligent Prosecution Bar — An Issue of
        Fact. ...................................................................... 6

    C.   Under Fundamental Principles of Permit Interpretation, Due
        Process, and Fair Notice, TVA is Entitled to Judgment in Its Favor
        on Plaintiffs' Allegations of Permit Provision Violations. ................... 11

    D.   Plaintiffs' Requested Injunctive Remedy is Not Warranted and
        Would Not Be in the Public Interest. ....................................... 14

        1.   *Sierra Club v. Va. Elec. & Power Co.* Offers a Practical
            Solution for Technical Violations of the CWA for Which
            There is No Proof of Irreparable Harm. ......................... 16

        2.   Plaintiffs' Demand for Injunctive Relief is Subject to the
            Diligent Prosecution Bar. ..................................... 19

        3.   TVA's Compliance Obligations Under the CCR Rule Render
            Plaintiffs Requested Injunctive Remedy Unnecessary and
            Unwarranted. ................................................ 21

    E.   Appointment of an Expert Witness or a Special Master is Not
        Necessary. ................................................................ 22

III.  CONCLUSION ................................................................. 25

# I.    INTRODUCTION

This is a Clean Water Act citizen enforcement action involving a National Pollutant Discharge Elimination System ("NPDES") permit ("Permit") reissued to the Tennessee Valley Authority ("TVA") for the Gallatin Fossil Plant ("Gallatin") facility in 2012 by the Tennessee Department of Environment and Conservation ("TDEC") under the Federal Water Pollution Control Act Amendments of 1972 ("CWA") and the Tennessee Water Quality Control Act of 1977 ("TWQCA").

Pursuant to the Court's instruction at the conclusion of the four-day bench trial of this action (Trial Tr. (Vol. 4) at 166), TVA submits this post-trial brief in conjunction with the submission of TVA's Proposed Post-Trial Findings of Fact and Conclusions of Law ("PFFCL").[1] The purpose of this brief is to address specific legal issues including those raised by the Court at the conclusion of the bench trial—how the diligent prosecution bar applies to liability and remedy in light of the Court's September 9, 2016 decision concerning the diligent prosecution bar, and assuming the Court finds liability, whether the Court should consider the appointment of one or more expert witnesses on the issue of remediation.  (Trial Tr. (Vol. 4) at 164:11-18.)[2]  For the reasons set forth herein and in TVA's PFFCL, the Court should enter judgment in favor of TVA.

# II.    BACKGROUND

On November 10, 2014, Plaintiffs Tennessee Clean Water Network ("TCWN") and Tennessee Scenic Rivers Association ("TSRA") sent the Environmental Protection Agency

---

[1]     A detailed compilation of the facts and evidence along with citations to the trial record is set forth in TVA's accompanying PFFCL.

[2]     Citations to the trial transcript are to volume, page, and line number (e.g., "Trial Tr. (Vol. __) at __ : __.").

("EPA"), TDEC, and TVA a 60-Day Notice of Intent to Sue ("NOI") pursuant to 33 U.S.C §

1365(b) for alleged ongoing violations of the CWA at the Gallatin facility.[3]  On January 7, 2015,

the State of Tennessee and TDEC filed suit against TVA in Davidson County Chancery Court

("State Enforcement Action") for alleged violations of the TWQCA and the Tennessee Solid

Waste Disposal Act ("SWDA"), which generally prohibit discharges of pollutants into the waters

of Tennessee and waters of the United States unless such discharges are authorized under a

permit issued by TDEC.

     Plaintiffs filed this CWA citizen enforcement action on April 14, 2015.  Plaintiffs' core

claim is that there are flows of CCR leachate from the Ash Pond Complex and the NRS to the

Cumberland River in the form of seeps and non-seep conduit flows via hydrologically connected

groundwater (such as through sinkholes and fissures).  Plaintiffs allege that these flows are

prohibited discharges under the CWA.

     In its September 9, 2016 Memorandum Opinion, the Court concluded that the diligent

prosecution bar applies to Plaintiffs' claims in this case which overlap with those being alleged

in the State Enforcement Action.  *See* Mem. Op., Doc. 139 at PageID 5340.  Pursuant to Federal

---

[3]     Plaintiffs' NOI alleges violations only of the NPDES Permit reissued to TVA for the Gallatin facility in 2012 (Doc. 1-2 (JX 102)).  (NOI, Doc. 1-3 at PageID 161, 164-74 & Doc. 1-4 at PageID 175, 178-89.)  The NOI does not allege violations of any earlier NPDES permit. Therefore, to the extent Plaintiffs attempted at trial to allege violations of any permit in effect prior to TDEC's reissuance of the current Permit in 2012 (*see* Trial Tr. (Vol. 2) at 37:23-38:20, 41:18-42:23, 47:4-48:14; 50:5-8; TVA's 2005 NPDES Permit, JX 136), the Court lacks jurisdiction over such allegations because they were not included in the NOI, and thus, Plaintiffs failed to "give[] notice of the alleged violation" as required by 33 U.S.C. § 1365(b)(1)(A).  *Bd. of Trs. of Painesville Twp. v. City of Painesville, Ohio*, 200 F.3d 396, 400 (6th Cir. 1999) (holding that compliance with CWA's notice provision "is a jurisdictional prerequisite to recovery under the statute"); *accord Greene v. Reilly*, 956 F.2d 593, 594 (6th Cir. 1992); *Chute v. Montgomery Cnty. Shooting Complex*, No. 3:12-CV-0776, 2013 WL 681987, at *3 (M.D. Tenn. Feb. 25, 2013); *Ass'n Concerned Over Res. & Nature, Inc. v. Tenn. Aluminum Processors, Inc.*, No. 1:10-00084, 2011 WL 1357690, at *7 (M.D. Tenn. Apr. 11, 2011).

Rule of Civil Procedure 12(b)(6), the Court dismissed Plaintiffs' Claims A, C, D, E.b, E.c., E.d, and E.e "except insofar as they deal with one or both of the following: discharges from the Non-Registered Site into the Cumberland River; and discharges from the Ash Pond Complex via hydrologic flows that are not seeps alone." *Id.* at PageID 5368.[4] The Court found that "[o]pen factual issues exist with regard to the extent of the discharges that fall within these two circumscribed categories." *Id.* at PageID 5357

The Court also determined that CWA's permit shield, 33 U.S.C. § 1342(k), applies in this case, that "TVA has demonstrated that some seeps were contemplated by TDEC at the time of the reissuance of the NPDES Permit in 2012," and that, if the alleged "discharges on which Plaintiffs rely were of the type disclosed to and reasonably contemplated by TDEC at the time the NPDES Permit was under consideration," the discharges would be subject to the permit shield and, therefore, lawful under the CWA. *Id.* at PageID 5367-68.[5]

As set forth more fully in TVA's bench brief (Doc. 231-1), Plaintiffs have the burden of proving (1) the existence of the alleged flows from the Non-Registered Site (seeps and non-seep conduit flows via hydrologically connected groundwater) and from the Ash Pond Complex (non-seep conduit flows via hydrologically connected groundwater); (2) that the alleged flows are prohibited discharges under the CWA; and (3) that the alleged flows were not within TDEC's reasonable contemplation when TDEC reissued the Gallatin Permit in 2012.

---

[4] The Court concluded that the diligent prosecution bar "prevents the Plaintiffs from bringing claims based solely on seeps alone from the Ash Pond Complex." Mem. Op., Doc. 139 at PageID 5357 n.7.

[5] Plaintiffs also allege violations of various NPDES Permit provisions; however, the Court found that, to the extent these Permit provisions are applicable, they are dependent upon Plaintiffs' ability to prove the "alleged unauthorized discharges" from the Ash Pond Complex and the NRS. *Id.* at PageID 5343, 5359-65.

## II.    DISCUSSION OF LAW

### A.    Plaintiffs Stand in the Shoes of TDEC.

Pursuant to the citizen-suit provision of the CWA, § 1365(a)(1), citizen plaintiffs act as private attorneys general seeking relief not on their own behalf but on behalf of society as a whole.  As concisely stated in *Altamaha Riverkeeper, Inc. v. Rayonier, Inc*., No. CV214-44, 2015 WL 1505971 (S.D. Ga. Mar. 31, 2015):

> Citizen plaintiffs who bring a suit under § 1365 are suing as "private attorneys general seeking enforcement of a federal law."  These plaintiffs "effectively stand in the shoes of the EPA."  Likewise, for purposes of this civil action, the Riverkeeper stands in the shoes of Georgia EPD [the state regulator with authority for issuing NPDES permits in Georgia].

*Id*. at *3 (citations omitted); *see also DP Marina, LLC v. City of Chattanooga*, 41 F. Supp. 3d 682, 689 (E.D. Tenn. 2014) ("[A]s noted by . . . numerous other courts, a party who brings a citizens' suit pursuant to the CWA is acting in the role of a private attorney general[.]").  Thus, Plaintiffs here are acting as private attorneys general in this CWA citizen suit and "stand in the shoes" of TDEC, the governmental entity that in 2012 reissued the Permit for the Gallatin facility.

In accordance with well-settled principles of law, Plaintiffs' stand-in-the-shoes status has consequences, not only for liability purposes, but evidentiary purposes as well.  *See Robinson v. Audi Nsu Auto Union Aktiengesellschaft*, 739 F.2d 1481, 1488 (10th Cir. 1984) ("[T]he seller of a product stands in the same shoes as the manufacturer in an Oklahoma products liability action and is subject to admission of the same evidence[.]"); *Estate of Shafer v. C.I.R*., 749 F.2d 1216, 1220 (6th Cir. 1984) (holding that statements made by a decedent when offered against the executor of his estate were "party-admissions within Rule 801(d)(2)(A)"); *Limone v. United States*, 497 F. Supp. 2d 143, 162 n.31 (D. Mass. 2007) ("The FTCA puts the government in the

4

shoes of the agent.  This must be so not only for liability purposes but evidentiary purposes as well.") (citations omitted), *aff'd*, 579 F.3d 79 (1st Cir. 2009).

The legal principles governing stand-in-the-shoes litigants are directly applicable to plaintiffs in CWA citizen suits.  The point is illustrated by the res judicata holding in *DP Marina, LLC*.  There, DP Marina filed a CWA citizen suit against the City of Chattanooga for alleged unpermitted sewage and wastewater discharges from a specific City pump station, and the EPA and the State of Tennessee subsequently filed (on July 17, 2012) a CWA suit against the City for numerous unpermitted discharges from numerous locations throughout the City's sewer system.  After a consent decree was entered in the EPA/State suit, the City moved in the citizen suit to dismiss all alleged CWA violations that occurred before July 17, 2012, as precluded by res judicata.  The court dismissed those claims with prejudice, finding that "for the purposes of res judicata, the government is necessarily in privity with those plaintiffs bringing [a] citizens' suit." *DP Marina, LLC*, 41 F. Supp. 3d at 689.

The decision in *Altamaha Riverkeeper, Inc.*, also illustrates the point.  In that CWA citizen suit, the plaintiffs asserted that Rayonier was in violation of its NPDES permit on the theory that the permit incorporated Georgia's water quality standards and that Rayonier's discharges violated those standards.  The court granted summary judgment for Rayonier:

> [T]he Riverkeeper "stands in the shoes" of Georgia EPD, who drafted the Permit.  As such, it will be considered the drafter for purposes of applying this statutory rule of [contract] construction, as judicially interpreted.  Because Georgia EPD drafted the relevant provisions and issued the permit, ***any ambiguity*** as to whether the Georgia water quality standards are incorporated ***should be construed against the Riverkeeper.***  This rule of construction also tilts in Rayonier's favor.

2015 WL 1505971 at \*7 (citation omitted).[6]

---

[6]     Emphasis added here and throughout this brief unless otherwise noted.

**B.      Application of the CWA's Diligent Prosecution Bar — An Issue of Fact.**

Under the CWA, the States have "the primary responsibilit[y] . . . to prevent, reduce, and eliminate pollution," 33 U.S.C. § 1251(b), and "citizen suits are proper only if the Federal, State, and local agencies fail to exercise their enforcement responsibility." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60 (1987) (internal quotation marks omitted).

Because TVA's diligent prosecution motion to dismiss arose under Federal Rule of Civil Procedure 12(b)(6), the Court accepted as true Plaintiffs' allegation that "Plaintiffs' claims are tailored to target alleged violations that were omitted from the State Enforcement Action." Mem. Op., Doc. 139 at PageID 5338, 5341-43.  The Court ruled that the "'diligent prosecution bar only applies to those issues sought to be addressed in a citizen action that overlap with those issues sought to be addressed by the government's suit.'" *Id.* at PageID 5340 (quoting *United States v. Bd. of Cnty. Comm'rs of Hamilton Cnty.*, 1:02 CV 00107, 2005 WL 2033708 at *11 (S.D. Ohio Aug. 23, 2005)).

Consequently, the Court found that, although "the Complaint in this action was crafted broadly, with references to many alleged violations that plainly overlap with the State Enforcement Action," Plaintiffs "fairly pled some allegations that do not overlap."  Mem. Op. Doc. 139 at PageID 5343.  Specifically, the Court found that the following allegations were not overlapping and, thus, were not subject to dismissal under the diligent prosecution bar: "unlawful discharge of pollutants to the Cumberland River from the Non-Registered Site; and unlawful discharge of pollutants from the Ash Pond Complex [to the Cumberland River] through hydrologic flows that cannot be characterized as consisting of seeps alone."  *Id.* at PageID 5346. Nevertheless, the Court recognized "that the non-overlapping allegations are still closely connected."  *Id.*

Ultimately, however, the determination of whether a matter is being diligently prosecuted by the government's enforcement action is a question of fact. *Friends of Milwaukee's Rivers & Alliance for Great Lakes v. Milwaukee Metro. Sewerage Dist.*, 556 F.3d 603, 609 (7th Cir. 2009) ("We instructed the district court to make findings of fact regarding whether the State's prosecution of MMSD's violations of the Act was diligent and to apply the law as we defined it to those facts. To do so, the court held an evidentiary hearing, in which it was necessary, among other things, to assess the credibility of witnesses."); *Williams Pipe Line Co. v. Bayer Corp.*, 964 F. Supp. 1300, 1307, 1324-27 (S.D. Iowa 1997) (making findings of fact and conclusions of law on the issue of diligent prosecution following a four-day trial); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 890 F. Supp. 470, 474 (D.S.C. 1995) (ruling "that the determination of whether DHEC's action constituted diligent prosecution sufficient to bar the Plaintiffs' citizen suit involved disputed factual matters").[7] The question of whether, as an issue of fact, the government enforcement action is being "diligently prosecuted" may be answered during the pendency of the government enforcement action or even after it has concluded.

At trial, because the standard of review governing motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) was no longer applicable, Plaintiffs had the burden of proving that the State Enforcement Action does not seek to address (1) the unlawful discharge of pollutants into the Cumberland River from the Non-Registered Site; and (2) the unlawful discharge of

---

[7]    *See also Gwaltney of Smithfield, Ltd.*, 484 U.S. at 59 ("One of the most striking indicia of the prospective orientation of the citizen suit is the pervasive use of the present tense throughout § 505. . . . [T]he undeviating use of the present tense strongly suggests [that] the harm sought to be addressed by the citizen suit lies in the present or the future, not in the past."); *Friends of the Earth, Inc.*, 890 F. Supp. at 486 ("[T]he court has determined that Congress intended to prohibit citizen suits where the governmental enforcement agency is diligently prosecuting or has diligently prosecuted a judicial action to enforce the same alleged violations of a particular permit, standard, or limitation.").

pollutants from the Ash Pond Complex to the Cumberland River through hydrologic flows that cannot be characterized as consisting of seeps alone.  *See Cmty. of Cambridge Envtl. Health & Cmty. Dev. Grp. v. City of Cambridge*, 115 F. Supp. 2d 550, 554 (D. Md. 2000) (holding that citizen plaintiffs have the burden of proving that the diligent prosecution bar does not apply); *Williams Pipe Line Co.,* 964 F. Supp. at 1324 (same).

In connection with the Court's consideration of TVA's pre-trial motion to dismiss, this Court found that some of Plaintiffs' CWA claims were barred due to the application of the diligent prosecution bar.  Mem. Op., Doc. 139 at PageID 5368.  Now, following the trial during which Plaintiffs had the opportunity to flesh out their remaining claims and show that each was separate and distinct from the issues being addressed in the State Enforcement Action, the record is clear that Plaintiffs have failed to distinguish their claims from those at issue in the State Enforcement Action.  Therefore, with the full evidentiary record now before it, the Court should apply the rulings in its September 9, 2016 decision and find that the diligent prosecution bar applies to Plaintiffs' remaining claims concerning the Ash Pond Complex and the NRS.

As explained in TVA's PFFCL, Plaintiffs claimed prior to trial that they could identify the location of all leaks, seeps, or discharges upon which their CWA claims were based.  Each alleged unpermitted discharge is labeled on the parties' Joint Map (JX 279).**[8]**  *See* PFFCL, Doc. 242 at PageID at 9682-83.)  Plaintiffs' claims of unpermitted flows from the Ash Pond Complex along the west perimeter of Odom's Bend Peninsula are identified on the Joint Map as APC-1, APC-2, APC-3, APC-4, GT-1, and GT-2. *Id.* at  PageID 9687.  Plaintiffs' claims of unpermitted

---

**8**      Joint exhibits will be referred to as (JX___.) Plaintiffs' exhibits as (Pls. Ex. ____.), and TVA's exhibits as (TVA Ex. ___.).  All exhibits are listed on the Exhibit and Witness List (Doc. 238).

flows from the Ash Pond Complex along the east perimeter of Odom's Bend Peninsula are identified on the Joint Map as ES-1, ES-2, GT-6, and GT-7. *Id.* at PageID 9685. As the Court noted at trial, the burden was on Plaintiffs to distinguish, with specific facts and evidence, flows that are not seeps alone from the seeps at issue in the State Enforcement Action. (Trial Tr. (Vol. 3) at 66:7-11, 67-68:23-2.) Plaintiffs failed to meet this burden.[9]

Plaintiffs presented no proof distinguishing sampling locations APC-1, APC-2, APC-3, and APC-4 from the seeps at issue in the State Enforcement Action. PFFCL at PageID 9687-89. Instead, Plaintiffs' own witness, Mark Quarles, testified that APC-1, APC-2, APC-3, and APC-4 are in the same location as seeps identified in the State Enforcement Action. *See id.* at PageID 9687 ¶ 203.

Plaintiffs also presented no evidence distinguishing sampling locations ES-1, ES-2, GT-6, and GT-7 from the seeps at issue in the State Enforcement Action. *See id.* at PageID 9685. Mr. Quarles acknowledged that ES-1, ES-2, GT-6, and GT-7 are in the same location as seeps identified in the State Enforcement Action, *id.* ¶¶ 195, and that flows from ES-1 and ES-2 were each "diffuse flow springs," which are not conduit flows. *id.* ¶ 193. Further, according to another of Plaintiffs' witnesses, Dr. Vengosh, the diffuse flow springs from ES-1 and ES-2 were "pristine" and not contaminated by coal ash. *See id.* at PageID 9685-86 ¶¶ 197-200.

Thus, not only do Plaintiffs' Ash Pond Complex claims overlap, the evidence shows that they are ***indistinguishable*** from the claims sought to be addressed by the State Enforcement

---

[9] The seeps identified by Plaintiffs as at issue in the State Enforcement Action are Seeps 1, 2, 3, 4, 5, 6, 7, 10, 11 and 12. (Trial Tr. (Vol. 1) at 14:8-16; State Compl., Doc. 13-5 at PageID 330 ¶ 37.) Notably, Plaintiffs' complaint in this Federal action identifies the ***same*** seeps (*compare* Joint Map, Doc. 220-1 *with* Compl. Ex. 6, Doc. 1-8), and Plaintiffs' proof at trial merely re-labeled the seeps as "APCs" without making any distinction whether the samples taken before the Court's September 9, 2016 ruling were evidence of discharges from Seeps or from Seeps that were newly re-labeled as APCs.

Action. *See* Mem. Op., Doc. 139 at 5340 ("[A] diligent prosecution bar . . . applies to those issues sought to be addressed in a citizen action that overlap with those issues sought to be addressed by the government's suit.") (citations omitted).

The diligent prosecution bar also applies for the additional reason that Plaintiffs' citizen enforcement action and the State Enforcement Action seek to abate and remediate the same issues. *Karr v. Hefner*, 475 F.3d 1192, 1199 (10th Cir. 2007) (applying diligent prosecution bar despite consent decree's omission of several specific violations alleged by citizen because the consent decree had "as its underlying purpose the resolution of all claims"); *see also Friends of Milwaukee's Rivers & Alliance for Great Lakes*, 556 F.3d at 610-11; *Friends of Milwaukee's Rivers & Lake Mich. Fed'n v. Milwaukee Metro. Sewerage Dist.*, 382 F.3d 743, 760-61 (7th Cir. 2004); *N. & S. Rivers Watershed Ass'n v. Town of Scituate*, 949 F.2d 552, 556 (1st Cir. 1991).

Both the State Enforcement Action and this action seek to address alleged seepage from the embankment dikes of the Ash Pond Complex and the NRS into the Cumberland River and alleged leakage from the bottom of the Ash Pond Complex and the NRS into the Cumberland River through groundwater. Both seek a remedy to abate any CWA violations as to the "entire peninsula." (Trial Tr. (Vol. 3) at 204:22-23.) Now, following a full trial, the evidentiary record makes clear that while there may have been technical pleading differences between the claims made against TVA in both actions, the claims and requested remedy in the State Enforcement Action, which seeks a corrective action for the entire peninsula, cannot be distinguished from Plaintiffs' claims and requested remedy in this action.[10]

---

[10]    "Instead of the more stringent federal standard, Tennessee employs a 'liberal notice pleading standard,' the primary purpose of which is merely 'to provide notice of the issues presented to the opposing party and the court.'" *Jackson v. Cooper Tire & Rubber Co.*,

**C.    Under Fundamental Principles of Permit Interpretation, Due Process, and Fair Notice, TVA is Entitled to Judgment in Its Favor on Plaintiffs' Allegations of Permit Provision Violations.**

In 2009, TVA submitted a renewal application for the Gallatin Permit.  During the permitting process, several environmental advocacy groups (including Plaintiff TCWN) submitted comments to TDEC regarding the draft Permit.  (Letter from Environmental Integrity Project to TDEC (June 13, 2011), JX 150.)  The environmental groups alleged that, in the draft Permit, TDEC had failed to address all known discharges — flows of CCR leachate from the Ash Pond Complex and the NRS to the Cumberland River via embankment seeps and via seeps flowing into groundwater that is hydrologically connected to the Cumberland River.  (*Id.* at 15-16.)

At trial, however, the evidence showed that TDEC already was aware of the possibility of flows of CCR leachate from the Ash Pond Complex and the Non-Registered Site to the Cumberland River via embankment seeps and via groundwater that is hydrologically connected to the Cumberland River when TDEC reissued the Gallatin Permit effective on July 1, 2012. (*E.g.,* Trial Tr. (Vol. 2) at 43:1-11, 55:10-13; Trial Tr. (Vol. 4) at 95:23-96:17; JX 137.)  Further, in the Permit's Addendum to Rationale, TDEC specifically addressed the public comments from the environmental advocacy groups regarding the alleged discharges.  (Permit, Doc. 1-2 (JX 102) at PageID 105-06.)

"Generally speaking, the Court must interpret an NPDES Permit in the same manner as it would a contract, determining first whether a particular term has an unambiguous meaning, and, if the meaning is ambiguous, looking to the document as a whole, its underlying purpose, and, if

(. . . continued)
57 F. Supp. 3d 863, 868 (M.D. Tenn. 2014) (quoting *Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 426 (Tenn. 2011)).

necessary, appropriate extrinsic evidence to aid the Court's construction."  Mem. Op., Doc. 139 at PageID 5360 (citing *Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty., Md.*, 268 F.3d 255, 269-70 (4th Cir. 2001)).

It is, of course, well recognized that applicable interpretation "aids include the circumstances surrounding the formation of the [document]."  *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 238 (1975).  And "[s]uch reliance does not in any way depart from the 'four corners' rule[.]"  *Id.*; *see also* Restatement (Second) of Contracts § 202 (1981) (Rules in Aid of Interpretation) (enumerating fundamental principles of interpretation applicable here).  And where through a course of dealing an "interpretation has been adhered to over many years by all the parties, including those government officials who drew up and administered the decree from the start," the interpretation cannot be nullified and replaced "simply because another reading might seem more consistent" with the underlying statutory purpose.  *United States v. Atl. Refining Co.*, 360 U.S. 19, 23-24 (1959).

Significantly, "[c]ourse of dealing may become a part of an agreement either by explicit provision or by tacit recognition," and "[t]here is no requirement that an agreement be ambiguous before evidence of course of dealing can be shown[.]"  Restatement (Second) of Contracts § 223 cmt. b (1981).  Also, any ambiguities are to be construed against the Plaintiffs. *See Altamaha Riverkeeper, Inc.*, 2015 WL 1505971, at *7 (construing ambiguity in the NPDES permit against the citizen plaintiffs).

When analyzed under the above principles, Plaintiffs' allegations of Permit violations based on discharges via seepage through the embankments and hydrologically connected groundwater must fail.  When TDEC reissued the Permit in 2012, TDEC knew there was ongoing seepage from the unlined Gallatin facilities and contemplated that there would continue

to be a volume of wastewater seepage containing coal ash leachate from the unlined Gallatin facilities.  Mr. Janjic, the Manager of the Water-Based Systems Unit of TDEC's Division of Water Resources, testified on cross-examination about the Permit's Sanitary Sewer and Removed Substances provision.  (Trial Tr. (Vol. 2) at 62:3-63:22.)  Mr. Janjic testified that TDEC was aware of the possibility of seeps and that, in the Addendum to Permit Rationale, TDEC wrote almost two pages of explanation regarding seeps and how TDEC expected seeps to be de minimis and the impacts inconsequential.  (*Id*. at 62:6-25.)

*If* seepage discharges were a violation of the Permit's Sanitary Sewer or Removed Substances provision, there would have been no need for TDEC to write two pages of explanation about how TDEC has addressed seeps through the Permit's dike inspection provisions (Permit, Doc. 1-2 (JX 102) at PageID 105), how "***TDEC experience*** with these seeps is that additional pollutant loading, if possible, would be de minimus [sic]" (*id.* at PageID 105), or why TDEC determined that "no NPDES permit conditions are established" for possible discharges via groundwater with a hydrologic connection to the Cumberland River (*id.* at PageID 106).

*If* TDEC in 2012 had considered seepage through the embankments and hydrologically connected groundwater to be prohibited because such seepage is not authorized by the Permit, there would have been no need for TDEC's extensive discussion in the Permit's Addendum to Rationale.  (*Id.* at PageID 105-06.)  Instead, the Permit's Addendum to Rationale simply would have stated that all seepage of coal ash leachate from the unlined Gallatin facilities to surface or subsurface waters would henceforth be prohibited as not authorized by the reissued Permit— thereby prospectively informing the public and TVA of TDEC's interpretation of the reissued Permit.

Also, there is no evidence that TDEC notified TVA in 2012 that it was construing the reissued Permit such that the ongoing seepage from the unlined Gallatin facilities to surface or subsurface waters would constitute an immediate breach of the Permit.  *If* TDEC had so construed the reissued Permit in 2012, basic considerations of due process, fair dealing, and fair notice would have required such notification.

In *Wisconsin Res. Prot. Council v. Flambeau Mining Co*., a CWA enforcement action, the Seventh Circuit stated:  "Informed by basic principles of due process, it is a cardinal rule of administrative law that a regulated party must be given fair warning of what conduct is prohibited or required of it."  727 F.3d 700, 707 (7th Cir. 2013) (internal quotation marks omitted).  The court then reversed a bench trial finding that the defendant mining company had violated the CWA by discharging copper into navigable waters without a proper permit.  *Id*. at 711.  Under principles of due process and fair notice, the court held that the mining company could not be liable where the state permitting authority had issued a mining permit and informed the mining company—incorrectly—that the mining permit constituted a valid NPDES permit.  *Id*.

The above legal principles are clearly applicable here given the long course of dealing between TDEC and TVA treating the long-known ongoing seepage from the unlined Gallatin facilities as permissible and authorized.  And, because Plaintiffs stand in the shoes of TDEC, these principles apply with equal force here.

D.     **Plaintiffs' Requested Injunctive Remedy is Not Warranted and Would Not Be in the Public Interest.**

Although a district court may prescribe injunctive relief in a citizen enforcement action to impel future compliance with the CWA, *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 173 (2000), "[i]t goes without saying that an injunction is an

14

equitable remedy," and is not "a remedy which issues as of course," or "to restrain an act the injurious consequences of which are merely trifling." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311–12 (1982) (internal citations and quotation marks omitted). "Injunctive relief— especially mandatory injunctive relief—is a 'drastic and extraordinary' remedy, available only in unusual situations." *Sierra Club v. Virginia Elec. & Power Co.*, No. 2:15-CV-112, 2017 WL 1095039, at *9 (E.D. Va. Mar. 23, 2017) (quoting *Monsanto Co. v. Geerston Seed Farms*, 561 U.S. 139, 165 (2010)).

Assuming arguendo that Plaintiffs have met their burden of proof on liability (which they have not), Plaintiffs wholly failed to meet their burden of showing that they are entitled to their "***demand [for] draconian injunctive relief***"—the complete excavation and removal offsite of the 11 million cubic yards of coal ash stored at Gallatin. *Id.* at *9 ("It [Sierra Club] wants the Court to order Dominion to move over three million tons of coal ash to a landfill that may not even be willing to accept it."). In addition to Plaintiffs' failure to make the required four-factor showing for injunctive relief, *see e.g.*, *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006), Plaintiffs' offered no proof at trial showing why their requested remedy is warranted in light of the following: the Court's diligent prosecution ruling; the on-going work under the EIP and Agreed Temporary Injunction in the State Enforcement Action; TVA's compliance obligations under the CCR Rule; the collateral environmental and safety concerns and public infrastructure impacts associated with hauling the ash away from Gallatin over several decades; and the economic waste associated with a proposed remedy to address alleged discharges (without any proof of irreparable harm) at a cost of $2 billion that will ultimately be borne by TVA's ratepayers.

1.     *Sierra Club v. Va. Elec. & Power Co.* **Offers a Practical Solution for Technical Violations of the CWA for Which There is No Proof of Irreparable Harm.**

This Court's determination of the appropriate relief, one that does not require the assistance of either an expert witness on remediation or a special master, is best informed by the recent decision in a similar CWA citizen suit, *Sierra Club v. Va. Elec. & Power Co.*, No. 2:15-CV-112, 2017 WL 1095039 (E.D. Va. Mar. 23, 2017).[11]  *Sierra Club* was a citizen enforcement action involving a power generating station in Virginia, Chesapeake Energy Center ("the CEC"), operated by Virginia Electric Power Company, d/b/a Dominion Virginia Power ("Dominion").  2017 WL 10955039, at *1.  The coal-fired CEC is situated on a peninsula bounded on three sides by water.  *Id.*  Dominion stored coal ash from its electricity production in a series of piles amounting to slightly less than three million cubic yards of coal ash.  *Id.* at *2.[12] Like Plaintiffs' allegations here, Sierra Club alleged that Dominion was violating the CWA and its NPDES permit and demanded both civil penalties and complete excavation and removal of all coal ash from the CEC.  *Id.* at *1.

Following a bench trial, the district court found Dominion in violation of the CWA because the groundwater discharging into the surrounding surface waters contained an unpermitted discharge of arsenic.  *Id.* at *1, 7-10 & n.10.  However, the court rejected ***both*** of Sierra Club's demands for relief finding that because "Dominion's conduct does not merit the assessment of civil penalties [and] the evidence does not justify the draconian injunction [of

---

[11]     The CWA's diligent prosecution bar and permit shield exception were not at issue.

[12]     For comparison, Plaintiffs in this action demand that TVA excavate and remove 11 million cubic yards of coal ash from Gallatin is more than ***five times*** the volume of coal ash at issue in *Sierra Club*.  2017 WL 1095039, at *9 ("three million tons of coal ash").

complete excavation and removal when] a lesser measure will do." *Id.* at *1, 9-11. The court

found that while arsenic may be discharging into the surrounding waters, there was no proof of

any environmental harm:

> While the evidence shows that Dominion does discharge some arsenic into
> surface waters surrounding the CEC, it does not show how much. The Court
> cannot determine how much groundwater reaches the surface waters, or how
> much arsenic goes from the CEC to the surrounding waters. It could be a few
> grams each day, or a much larger amount. **What the Court does know, however,
> is that the discharge poses no threat to health or the environment.** All tests of
> the surface waters surrounding the CEC have been well below the water quality
> criteria for arsenic. This fact, however, does not indicate that a miniscule amount
> of arsenic reaches the water. **The CEC is surrounded by an enormous amount
> of water, and even a large arsenic discharge would amount to a drop in the
> bucket.** But this fact does demonstrate the absence of significant environmental
> harm.

*Id.* at *4.

The court found that Sierra Club failed to show that complete excavation and removal

would be in the public interest:

> The Sierra Club's evidence in support of its proposed remedy is
> remarkable only for what it does not show. **The plaintiff has offered no credible
> evidence of the cost of this removal. It has offered no credible evidence of how
> long it would take to move the ash. It has offered no credible evidence of how
> the ash will safely travel across Tidewater Virginia.**
>
> The plaintiff's damage experts have not considered the simple fact known
> by everyone who has ever dug a hole and moved dirt around in his or her yard.
> When one digs a hole, some of the dirt slops over and does not go where it is
> supposed to wind up. **How much spillage will occur when someone moves three
> million tons of ash? How many truck wrecks will occur with resulting coal ash
> dropped on the roads, and perhaps on the motorists? The Sierra Club does not
> consider, much less address, these questions.**
>
> The Sierra Club's desperation to provide some evidence to support its
> requested relief causes it to speculate. **It says that Dominion might be able to
> cart the coal ash around Virginia on train cars. But again, this speculation
> leads to nothing but unanswered questions. How many train cars would it
> take? Do tracks still run where the ash needs to go? Where are the loading
> and unloading facilities? Will the ash blow out of the cars as the big train**

> *keeps on rolling?*

*Id.* at *9-10.

In fact, the court found that Sierra Club's request that Dominion be ordered to remove all of the coal ash was not in the public interest:

> As discussed above, ***no evidence shows that any injury, much less an irreparable one, has occurred to health or the environment.*** In contrast, the ***hardships of the proposed injunction on Dominion are enormous***, given the absence of any evidence of the amount of arsenic going into the water. The ***proposed injunction will entail years of effort costing hundreds of millions of dollars, for very little return. The public interest will not be served. Dominion receives income through rates charged to its customers; those rates would likely rise to pay for the Sierra Club's proposal. Moreover, the Sierra Club has not even attempted to itemize the collateral environmental effects of moving this much coal ash.***

*Id.* at *9.

After finding no evidence of environmental harm and no benefit to the public from the requested remedy of complete removal, the court ordered Dominion: (1) to conduct an extensive monitoring program with reporting requirements to the state regulating agency and to Sierra Club and (2) to reopen its application process for a revised NPDES permit. *Id.* at *10.

The relief ordered in *Sierra Club* is consistent with Supreme Court precedent in CWA cases. In *Weinberger*, the Navy was found to be in violation of the CWA for discharging ordnance into navigable waters without an NPDES permit. As in *Sierra Club*, these discharges had "not harmed the quality of the water." *Weinberger*, 456 U.S. at 307. As the Supreme Court recounted, "[r]ecognizing that violations of the Act must be cured," the district court ordered the Navy to apply for an NPDES permit. The district court refused to enjoin the discharges, finding that the Navy's "technical violations" were not causing any "appreciable harm" to the environment. *Id.* at 309-10 (internal quotation marks omitted).

The Supreme Court upheld the district court's approach, explaining that an "injunction should issue only where the intervention of a court of equity is essential in order effectually to protect property rights against injuries otherwise irremediable." *Weinberger*, 456 U.S. at 312. With these principles in mind, the Supreme Court found that the CWA's purpose to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" would be "achieved by compliance with the Act, including compliance with the permit requirements." *Id.* at 314-15. Thus, since the "discharge of ordnance had not polluted the waters," the district court's decision to not enjoin the discharges did not mean that it had "ignored the statutory violation [or] undercut the purpose and function of the permit system." *Id.* at 315. Rather, the Supreme Court found the district court's order that the Navy apply for a permit sufficient to remedy the violation. *Id.*[13]

### 2. Plaintiffs' Demand for Injunctive Relief is Subject to the Diligent Prosecution Bar.

The Court's September 9, 2016 decision made clear that Plaintiffs' claims which overlap with the issues being addressed in the State Enforcement Action "must be dismissed" pursuant to the CWA's diligent prosecution bar. *See* Mem. Op., Doc. 139 at PageID 5346. As evidenced by the trial record, Plaintiffs' remedy demand overlaps with TVA and TDEC's work under the EIP

---

[13] Other courts have followed this approach. *Dubois v. U.S. Dep't Agric.*, 102 F.3d 1273, 1294 (1st Cir. 1996) ("The most important component of the Act is the requirement that an NPDES permit be obtained."); *W. Va. Highlands Conservancy, Inc. v. Huffman*, 651 F. Supp. 2d 512, 529 (S.D. W. Va. 2009) (ordering defendant to apply for and obtain NPDES permit); *W. Va. Highlands Conservancy. Inc. v. Huffman*, 588 F. Supp. 2d 678, 693 (N.D. W. Va. 2009) (same); *Idaho Conservation League v. Atlanta Gold Corp.*, 879 F. Supp. 2d 1148, 1164 (D. Idaho 2012) (directing defendant to "come into compliance" with the NPDES program); *cf. United States v. Bay-Houston Towing Co.*, 197 F. Supp. 2d 788, 795 (E.D. Mich. 2002) ("The more relevant and cogent line are the cases which hold that injunctive relief is not appropriate under traditional equitable principles even though the activity is being carried out either in the absence of a permit or while an application is pending.").

and the Agreed Temporary Injunction and TDEC's development of the corrective action plan. Indeed, counsel for the State of Tennessee described how TDEC's corrective action plan will cover the entire Gallatin site:

> The purpose of the [EIP] is, once the [EIP] is complete—TDEC is receiving the data as it comes in.  TVA is also reviewing that data—TVA will prepare an environmental assessment report that they present to the State.
>
> The State will review that, alone with its own interpretation of the data, and ultimately the State will reach a corrective action determination.

(Trial Tr. (Vol. 3) at 204:9-206:13.)

If the Court were to order a remedy to address Plaintiffs' allegations that the Court found did not overlap with those at issue in the State Enforcement Action, it would be necessary to craft a closure remedy that would carve out the matters at issue in the State Enforcement Action. At a minimum, such a remedy would be inefficient and costly; at most, it would be difficult to implement and could conflict with TDEC's corrective action determinations.

Further, if the Court were to order the complete excavation and removal requested by Plaintiffs, it would render useless the EIP work that TVA and TDEC have been diligently pursuing at a cost of $10 million at the time of trial.  (JX 270 at 3.)  Moreover, such an order would contravene the diligent prosecution bar, as it would put the Court in the position of designing a closure plan, *see Friends of Milwaukee's Rivers& Lake Mich. Fed'n*, 382 F.3d at 760, and would offend principles of comity and federalism.  *See United States v. City of Detroit*, No. 77-71100, 2013 WL 1282021, at *10 (E.D. Mich. Mar. 27, 2013) (finding, in a CWA case, that "remedies that override state or local law should be narrowly tailored and that, to the extent possible, local officials should at least have the opportunity to devise their own solutions to remedy a violation of federal law.").

3. **TVA's Compliance Obligations Under the CCR Rule Render Plaintiffs Requested Injunctive Remedy Unnecessary and Unwarranted.**

The relief ordered in *Sierra Club*, a program of extensive monitoring and reporting, together with permit compliance requirements, is precisely what TVA is doing in the State Enforcement Action and what TVA will be required to do in order to comply with its obligations under the CCR Rule. (Trial Tr. (Vol. 3) at 77:1-2 ("The CCR rule requires that the groundwater monitoring network be certified by a qualified engineer."); Lang DT, Doc. 229-1 (TVA Ex. 205) at PageID 8566-68 (discussing the Gallatin CCR Rule Closure Plan (JX 191) including the requirement that TVA install and "maintain the groundwater monitoring system throughout the active life and post-closure period of the Ash Pond Complex").

The CCR Rule provides for two alternative closure methods—closure by removal or closure in place. 40 C.F.R. § 257.102 ("Closure of a . . . CCR surface impoundment . . . must be completed either by leaving the CCR in place and installing a final cover system or through removal of the CCR and decontamination of the CCR unit."). In the preamble to the final rule, EPA acknowledged that "most facilities will likely not clean close their CCR units given the expense and difficulty of such an operation" and that "***both methods of closure (i.e., clean closure and closure with waste in place) can be equally protective, provided they are conducted properly.***" 80 Fed. Reg. 21,302, 21,412 (Apr. 17, 2015). Moreover, "the final rule allows the owner or operator to determine whether clean closure or closure with waste in place is appropriate for their particular unit." *Id.*

Thus, after years of studying the complex technical and scientific issues associated with closure of CCR surface impoundments, EPA found that both closure-in-place and closure-by-removal can be equally protective of the environment if conducted properly. If the Court were to

order the remedy demanded by Plaintiffs, the Court would be ordering and overseeing a remedial action which EPA did not require and, without the benefit of any of the relevant technical considerations set forth in the CCR Rule, would be invalidating the EPA's considered policy judgment that individual owner/operators should be allowed to determine the best closure plan for each particular site.

### E. Appointment of an Expert Witness or a Special Master is Not Necessary.

TVA's closure obligations under the CCR Rule, coupled with TDEC's development of a corrective action plan for the Gallatin facility and its assessment of TVA's pending NPDES permit application, render unnecessary the appointment of an expert witness or special master on the issue of remediation. The appointment of a third-party "expert" to conduct a separate investigation and analysis of closure of the Gallatin facility, a facility TDEC is charged with regulating and monitoring, is inefficient, a waste of resources, and will create a significant risk of conflict with TDEC's regulatory role and corrective action determinations.[14]

The enlistment of court-appointed expert assistance under Federal Rule of Evidence 706[15] ("Rule 706") is not commonplace. *See* Fed. R. Evid. 706, Adv. Comm. Note ("experience indicates that actual appointment [of a Rule 706 witness] *is a relatively infrequent occurrence*");

---

[14]    Counsel for the State of Tennessee and TDEC in the State Enforcement Action advised the Court that the EIP "covers 16 . . . separate investigations that have separate sampling analysis plans to go along with those. ***It's a massive undertaking.*** Data is starting to come in. . . . ***For the entire site.***" (Trial Tr. (Vol. 3) at 204:13-16.) Counsel for the State and TDEC further informed the Court that the ongoing EIP covers the "***entire peninsula.***" (*Id.* at 204:22-23.) TVA and Plaintiffs agreed with TDEC's Counsel as to her summary of what is diligently being prosecuted in the State Enforcement Action. (*Id.* at 208:10-20.) Thus, according to TDEC, the agency charged with enforcing the standards and limitations of the CWA in Tennessee, the corrective action plan being developed by TDEC and TVA addresses the entire peninsula.

[15]    "The court may order the parties to show cause why expert witnesses should not be appointed and may ask the parties to submit nominations." Fed. R. Evid. 706(a).

*see also* 29 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure* § 6302 n.18 (3d ed.) (quoting Joe S. Cecil and Thomas E. Willging, *Court-Appointed Experts*, in Federal Judicial Center Reference Manual on Scientific Evidence at 539 (Federal Judicial Center, 1994) ("Judges view the appointment of an expert as an ***extraordinary activity*** that is appropriate only in rare instances in which the ***traditional adversarial process has failed*** to permit an informed assessment of the facts.")); *Applegate v. Dobrovir, Oaks & Gebhardt*, 628 F. Supp. 378, 383 (D. D.C. 1985), *aff'd* 809 F.2d 930 (D.C. Cir. 1987) (appointment of expert appropriate only in "***compelling circumstances***").

The appointment of a Rule 706 witness also raises numerous procedural issues including the timing of the appointment; how the Court, the parties, and the expert should communicate concerning the issues and the expert's duties in the case; the necessary discovery; the scope of the expert's testimony and cross-examination; and the expert's compensation. *See* 29 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure* § 6305 (3d ed.) (discussing procedural issues related to appointment of a Rule 706 expert witness).

Further, the "use of Rule 706 should be reserved for exceptional cases in which the ordinary adversary process does not suffice," such as "complex mass tort problems" that call upon the court to resolve causation and assign damages when the "number of persons affected runs into the hundreds of thousands." *In re Joint E. & S. Dists. Asbestos Litig*., 830 F. Supp. 686, 693 (S.D.N.Y. 1993); *see also Ledford v. Sullivan*, 105 F.3d 354, 359 (7th Cir. 1997) (declining to require Rule 706 expert in a complex medical malpractice case where the "determining [issue]," although technical and medical in nature, "was not so complicated that an expert was required"). This is not a case where the ordinary adversarial process has failed. Although this matter is no doubt technical in nature, it is not so "exceptional" that the technical

aspects have caused a breakdown in the "ordinary adversary process." *Asbestos Litig.*, 830 F. Supp. at 693.

Finally, a Rule 706 expert should not be appointed when doing so would be tantamount to the court assisting a party in proving its case. *See, e.g.*, *Tangwall v. Robb*, No. 01-10008-BC, 2003 WL 23142190, at *3-*4 (E.D. Mich. Dec. 23, 2003) (refusing to grant request to appoint expert witness on the ground that it would be tantamount to assisting a party in meeting its burden of proof). The appointment of a Rule 706 expert would be virtually unworkable without, in effect, reopening the proof in this case. It is simply too late to implement effectively and fairly the procedures governing court-appointed experts without reopening the proof at a significant cost to the parties and to the resources of the Court. *United States v. Weathers*, 618 F.2d 663, 664 (10th Cir. 1980) (error to appoint expert after presentation of evidence was completed and proof submitted).[16]

Appointment of a special master pursuant to Federal Rule of Civil Procedure 53 is equally inappropriate. Like a Rule 706 expert, appointment of a special master is "the exception, not the usual or common practice."[17]   9C Charles Alan Wright & Arthur R. Miller, *Federal*

---

[16]    The Tenth Circuit Court of Appeals noted in *Weathers* that the requirements of Rule 706 were "designed in part to lessen the risk that the adversary system would be encroached upon by a judge's assumed inquisitorial power" and that Rule 706 is ordinarily "***invoked considerably before trial*** since to comply with subdivision (a) there must be time for (1) a hearing on the order to show case, (2) consent by the designated expert, (3) notification of the expert of his duties either in writing or at a conference, and (4) findings by the expert which (5) must be communicated to the parties." 618 F.2d at n.1 (internal quotation marks and citation omitted).

[17]    Procedural considerations also apply to appointment of a special master under Rule 53(a)(1)(C). There must be an order setting forth the master's duties, including the scope of any investigation or enforcement duties, the scope of what the master may consider, whether evidence will be taken, and the time limits for any report of findings of fact. *See* Fed. R. Civ. P. 53(b) & (c). The Court must also determine the procedures and standards of review for the

*Practice and Procedure* § 2602.1 (3d ed.)  It is long-accepted that use of a special master

generally increases the cost of litigation as well as delays the ultimate resolution of the case.  *See*

*Adventures in Good Eating, Inc. v. Best Places to Eat, Inc.*, 131 F.2d 809, 815 (7th Cir. 1942)

("It is . . . common knowledge that references ***generally increase the cost of litigation and delay***

***and postpone the end of litigation.  References are expensive and time-consuming.  The delay***

***in some instances is unbelievably long***.  Likewise, the ***increase in cost is heavy***.").

### III.    CONCLUSION

For the reasons provided and upon the authorities cited herein and in TVA's

accompanying Proposed Findings of Fact and Conclusions of Law, TVA requests that judgment

be entered in favor of TVA.

<div style="margin-left: 40%;">

Respectfully submitted,

*s/David D. Ayliffe*_____
James S. Chase, Associate General Counsel
David D. Ayliffe (BPR 024297)
Lane E. McCarty (BPR 02834)
TVA GENERAL COUNSEL'S OFFICE
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Telephone 865.632.8964
ddayliffe@tva.gov

Attorneys for Tennessee Valley Authority

</div>

---

(. . . continued)
master's order, report, or recommendations and determine appropriate compensation.  *See* Fed.
R. Civ. P. 53(f) & (g).

## CERTIFICATE OF SERVICE

I certify that on April 14, 2017, the foregoing document was filed electronically through the Court's ECF system. Notice of this filing will be sent by operation of the Court's ECF system to counsel for all parties as indicated below. Parties may access this filing through the Court's ECF system.

Delta Ann Davis, Esq.
Elizabeth A. Alexander, Esq.
Anne E. Passino, Esq.
Southern Environmental Law Center
2 Victory Avenue, Suite 500
Nashville, Tennessee 37213
Telephone 615.921.9470
adavis@selctn.org

Frank S. Holleman III, Esq.
Southern Environmental Law Center
601 West Rosemary Street, Suite 220
Chapel Hill, North Carolina 27516-2356
Telephone 919.967.1450
fholleman@selcnc.org

Jonathan Gendzier, Esq.
Southern Environmental Law Center
103 East Water Street, Suite 201
Charlottesville, Virginia 22902
Telephone 434.977.4090
jgendzier@selcva.org

Shelby Renee Burks Ward, Esq.
Tennessee Clean Water Network
625 Market Street, 8th Floor
Knoxville, Tennessee 37902
Telephone 865.522.7007
shelby@tcwn.org

*s/David D. Ayliffe*
David D. Ayliffe
Attorney for Tennessee Valley Authority

41791831