# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **TENNESSEE CLEAN WATER NETWORK** | ) | |
| **and TENNESSEE SCENIC RIVERS** | ) | |
| **ASSOCIATION,** | ) | Case No. 3:15-cv-00424 |
| | ) | |
| Plaintiffs, | ) | Judge Crenshaw |
| | ) | |
| v. | ) | Magistrate Judge Holmes |
| | ) | |
| **TENNESSEE VALLEY AUTHORITY,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## CONSERVATION GROUPS' POST-TRIAL BRIEF

# **Table of Contents**

I.   TVA OPERATES UNDER A LIMITED EXCEPTION TO THE CLEAN WATER ACT'S
PROHIBITION ON THE DISCHARGE OF POLLUTION FROM THE ASH POND COMPLEX .......... 1

II.   TVA IS IN VIOLATION OF THE CLEAN WATER ACT BECAUSE OF NPDES PERMIT
VIOLATIONS AT THE ASH POND COMPLEX ........................................................................ 2

    A.   Removed Substances Provision .......................................................................... 2

    B.   Proper Operations and Maintenance. .................................................................. 5

    C.   Sanitary Sewage Overflows. ............................................................................... 6

III.   TVA WAS NOT AUTHORIZED BY THE PERMIT TO HAVE OR MAINTAIN SEEPS AT
THE ASH POND COMPLEX OR THE NRS, AND TVA'S PERMIT SHIELD ARGUMENT MUST
FAIL  ............................................................................................................................... 7

    A.   Burden of Proof for Permit Shield. ..................................................................... 8

    B.   TVA's Assertion of the Permit Shield Affirmative Defense is Without Merit............................. 10

IV.   CLEAN WATER ACT LIABILITY. ............................................................................. 13

A.   Discharges to Groundwater that is Hydrologically Connected to Surface Water is Prohibited by the
Clean Water Act...................................................................................................................... 14

B.   The Non-Registered Site and the Ash Pond Complex Are Point Sources. ......................................... 19

V.   CONSERVATION GROUPS' CLAIMS ARE NOT BARRED BY DILIGENT PROSECUTION.  21

VI.   TVA'S PAST POLLUTION IS NOT A BAR TO CONSERVATION GROUPS' CLAIMS, BUT
INSTEAD ESTABLISHES A CONTINUING VIOLATION. .................................................. 22

VII.   REMEDIES FOR VIOLATIONS OF THE CLEAN WATER ACT. ........................................... 24

    A.   The Removed Substances Provision Requires Removal of the Ash. .............................................. 24

    B.   Excavation and Removal is Required by the Clean Water Act Because it is the Only Remedy That
Will Stop the Unpermitted Discharges. ..................................................................................... 28

    C.   Based on the Statutory Penalty Factors, Civil Penalties are Appropriate. ....................................... 32

    D.   Conservation Groups are Entitled to an Award of Attorneys' Fees and Costs. .............................. 33

VIII.   APPOINTMENT OF AN EXPERT. ............................................................................... 33

Case 3:15-cv-00424   Document 246   Filed 04/14/17   Page 2 of 41 PageID #: 10076

# Table of Authorities

## Cases

*Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536 (6th Cir. 2004).......... 8, 27

*Amoco Prod. Co. v. Village of Gambell, A.K.*, 480 U.S. 531 (1987) ............................................. 29

*Ass'n Concerned Over Res. & Nature, Inc. v. Tenn. Aluminum Processors, Inc.*,
No. 1:10–00084, 2011 WL 1357690 (M.D. Tenn. 2011) ............................................... 15, 17

*Burlington N.R.R. v. Bair*, 957 F.2d 599 (8th Cir. 1992) ................................................. 28, 29, 30

*Chevron v. NRDC*, 467 U.S. 837 (1984)........................................................................................ 16

*Consolidation Coal Co. v. Costle*, 604 F.2d 239 (4th Cir. 1979)................................................. 20

*eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)......................................................... 29

*E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112 (1977)...................................................... 9

*Frilling v. Vill. of Anna*, 924 F. Supp. 821 (S.D. Ohio 1996) .............................................. 21, 27

*Greater Yellowstone Coalition v. Larsen*, 641 F.Supp. 2d 1120 (D. Idaho) .............................. 18

*Greenfiled Mills, Inc. v. Goss,* No. 1:00-cv-0219, 2005 WL 1563433 (N.D. Ind. June 28, 2005) ............ 23

*Gwaltney v. Chesapeake Bay Found.*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987) ............... 27

*Hawaii Wildlife Fund v. Cty. of Maui*, 24 F.Supp. 3d 980 (D. Haw. 2014).......................... 1, 18

*Idaho Rural Council v. Bosma,* 143 F.Supp. 2d 1169 (D. Idaho 2001) ...................................... 17

*In re: 539 Alaska Placer Miners, More or Less, & 415 Alaska Placer Miners, More or Less, Permittees*,
No. 1085-06-14-402C, 1990 WL 324284 (E.P.A. Mar. 26, 1990) ............................................ 3

*McClellan Ecological Seepage Situation v. Weinberger,* 707 F.Supp. 1182 (E.D. Cal. 1988) ................. 18

*N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007)................................. 14

*N. Cal. Riverwatch v. Mercer Fraser Co.*, No. C-04-4620,
2005 WL 2122052 (N.D. Cal. 1 Sept. 2005) .................................................................... 15

*Nat. Res. Def. Council, Inc. v. Cty. of Los Angeles*, 725 F.3d 1194 (9th Cir. 2013)...................... 8

*Nat. Res. Defense Council, Inc. v. Costle*, 568 F.2d at 1374 ........................................................ 8

*Ohio Valley Environmental Coalition, Inc. v. Hernshaw Partners, LLC*,
984 F.Supp. 2d 589 (S.D.W.Va. 2013).............................................................................. 20

*Ohio Valley Environmental Coalition, Inc. v. Apogee Coal Co.*,
555 F. Supp. 2d 640 (S.D.W.Va. 2008)............................................................................. 30

*Ohio Valley Environmental Coalition, Inc. v. Fola Coal Co., LLC*, No. CV 2:13-5006,
2015 WL 5972430 (S.D.W. Va. Oct. 14, 2015)................................................................. 31

*Quivara Mining Co. v. EPA*, 765 F.2d 126 (10th Cir. 1985) ...................................................... 14

*S. Appalachian Mountain Stewards v. A & G Coal Corp.*, 758 F.3d 560 (4th Cir. 2014)........................... 9

*San Francisco Baykeeper v. Levin Enterprises, Inc.*, 12 F. Supp. 3d 1208 (N.D. Cal. 2013) ..................... 9

*Sierra Club v. Abston Constr. Co.*, 620 F.2d 41 (5th Cir. 1980) ................................................ 20

*Sierra Club v. ICG Hazard, LLC*, 781 F.3d 281 (6th Cir. 2015) ........................................... 1, 13

*Sierra Club v. Va. Elec. And Power Co.*, No. 2:15-CV-112,
2017 WL 1095039 (E.D. Va. Mar. 23, 2017) ................................................................... 18

*Sierra Club v. Young Life Campaign, Inc.*, 176 F. Supp. 3d 1070 (D. Colo. 2001) .................................. 12

*Stepniak v. United Materials, LLC*, No. 03–CV–569A,
2009 WL 3077888 (W.D.N.Y. Sept. 24, 2009) ................................................................. 23

*Tenn. Clean Water Network v. TVA*, 206 F.Supp. 3d 1280 (M.D. Tenn. 2016) ........................ 2, 10, 21, 22

*Torres–Santiago v. Municipality of Adjuntas,* 693 F.3d 230 (1st Cir. 2012).............................. 33

ii

*U.S. Pub. Interest Research Grp. v. Atl. Salmon of Maine, LLC*, 339 F.3d 23 (1st Cir. 2003)..................30

*U.S. Steel Corp. v. Train*, 556 F.2d 822 (7th Cir. 1977) ...............................................................14

*United States v. Alpha Nat. Res., Inc.*, No. CIV.A. 2:14-11609,
    2014 WL 6686690 (S.D.W.Va. Nov. 26, 2014) .....................................................................21

*United States v. Bd. of Cyt. Comm'rs of Hamilton Cty., Ohio*, No. 1:02 cv 00107,
    2005 WL 2033708 (S.D. Ohio Aug. 23, 2005) .....................................................................21

*United States v. Ciampitti*, 615 F. Supp. 116 (D.N.J. 1984) .............................................................30

*United States v. City of San Francisco*, 310 U.S. 16 (1940) .............................................................29

*United States v. City of Toledo*, 867 F. Supp. 603 (N.D. Ohio 1994).................................................26

*United States v. Cundiff*, 555 F.3d 200 (6th Cir. 2009) ...........................................................30, 31

*United States v. Earth Sciences, Inc.*, 599 F.2d 368, 373 (10th Cir. 1979)..........................12, 20

*United States v. Ohio Edison Co.*, 725 F. Supp. 928 (N.D. Ohio 1989) .............................................26

*United States v. Outboard Marine Corp.*, 549 F. Supp. 1036 (N.D. Ill. 1982) ...................................31

*United States v. Sharon Steel Corp.*, 30 Env't. Rep. 1778 (N.D. Ohio 1989) ...................................26

*United States v. Smith*, 149 F.3d 1172 (4th Cir. 1998) ..................................................................30

*United States v. Tom-Kat Dev., Inc.*, 614 F. Supp. 613 (D. Alaska 1985).........................................12

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982).............................................................28, 31

*Williams Pipe Line Co. v. Bayer Corp.*, 964 F. Supp. 1300 (S.D. Iowa 1997).....................................2, 20

*Yadkin Riverkeeper Inc. v. Duke Energy Carolinas, LLC*,
    141 F. Supp. 3d 428 (M.D.N.C. 2015)....................................................................3, 18, 20, 22

## Statutes

33 U.S.C. § 1319(d) ...................................................................................................................32

33 U.S.C. § 1342 .........................................................................................................................1

33 U.S.C. § 1342(h) ......................................................................................................................1

33 U.S.C. § 1342(k) ....................................................................................................................8, 9

33 U.S.C. § 1362(5) ....................................................................................................................13

33 U.S.C. § 1362(6) ....................................................................................................................14

33 U.S.C. § 1365 (a) (2) .........................................................................................................26, 32

33 U.S.C. § 1365(d) ....................................................................................................................33

33 U.S.C. § 1319(d) ....................................................................................................................32

33 U.S.C. § 1251 ........................................................................................................................13

Tenn. Code Ann. § 68-31-101 ......................................................................................................3

Tenn. Code Ann. § 68-46-101 ......................................................................................................3

## Other Authorities

55 Fed. Reg. 47,990 (Nov. 16, 1990)............................................................................................16

56 Fed. Reg. 64,876 (Dec. 12, 1991) ............................................................................................16

63 Fed. Reg. 7858 (Feb. 17, 1998)...............................................................................................16

66 Fed. Reg. 2960 (Jan. 12, 2001) ..........................................................................................16, 17

74 Fed. Reg. 626 (Jan. 2009) ......................................................................................................32

81 Fed. Reg. 43091-01 (July 2016)...............................................................................................32

Permit § I.A.c ..............................................................................................................................4

Permit § II.A.4.a...........................................................................................................................5

Permit § II.C.3.b.................................................................................................................6

**Rules**

Fed. R. Civ. P. 8................................................................................................................8
Fed. R. Ev. 706...............................................................................................................33

**Regulations**

40 C.F.R Part 423 Appendix A........................................................................................14
40 C.F.R. § 122.2............................................................................................................14
40 C.F.R. § 122.41(a)........................................................................................................1
40 C.F.R. § 401.15..........................................................................................................14
40 C.F.R. Part 19 (§§ 19.2, 19.4)...................................................................................32

This is a Clean Water Act case brought by two environmental conservation groups, Tennessee Clean Water Network and Tennessee Scenic Rivers Association ("Conservation Groups"), against the Tennessee Valley Authority for discharges of coal ash contamination into groundwater and the Cumberland River from TVA's Gallatin Fossil Plant. TVA is in violation of the Clean Water Act at the Ash Pond Complex, which is a permitted wastewater treatment facility from which TVA is allowed to discharge treated coal ash wastewater at one location. TVA is also in violation of the Clean Water Act at the Non-Registered Site ("NRS"), a closed ash disposal facility for which TVA does not have a permit to discharge any pollution into the Cumberland River. Any discharges of pollution from the NRS are violations of the Clean Water Act.

I.     **TVA OPERATES UNDER A LIMITED EXCEPTION TO THE CLEAN WATER ACT'S PROHIBITION ON THE DISCHARGE OF POLLUTION FROM THE ASH POND COMPLEX.**

The goal of the Clean Water Act is to eliminate the discharge of pollutants into navigable waters and thereby "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. Under the Clean Water Act, "the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a). Polluters are strictly liable for each unpermitted discharge. *Sierra Club v. ICG Hazard, LLC*, 781 F.3d 281, 284 (6th Cir. 2015). The only exception to the prohibition on discharging pollution is for discharges allowed by a NPDES permit issued pursuant to 33 U.S.C. § 1342. "Any permit noncompliance constitutes a violation of the Clean Water Act and is grounds for enforcement action." 40 C.F.R. § 122.41(a); *see* 33 U.S.C. § 1342(h). All unpermitted discharges are prohibited by the Clean Water Act, without regard to the impact on water quality. *Hawaii Wildlife Fund v. Cty. of Maui,* 24 F. Supp. 3d 980, 997 (D. Haw. 2014).

1

TVA currently has an NPDES Permit for the Gallatin Plant that was issued July 1, 2012 and expires May 31, 2017. (Tr. v. 2, 37:3-22; J. Ex. 102). TVA was previously operating under a 2005 Permit which was administratively extended until the current Permit was issued. (Tr. v. 2, 38:9-17; J. Ex. 135 at TSRA-GAF049091).

Both the 2005 and 2012 NPDES Permits identify only one specific discharge location for the discharge of coal ash wastewater to the Cumberland River, referred to as Outfall 001. (J. Ex. 102 at 1; Tr. v. 2, 40:21-24; 47:25-48:4). "[T]he Court must interpret an NPDES Permit in the same manner as it would a contract, determining first whether a particular term has an unambiguous meaning, and, if the meaning is ambiguous, looking to the document as a whole, its underlying purpose, and, if necessary, appropriate extrinsic evidence to aid the Court's construction." *Tenn. Clean Water Network v. TVA,* 206 F. Supp. 3d 1280, 1302 (M.D. Tenn. 2016) (citing *Piney Run Preservation Ass'n v. Cty. Comm'rs*, 268 F.3d 255, 269-70 (4th Cir. 2001), which provides, "In analyzing a provision of an NPDES permit, we review the district court's interpretation in the same manner as we would contracts or other legal documents.")); *Williams Pipe Line Co. v. Bayer Corp.*, 964 F. Supp. 1300, 1325 (S.D. Iowa 1997) ("Interpretation of the meaning of provisions of an NPDES permit is a matter of law for a court to determine."). Because TVA's NPDES Permits are clear that Outfall 001 is the only location from which TVA can lawfully discharge coal ash wastewater from the Ash Pond Complex, the Court need not consider any other evidence on this issue.

## II. TVA IS IN VIOLATION OF THE CLEAN WATER ACT BECAUSE OF NPDES PERMIT VIOLATIONS AT THE ASH POND COMPLEX.

### A. Removed Substances Provision.

TVA's NPDES Permit § I.A.c. is referred to as the "Removed Substances Provision," and provides:

2

Sludge or any other material removed by any treatment works must be disposed of in a manner, which prevents its entrance into or pollution of any surface or subsurface waters. Additionally, the disposal of such sludge or other material must be in compliance with the Tennessee Solid Waste Disposal Act, TCA § 68-31-101 et seq. and the Tennessee Hazardous Waste Management Act, TCA § 68-46-101 et seq.

Generally, the removed substances provision's "inclusion in the permit is based on the simple proposition that there is no way one can protect the water quality of the waters of the U.S. if the [polluter] is allowed to redeposit the pollutants collected in his settling ponds back in the waters of the U.S. since that would be contrary to the general requirements [and] conditions of the CWA." *In re: 539 Alaska Placer Miners, More or Less, & 415 Alaska Placer Miners, More or Less, Permittees*, No. 1085-06-14-402C, 1990 WL 324284, at *8 (E.P.A. Mar. 26, 1990). Uniformly, courts have long recognized the importance of removed substances permit provisions to ensure that "measures shall be taken to assure that pollutants materials [*sic*] removed from the process water and waste streams *will be retained in storage areas* and not discharged or released to waters of the U.S." *Id.* (emphasis added); *see also* 40 C.F.R. § 440.148(c) ("Measures shall be taken to assure that pollutant materials removed from the process water and wastewater streams *will be retained in storage areas* and not discharged or released to the waters of the United States.") (emphasis added). "[T]he removed substances provision aims to ensure the integrity of wastewater treatment and control systems" for the simple reason that "'[i]f you have a wastewater treatment plant, it can't leak.'" *Yadkin Riverkeeper Inc. v. Duke Energy Carolinas, LLC*, 141 F. Supp. 3d 428, 446 (M.D.N.C. 2015).

The Ash Pond Complex is a "wastewater treatment system" designed to "treat and remove solids, sludges, substances, materials, and pollutants." *Yadkin Riverkeeper*, 141 F. Supp. 3d at 446. The manager of water-based systems unit in TDEC's Division of Water Resources was Vojin Janjic at the time the current Gallatin NPDES Permit was issued. (Tr. v. 2, 31:4-7; 36:16-

3

24). According to Mr. Janjic, under the Permit, the ash ponds are designed to treat the wastewater by allowing the solids and pollutants to settle on the bottom of the ponds. (Tr. v. 2, 39:9-40:2). Sludge, in the context of TVA's Permit, refers to any solids, pollutants, or other material that is removed as part of the wastewater treatment process, and includes coal ash or other material that is expected to settle to the bottom of the ponds. (Tr. v. 2, 49:23-50:4). The Removed Substances Provision of the Permit prohibits the discharge of sludge into groundwater or surface water. (Tr. v. 2, 51:3-51:5). Under both the current Permit and the 2005 Permit, the only discharge point for the ash transport water is Outfall 001. (Tr. v. 2, 40:21-24; 41:13-17; 42:3-11).

The ash contaminants that settle to the bottom of the ash ponds and settling ponds of the Ash Pond Complex would thus have been "removed in the course of treatment" under the Removed Substances Provision. The Removed Substances Provision does not require anything to be removed from the ash ponds or settling ponds themselves. Rather, it applies to substances "removed in the course of treatment or control of wastewaters." (Permit § I.A.c).

TVA's unpermitted discharges of contaminants through seeps, conduits, sinkholes, and fissures, as described in detail in Conservation Groups' Proposed Findings of Facts and Conclusions of Law, are violations of the Permit's Removed Substances Provision.

Disposal of coal ash and other removed materials into the groundwater at the Gallatin site also represents a violation of the Permit's Removed Substances Provision. The Removed Substances Provision expressly prohibits the entrance into or pollution of "subsurface waters" by any sludge or materials removed during treatment. This wastewater treatment facility is designed to allow coal ash and other pollutants to settle before discharging treated water into the Cumberland River. Here, the coal ash and other removed materials have been settled out and

deposited into groundwater. In this way, also, TVA has violated the Removed Substances Provision of its permit for its Gallatin wastewater treatment facility.

**B. Proper Operations and Maintenance.**

TVA'S NPDES Permit § II.A.4.a., titled "Proper Operations and Maintenance," provides that TVA is required to "at all times properly operate and maintain all facilities and systems (and related appurtenances) for collection and treatment which are installed or used by the permittee to achieve compliance with the terms and conditions of the permit."

As set forth in detail in Conservation Groups' Proposed Findings of Fact and Conclusions of Law, TVA has failed to repair sinkholes, conduits, and fissures in the bottom of the Ash Pond Complex, has never determined that the sinkholes it did repair stopped leaking from the bottom of the Ash Pond Complex, never installed a liner, and has left groundwater saturated with ash in the Ash Pond Complex.

TVA disregarded the recommendations of its contractor, Stantec, in 2009: Stantec noted that the karst geology at the site posed a concern and should be addressed, with consideration of a liner. (Tr. v.1, at 39:24-40:13; J. Ex. 146 at TVGF_018829; TVGF_018835; TVGF_018842) ("Karst bedrock and sinkhole activity is present plant-wide and is a concern," and recommended that "[l]ong-term strategies relative to plant-wide karst subsurface conditions should be developed, including consideration to installing lining system beneath all ponds or converting to dry disposal operation where appropriate.").

When TVA finally did examine the possibility of installing a liner under the Ash Pond Complex in March of 2015 (roughly six years after Stantec recommended it and after this lawsuit was filed), its contractor, AECOM, essentially determined that it was not feasible to install a liner, noting that "[d]ewatering is necessary to allow the ash to be excavated, transported and

stockpiled," but that "[a] portion of the ash is below (up to 10 feet below) the elevation of the Cumberland River," and that "[i]f [Pond E of the Ash Pond Complex] is hydraulically connected to the Cumberland River, dewatering below the river level would be virtually impossible (you cannot pump the river down)." (J. Ex. 113; TVGF_111673). Although TVA is aware that ash is saturated in the groundwater, TVA has since done nothing to address the karst problem at the Ash Pond Complex.

TVA also allowed flowing discharges directly into the Cumberland River to remain unrepaired for years, even though it was aware of the discharges. Conservation Groups photographed those flowing discharges on May 7, 2014. (Tr. v. 2, at 91:6-11; J. Ex. 11). TVA did not make repairs until January 2015, after Conservation Groups issued their 60 day notice. (Tr. v. 2, at 92:3-7). The "repair" that TVA did finally make was not designed to stop the flow of contaminants into the groundwater or the Cumberland River.  (Tr. v. 3, at 126:1-3) (TVA's expert Gabe Lang admitted that the "repair" TVA conducted did not stop the flow of waste).

For these reasons, the Court should find that TVA is in violation of the Proper Operations and Maintenance Provision of its Permit.

**C. Sanitary Sewage Overflows.**

NPDES Permit § II.C.3.b. forbids "Sanitary Sewer Overflows" and prohibits "the discharge to land or water of wastes from any portion of the collection, transmission, or treatment systems other than through permitted outfalls." (J. Ex. 102 at 17; Dkt. No. 1-2 at PageID 79).

"Sanitary sewer" in the context of TVA's NPDES Permit refers to any wastewater at the facility that is authorized by the Permit. (Tr. v. 2 at 51:6-52:6). As set forth in above regarding the Removed Substances Provision and Proper Operation and Maintenance Provision and in

6

Case 3:15-cv-00424   Document 246   Filed 04/14/17   Page 11 of 41 PageID #: 10085

detail in Conservation Groups' Proposed Findings of Fact and Conclusions of Law, TVA has allowed discharges of wastewater to groundwater and the Cumberland River through conduits other than permitted Outfall 001. Thus, TVA is in violation of the Sanitary Sewer Overflow provision of its NPDES Permit.

### III. TVA WAS NOT AUTHORIZED BY THE PERMIT TO HAVE OR MAINTAIN SEEPS AT THE ASH POND COMPLEX OR THE NRS, AND TVA'S PERMIT SHIELD ARGUMENT MUST FAIL.

First, TVA cannot claim that any Permit authorizes discharges of pollution from the Non-Registered Site. The Non-Registered Site is not a permitted facility. (Tr. v. 2, at 57:18) (the Non-Registered Site "is not part of this NPDES permit."). Discharges of pollution into the Cumberland River from the Non-Registered Site are subject to strict liability under the Clean Water Act *without exception.*

TVA does have an NPDES Permit for discharges of treated coal ash wastewater from the Ash Pond Complex at Outfall 001 only. (Tr. v. 2, at 42:20-23; 40:21-41:10). TVA argues, however, that the Permit gives it authority to discharge pollution from "seeps" that may develop at any time because the Tennessee Department of Environment and Conservation understood them to be part of the NPDES Permit. There is no evidence that supports this argument. As an initial matter, this Court previously ruled that, "If TVA can eventually show that specific seeps were only of the type contemplated by the permit, and that the seeps' detection, monitoring, reporting, disclosure, and, if necessary, remediation, were handled in full compliance with the permit, the permit shied may apply." (Dkt. 139, PageID 5358). The record is utterly devoid of any of this required proof. Moreover, the Court ruled that the permit shield could not apply to seeps that were unknown to TVA when it applied for the Permit because "A permit applicant cannot disclose discharges that it does not know about." *Id.* This fact has not changed.

**A. Burden of Proof for Permit Shield.**

TVA (Dkt. 321-1) erroneously suggests Conservation Groups must prove both that TVA violated the Clean Water Act and that the Act's "permit shield" defense does not apply. The "permit shield" defense is an exception to the Clean Water Act's prohibition on discharges of pollution without a permit, and it is an affirmative defense for which TVA bears the burden of proof.

First, TVA fails to distinguish between claims predicated on NPDES permit violations at the Ash Pond Complex, on the one hand, and claims based on violations of the Clean Water Act for discharges without a permit at the NRS where TVA has no permit to discharge. *Nat. Res. Defense Council, Inc. v. Costle*, 568 F.2d at 1374 (Congress made clear that "the NPDES permit is the only means by which a discharger from a point source may escape the total prohibition of [33 U.S.C. § 131 l(a)].") Accordingly, permit shield cannot apply to claims related to the NRS.

Conservation Groups do allege that TVA has been and is continuing to violate its NPDES Permit at the Ash Pond Complex, and therefore is in violation of the Clean Water Act. 40 C.F.R. § 123.45, App. A ("Any violation of an NPDES permit is a violation of the Clean Water Act (CWA) for which the permittee is liable."); *Am. Canoe Ass'n v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 539 (6th Cir. 2004); *Nat. Res. Def. Council, Inc. v. Cty. of Los Angeles*, 725 F.3d 1194, 1204 (9th Cir. 2013). Conservation Groups have the burden of proving the elements of this claim and TVA has the burden of proving any affirmative defenses. *See* Fed. R. Civ. P. 8(c); *Fonseca v. Consol. Rail Corp.*, 246 F.3d 585, 590 (6th Cir. 2001).

The Clean Water Act Section 402(k)—known as the Act's "permit shield" provision—provides that "[c]ompliance with a permit issued pursuant to this section shall be deemed compliance [with the CWA]." 33 U.S.C. § 1342(k). The Supreme Court has explained that the

permit shield provision "serves the purpose of giving permits finality." *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 138 n. 28 (1977).

TVA claims that the permit shield provision "cannot be construed as an affirmative defense," switching the burden of proving that the permit shield *does not* apply to Conservation Groups. This argument flies in the face of both TVA's Answer and Amended Answer, where TVA itself identified the permit shield defense as an affirmative defense. (Dkt. 14 at PageID 529); (Dkt. 16 at PageID 562). TVA's argument is also contradicted by the case law on this point, holding uniformly that the permit shield is an affirmative defense. *See  S. Appalachian Mountain Stewards v. A & G Coal Corp.*, 758 F.3d 560, 569 (4th Cir. 2014) ("All that is before us is the question of whether the defendant can assert the 33 U.S.C. § 1342(k) permit shield as an affirmative defense. As with any such defense, the defendant bears the burden of proving that it may validly advance it."); *San Francisco Baykeeper v. Levin Enterprises, Inc.*, 12 F. Supp. 3d 1208, 1237 (N.D. Cal. 2013) ("The Court denies summary adjudication to Defendant on its use of the permit shield as an affirmative defense."). *Accord* Ex. A, <u>The Clean Water Act Handbook</u>, 236 (3d ed. 2011) (listing "The Permit Shield" among "Additional Affirmative Defenses").

The "permit shield" is properly understood as an affirmative defense because, "Unlike a negative defense, an 'affirmative defense is one that admits the allegations in the complaint, but seeks to avoid liability, in whole or in part, by new allegations of excuse, justification, or other negating matter.'"[1] "As one court explained, a 'true affirmative defense raises matters outside the scope of plaintiff's prima facie case and such matter is not raised by a negative defense.' An

---

[1] Hon. Amy St. Eve & Michael A. Zuckerman, <u>The Forgotten Pleading</u>, 7 Fed. Cts. L. Rev. 152, 161 (2013) (citing *Riemer v. Chase Bank USA, N.A.*, 274 F.R.D. 637 (N.D. Ill. 2011); *see also Donohue v. Am. Isuzu Motors, Inc.*, 155 F.R.D. 515, 519 (M.D. Pa. 1994) ("An affirmative defense is a matter which serves to excuse a defendant's conduct or otherwise avoids the plaintiff's cause of action but which is proven by facts extrinsic to the plaintiff's cause of action.").

affirmative defense operates much like a claim for relief in that '[t]he party asserting an affirmative defense usually has the burden of proving it.'" *Id.* Here, TVA argues that Conservation Groups must prove what was in the "reasonable contemplation" of TDEC in order to show that TVA is not entitled to the "permit shield." However, information available to the regulator is not a required element of Conservation Groups' proof. TVA has the burden to show permit shield applies.

**B. TVA's Assertion of the Permit Shield Affirmative Defense is Without Merit.**

As an initial matter, again, NPDES permits are to be construed as contracts, and when unambiguous, the Court cannot go beyond the terms of the contract. *Tenn. Clean Water Network,* 206 F. Supp. 3d at 1302. Because TVA's NPDES Permits are clear that Outfall 001 is the only location from which TVA can lawfully discharge coal ash wastewater from the Ash Pond Complex, the Court need not consider any extrinsic evidence on this issue, including evidence of what TDEC knew at the time or any information outside of the Permit.

As set forth in Conservation Groups' Proposed Findings of Fact and Conclusions of Law, Vojin Janjic was the manager of the water-based systems unit in TDEC's Division of Water Resources at the time the Gallatin NPDES Permit was issued. (Tr. v. 2, at 41:4-7; 36:12-24). He was involved in reviewing the Permit application for the current Permit, preparing the draft permit, reading the comments, and instructing TDEC staff on how to prepare the final permit and addendum to the rationale. (Tr. v. 2, at 36:12-24, 41:4-7).

According to Mr. Janjic, if TVA had disclosed the existence of seeps to TDEC during the permitting process, the information would have been included in the Permit application. (Tr. v. 2, at 48:8-9). TVA has not presented any evidence that it disclosed discernable seeps in the Ash Pond Complex in the Permit application or anywhere else. Nor did it disclose discharges from

the bottom of the Ash Pond Complex through sinkholes or fissures in the NPDES Permit application. According to Mr. Janjic, seepage from the bottom of the Ash Pond Complex is not authorized or identified in the NPDES Permit. (Tr. v. 2, at 48:10-49:4).

In support of its argument that it is allowed to maintain seeps under the Permit, TVA presented evidence of one comment letter from citizens' groups to TDEC provided during the permitting process that was included in the Addendum to the Permit Rationale. (J. Ex. 102 at 48; Dkt. No. 1-2 at PageID 105; Tr. v. 2 at 56:25-59:8). The Permit Rationale is extrinsic evidence, and should not be considered. (Tr. v. 2 at 55:21-56:14) (the Permit Rationale is not part of the Permit). Moreover, according to Mr. Janjic, the Permit Rationale does not have any impact on the restrictions that are placed in the Permit. (Tr. v. 2, at 34:22-35:12).

The subject of the letter is not the Ash Pond Complex. It did not discuss the Ash Pond Complex, but noted potential seeps at the "closed ash disposal area"—the Non-Registered Site. (Tr. v. 2, at 56:25-57:18). The Non-Registered Site "is not part of this NPDES permit," as Mr. Janjic testified. (Tr. v. 2, at 57:18), and thus the comment is not relevant to the Permit.

TDEC's response to the comment was that the potential seeps to which the comment referred had immeasurable flow rate, were similar to non-point source discharges, were diffused over a wide area, and resulted in, at the most, only *de minimus* loading of pollution (Tr. v. 2, at 58:16-59:1; J. Ex. 102 at 48; Dkt. No. 1-2 at PageID 105). The comment and TDEC's response did not have any bearing on discharges with measurable, discernable flow of water. Those types of discharges were, according to Mr. Janjic, not authorized under the Permit. (Tr. v. 2, at 48:3-4). Moreover, TVA cannot assert that the NPDES permit theoretically covers *de minimis* discharges or "flows" when the Permit does not explicitly so state. Moreover, TVA has an "absolute duty" to comply with its NPDES Permit and that "duty remains regardless of oral or written

representations by the permitting agency allegedly excusing compliance with the permit requirements." *Sierra Club v. Young Life Campaign, Inc.,* 176 F. Supp. 3d 1070, 1081 (D. Colo. 2001).

TDEC had concerns that seeps at the Ash Pond Complex might affect structural integrity or water quality, with the primary concern being structural integrity. (Tr. v. 2, at 44:24-45:3).[2] For these reasons, the current NPDES Permit requires TVA to address any seep at the Ash Pond Complex that has a discernable flow. (Tr. v. 2, at 46:7-14). It states, "Changes such as significant increases in seepage or seepage carrying sediment may be signs of imminent impoundment failure and should be addressed immediately." (Tr. v. 2, at 45:16-25; J. Ex. 102). Mr. Janjic testified that if TVA were to identify such a seep at the Ash Pond Complex, the Permit requires that the seep be addressed. (Tr. v. 2, at 43:12-44:23). According to Mr. Janjic, a discernable flow is more than a wet spot, but has actual flowing water. (Tr. v. 2, at 46:20-47:1). Thus, even if TDEC knew that the development of seeps was a possibility, a seep would have to be addressed and corrected addressed and corrected if it had any discharge. This is the opposite of *allowing* seeps. Moreover, no specific seep was allowed by any language in the Permit even though "[e]very identifiable point that emits pollution is a point source which must be authorized by an NPDES permit issued by  EPA." *United States v. Tom-Kat Dev., Inc.*, 614 F. Supp. 613, 614 (D. Alaska 1985) (citing *United States v. Earth Sciences, Inc.*, 599 F.2d 368, 373 (10th Cir. 1979)).

Based on the following factors, the Court should find that flowing seeps from the Ash Pond Complex are not allowed under the Permit at the Ash Pond Complex, are violations of the Permit, and are also therefore violations of the Clean Water Act: (1) the utter lack of evidence

---

[2] This language was not included in the 2005 Permit, but was added to the 2012 Permit in response to TVA's prior catastrophic failure of the coal ash impoundment at Kingston in 2008. (Tr. v. 2, at 47:19-24; J. Ex. 102, 136).

that TVA disclosed the existence of any seep to TDEC, (2) the fact that the Permit requires TVA to address any seeps that may develop at the Ash Pond Complex, and (3) the testimony of Mr. Janjic that the Permit did not allow TVA to have or maintain seeps, including those from the bottom of the Ash Pond Complex through sinkholes or fissures.

## IV. CLEAN WATER ACT LIABILITY.

As set forth above, TVA's violations of its NPDES Permits are violations of the Clean Water Act.

Separate and apart from its violations of its Permits, TVA is also in violation of the Clean Water Act at the Ash Pond Complex and the Non-Registered Site because it is discharging unpermitted pollution to both surface water and groundwater that is hydrologically connected to surface water in violation of the Act.

The Clean Water Act is a strict liability statute. *Sierra Club v. ICG Hazard, LLC*, 781 F.3d 281, 284 (6th Cir. 2015). The Act states unequivocally that, "[e]xcept as in compliance with this section and [other sections of the Act], the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a).

To establish a violation of the Clean Water Act, a plaintiff must prove that (1) a person (2) discharged a pollutant (3) from a point source (4) into waters of the United States (5) without a permit. Clean Water Act, § 101 *et seq.,* 33 U.S.C. § 1251, *et seq.*

A number of these factors are not at issue. One, TVA is a person for purposes of the Act. 33 U.S.C. § 1362(5) (defining person as an "individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body.") Two, coal ash and its constituents fall under the definition of "pollutant," which is defined as "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded

13

equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6). Arsenic, beryllium, cadmium, chromium and compounds, lead, nickel, selenium, and thallium are all toxic pollutants, 40 C.F.R. § 401.15, and priority pollutants under the Clean Water Act, 40 C.F.R Part 423 Appendix A. Finally, the Cumberland River and Old Hickory Lake are waters of the United States. 40 C.F.R. § 122.2.

TVA argues that it cannot be liable under the Clean Water Act because its discharges of coal ash into groundwater are not prohibited by the Clean Water Act. It also argues that, even if discharges to groundwater were prohibited where there is a direct hydrological connection to surface water, there is no such connection here.

### A. Discharges to Groundwater that is Hydrologically Connected to Surface Water is Prohibited by the Clean Water Act.

Many courts,[3] including this Court, have made plain that the Clean Water Act covers the pollution of waters of the United States via hydrologically connected groundwater. *Ass'n*

---

[3] *See N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993, 1000 (9th Cir. 2007) (Clean Water Act coverage based on hydrologic connection); *Waterkeeper All. Inc. v. EPA*, 399 F.3d 486, 515 (2d Cir. 2005) (upholding EPA's case-by-case approach to regulating feedlot pollutant discharges to surface waters through connected groundwater); *Quivara Mining Co. v. EPA*, 765 F.2d 126, 130 (10th Cir. 1985) (Clean Water Act coverage where discharges ultimately affected navigable-in-fact streams via underground flows); *U.S. Steel Corp. v. Train*, 556 F.2d 822, 852 (7th Cir. 1977) (Clean Water Act "authorizes EPA to regulate the disposal of pollutants into deep wells, at least when the regulation is undertaken in conjunction with limitations on the permittee's discharges into surface waters"), *overruled on other grounds by W. Chicago v. U.S. Nuclear Regulatory Comm'n*, 701 F.2d 632, 644 (7th Cir. 1983); *S.F. Herring Ass'n v. Pac. Gas & Elec. Co.*, 81 F. Supp. 3d 847, 863 (N.D. Cal. 2015); *Haw. Wildlife Fund v. Cty.. of Maui*, No. CIV. 12-00198 SOM/BM, 2015 WL 328227, at *5 (D. Haw. Jan. 23, 2015) ("exempting discharges of pollutants from a point source merely because the polluter is lucky (or clever) enough to have a nonpoint source at the tail end of a pathway to navigable waters would undermine the very purpose of the Clean Water Act"); *Raritan Baykeeper, Inc. v. NL Indus., Inc.*, No. 09-CV-4117 JAP, 2013 WL 103880, at *15 (D.N.J. Jan. 8, 2013) (Clean Water Act covers hydrologically connected groundwater; *Greater Yellowstone Coal. v. Larson*, 641 F. Supp. 2d 1120, 1138 (D. Idaho 2009) ("there is little dispute that if the ground water is hydrologically connected to surface water, it can be subject to" the Clean Water Act); *Nw. Envtl. Def. Ctr. v. Grabhorn, Inc.*, No. CV-08-548-ST, 2009 WL 3672895, at *11 (D. Or. Oct. 30, 2009) ("In light of the EPA's regulatory pronouncements, this court concludes that . . . the CWA covers discharges to navigable surface waters via hydrologically connected groundwater."); *Hernandez v. Esso Std. Oil Co.*, 599 F. Supp. 2d 175, 181 (D.P.R. 2009) ("CWA extends federal jurisdiction over groundwater that is hydrologically connected to surface waters that are themselves waters of the United States."); *Coldani v. Hamm*, No. 2:07-CV-0660, 2008 WL 4104292, at *7-*8 (E.D.

14

*Concerned Over Res. & Nature, Inc. v. Tenn. Aluminum Processors, Inc.*, No. 1:10–00084, 2011 WL 1357690, at \*17-18 (M.D. Tenn. 2011) ("groundwater is subject to the CWA provided an impact [*sic*] on federal waters") (Haynes, J.) (collecting cases). Courts have reasoned that this conclusion furthers the goals of the Act and that, "it would hardly make sense for the CWA to encompass a polluter who discharges pollutants via a pipe running from the factory directly to the riverbank, but not a polluter who dumps the same pollutants into a man-made settling basin some distance short of the river and then allows the pollutants to seep into the river via the groundwater." *N. Cal. Riverwatch v. Mercer Fraser Co.*, No. C-04-4620, 2005 WL 2122052, \*2 (N.D. Cal. Sept. 1, 2005).

---

Cal. Aug. 16, 2007) (pollution of groundwater that is hydrologically connected to navigable surface waters falls within the purview of the Clean Water Act); *N. Cal. River Watch v. Mercer Fraser Co.*, No. C-04-4620, 2005 WL 2122052, at \*3 (N.D. Cal. Sept. 1, 2005), *aff'd*, 496 F.3d 993 ("the regulations of the CWA do encompass the discharge of pollutants from wastewater basins to navigable waters via connecting groundwaters"); *Idaho Rural Council v. Bosma*, 143 F. Supp. 2d 1169, 1180 (D. Idaho 2001) ("CWA extends federal jurisdiction over groundwater that is hydrologically connected to surface waters that are themselves waters of the United States"); *Mut. Life Ins. Co. v. Mobil Corp.*, No. CIVA96CV1781RSP/DNH, 1998 WL 160820, at \*2-\*3 (N.D.N.Y. Mar. 31, 1998) (denying motion to dismiss Clean Water Act claim – plaintiff's complaint alleged that groundwater contaminated by underground storage tank failures three years prior was hydrologically connected to navigable waters); *Williams Pipe Line Co. v. Bayer Corp.*, 964 F. Supp. 1300, 1319–20 (S.D. Iowa 1997) (where groundwater flows toward surface waters, there is "more than the mere possibility that pollutants discharged into groundwater will enter 'waters of the United States,'" and discharge of petroleum into this hydrologically-connected groundwater violates the Clean Water Act); *Wash. Wilderness Coal. v. Hecla Mining Co.*, 870 F. Supp. 983, 990 (E.D. Wash. 1994) ("since the goal of the CWA is to protect the quality of surface waters, any pollutant which enters such waters, whether directly or through groundwater, is subject to regulation"); *Sierra Club v. Colo. Ref. Co.*, 838 F. Supp. 1428, 1434 (D. Colo. 1993) ("discharge of any pollutant into 'navigable waters' includes such discharge which reaches 'navigable waters' through groundwater"); *McClellan Ecological Seepage Situation v. Weinberger*, 707 F. Supp. 1182, 1195–96 (E.D. Cal. 1988) (Clean Water Act covers groundwater "naturally connected to surface waters that constitute 'navigable waters'"), *vacated on other grounds*, 47 F.3d 325 (9th Cir. 1995); *New York v. United States*, 620 F. Supp. 374, 381 (E.D.N.Y. 1985) (groundwater discharges threatening navigable waters subject to Clean Water Act); *Sierra Club v. Va. Elec. & Power Co.*, 145 F. Supp. 3d 601, 607-08 (E.D. Va. 2015); *Ohio Valley Envtl. Coal. Inc. v. Pocahontas Land Corp.*, No. CIV.A. 3:14-11333, 2015 WL 2144905, at \*8 (S.D.W. Va. May 7, 2015).

EPA has also explained repeatedly that the Clean Water Act applies to hydrologically connected groundwater discharges.[4] *See, e.g.*, 66 Fed. Reg. 2960, 3015-17 (Jan. 12, 2001) (EPA "interprets the Clean Water Act to apply to discharges of pollutants from a point source via ground water that has a direct hydrologic connection to surface water;" excluding such discharges "would . . . be inconsistent with the overall Congressional goals expressed in the statute." . . . "As a legal and factual matter, EPA has made a determination that, in general, collected or channeled pollutants conveyed to surface waters via ground water can constitute a discharge subject to the Clean Water Act."); 63 Fed. Reg. 7858, 7881 (Feb. 17, 1998) ("EPA interprets the CWA's NPDES permitting program to regulate discharges to surface water via groundwater where there is a direct and immediate hydrologic connection"); 56 Fed. Reg. 64876, 64892 (Dec. 12, 1991) ("the Act requires NPDES permits for discharges to groundwater where there is a direct hydrological connection between groundwaters and surface waters. In these situations, the affected groundwaters are not considered 'waters of the United States' but discharges to them are regulated because such discharges are effectively discharges to the directly connected surface waters."); 55 Fed. Reg. 47990, 47997 (Nov. 16, 1990) (stormwater rules cover hydrologically connected groundwater); 56 Fed. Reg. 64,876, 64,892 (Dec. 12, 1991) (preamble to final rule addressing water quality standards on Indian lands stated "the affected groundwaters are not considered 'waters of the United States' but discharges to them are regulated because such discharges are effectively discharges to the directly connected surface waters."); 55 Fed. Reg. 47,990, 47,997 (Nov. 16, 1990) (promulgation of storm water regulations in which EPA explained that "this rulemaking only addresses discharges to water of the United States, consequently discharges to ground water are not covered by this rulemaking (*unless there*

---

[4] EPA's interpretation is entitled to deference. *See Chevron v. NRDC*, 467 U.S. 837 (1984) (deferring to EPA construction of the Clean Air Act).

*is a hydrological connection between the ground water and a nearby surface water body*).")
(emphasis added).

TVA argues that establishing a hydrologic connection requires a traceable connection between the groundwater and the surface water, citing language from the Middle District of Tennessee case, *Association Concerned Over Resources and Nature,* which states that "the groundwater must have a direct hydrologic connection to surface waters that are waters of the United States." 2011 WL 1357690, at *17.

TVA misconstrues the point of the court's statement in *Association Concerned Over Resources and Nature*, which was merely distinguishing isolated groundwater from hydrologically connected groundwater. The court quoted *Idaho Rural Council v. Bosma,* 143 F. Supp. 2d 1169, 1179, 1180 (D. Idaho 2001), which says: "[C]ourts . . . generally agree that waters of the United States do not include isolated, nontributory groundwater." Beyond the fact that isolated groundwater is not hydrologically connected, the court was not setting up a hard line test for what is or is not a hydrologic connection.

EPA has explained that the determination of whether groundwater is hydrologically connected to surface water is "a factual inquiry like all point source determinations." 66 Fed. Reg. at 3017. It added, "The time and distance by which a point source discharge is connected to surface water via hydrologically connected surface waters will be affected by many site specific factors, such as geology, flow, and slope." *Id.* EPA did not establish any specific criteria, but explained that relevant evidence of a qualifying connection might include the type of pollutant, geology, direction of groundwater flow, and evidence that the pollutant can or does reach jurisdictional surface water. *Id.* A general hydrological connection between all groundwater and surface water is insufficient. *Id.; see also McClellan Ecological Seepage Situation v. Weinberger,*

707 F. Supp. 1182, 1196 (E.D. Cal. 1988) (finding that the hydrological connection is too attenuated where it would take "literally dozens, and perhaps hundreds, of years for any pollutant in the groundwater to reach surface waters."); *Greater Yellowstone Coalition v. Larsen*, 641 F. Supp. 2d 1120, 1139 (D. Idaho 2009) (the connection was too attenuated where movement to surface water could take up to 420 years and pollutants would have to travel underground through soil and rock for up to four miles).

In *Sierra Club v. Virginia Electric and Power Co*., the District Court for the Eastern District of Virginia applied this type of factual inquiry and determined that the groundwater under a coal ash impoundment was hydrologically connected to the adjacent river. Ex. B at 5. The court reasoned elevation and groundwater flow directions created a direct hydrologic connection. Ex. B at 5-6, *Sierra Club v. Va. Elec. And Power Co.*, No. 2:15-CV-112, 2017 WL 1095039, at *5-6 (E.D. Va. Mar. 23, 2017) ("The groundwater at the CEC site moves radially outward- toward surface water. . . . Dominion itself has agreed that the groundwater moves laterally into the surrounding surface water.").

In *Yadkin Riverkeeper*, 141 F. Supp. 3d at 445, the Middle District of North Carolina agreed and found a hydrologic connection in a nearby identical coal ash case. The court stated that it agreed with EPA's determination and "with the line of cases affirming CWA jurisdiction over the discharge of pollutants to navigable surface waters via hydrologically connected groundwater, which serves as a conduit between the point source and the navigable waters." *Id.* The court noted that most courts that have "declined to exercise jurisdiction over hydrologically connected groundwater claims have done so 'under the theory that the groundwater is not *itself* 'water of the United States.'" *Hawaii Wildlife Fund*, 24 F. Supp. 3d at 996. The court went on to explain that it "views the issue not as whether the CWA regulated the discharge of pollutants into

groundwater itself but rather whether the CWA regulates the discharge of pollutants to navigable waters via groundwater. Thus, the court concludes that it has jurisdiction under the CWA to adjudicate claims where, as alleged in this case, pollutants travel from a point source to navigable waters through hydrologically connected groundwater serving as a conduit between the point source and the navigable waters." *Id.*

Based on the overwhelming case law, including case law in this jurisdiction, and the EPA's interpretation of the Clean Water Act, the Court should find that groundwater that is hydrologically connected to surface water is protected by the Clean Water Act.

As set forth in Conservation Groups' Proposed Findings of Fact and Conclusions of Law, the existence of a hydrologic connection is evidenced by the general flow of groundwater from Odom's Bend Peninsula to the Cumberland River, as TVA's experts have admitted and as TVA has admitted time and again over decades in its groundwater studies at the Gallatin site. Moreover, the connection is evidenced by the proximity of the groundwater at the peninsula to the surface water that surrounds the peninsula, the karst geography of the impoundments that permits rapid flow of groundwater, the fact that the impoundments are unlined, and the fact that the groundwater and surface water are both contaminated with coal ash contaminants. All of these factors are more than sufficient to prove, by a preponderance of the evidence, that there is a direct hydrological connection between the groundwater and the surface water at both the NRS and the Ash Pond Complex.

### B. The Non-Registered Site and the Ash Pond Complex are Point Sources.

A "point source" is "any discernible, confined, and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, [or] container . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); *Ohio Valley Environmental Coalition, Inc. v. Hernshaw Partners, LLC*, 984 F. Supp. 2d 589, 599 (S.D. W.Va.

2013). The definition of point source is intended to be interpreted broadly, as indicated by the statute's "included but not limited to" language. *United States v. Earth Sciences, Inc*., 599 F.2d 368, 373-74 (10th Cir. 1979) ("The concept of a point source was designed to further this scheme by embracing the broadest possible definition of any identifiable conveyance from which pollutants might enter the waters of the United States.").

The size of the point source is not a consideration under the statute, let alone determinative. In fact, TVA itself has argued that "[a]n entire facility or industrial plant may be a point source." (Dkt. No. 103 at PageID 3742 n.2) (citing *Williams Pipe Line Co. v. Bayer Corp*., 964 F. Supp. 1300, 1319 (S.D. Iowa 1997)).

In *Yadkin Riverkeeper*, the Middle District of North Carolina found that coal ash ponds like TVA's ponds in this case are "surface impoundments designed to hold accumulated coal ash in the form of liquid waste"; "[t]hey are impounded by dams," and are thus "defined and discrete" point sources. *Yadkin*, 141 F. Supp. 3d 428, 443-44. The District Court for the Eastern District of Virginia also found that coal ash ponds like the ones here are point sources. It stated that Dominion Power "built the piles and ponds to concentrate coal ash, and its constituent pollutants, in one location. That one location channels and conveys arsenic directly into the groundwater and thence into the surface waters. Essentially, they are discrete mechanisms that convey pollutants from the old power plant to the river." *Sierra Club*, Ex. B, at 14; *see also Consolidation Coal Co. v. Costle*, 604 F.2d 239, 249-50 (4th Cir. 1979), *rev'd on other grounds*, 449 U.S. 64 (1980); *see also Sierra Club v. Abston Constr. Co*., 620 F.2d 41, 45 (5th Cir. 1980) ("mere collection of rock and other materials" can constitute a point source if it results in a discharge to waters); *United States v. Alpha Nat. Res., Inc.*, No. CIV.A. 2:14-11609, 2014 WL

6686690, at *1 (S.D.W.Va. Nov. 26, 2014) (discharges from coal mining operations are point sources).

The same is true here, and the Court should find that the TVA's Non-Registered Site and Ash Pond Complex are point sources under the Clean Water Act.

## V.     CONSERVATION GROUPS' CLAIMS ARE NOT BARRED BY DILIGENT PROSECUTION.

As the Court set forth in its Memorandum Opinion when it considered this issue previously, "[A] diligent prosecution bar only applies to those issues sought to be addressed in a citizen action that overlap with those issues sought to be addressed by the government's suit." *Tenn. Clean Water Network, et al. v. TVA,* 206 F. Supp. 3d 1280, 1291 (M.D. Tenn. 2016) (quoting *United States v. Bd. of Cyt. Comm'rs of Hamilton Cty., Ohio,* No. 1:02 cv 00107, 2005 WL 2033708, at *11 (S.D. Ohio Aug. 23, 2005) (citing *Frilling v. Vill. Of Anna,* 924 F.Supp. 821, 836 (S.D. Ohio 1996)).

The factual and legal basis of the Court's previous determination on diligent prosecution has not changed since it denied TVA's motion to dismiss on these grounds. Today, as then, "with regard to the Non-Registered Site, the State Enforcement Action is targeted at groundwater contamination, not contamination of the Cumberland River through either seeps or any other leaks or hydrologic connections." *Id*. at *8. Further, "discharges from the Non-Registered Site to the Cumberland, either directly or otherwise, represent a discrete set of allegations raised by Plaintiffs in this Court that are not barred by the pendency of the State Enforcement Action." *Id.* Likewise, nothing has changed with respect to the Court's conclusion that Conservation Groups' complaint "contemplates both leaks that are purely seeps and leaks based entirely on or in part on faster-moving conduit flows, such as through sinkholes and fissures," and thus "Plaintiffs'

21

allegations that involve forms of wastewater flow other than seeps alone do not overlap with the State Enforcement Action," and should not be barred by diligent prosecution. *Id.* at *8.

Moreover, today as then, the Permit violations alleged here are distinguishable from the basis for TDEC's claims in the State Action. For example, the Removed Substances Provision of TVA's Permit "is distinct from the state groundwater regulations [TDEC] seeks to enforce in state court. While the state groundwater regulations aim to ensure the quality of groundwater, the removed substances provision aims to ensure the integrity of wastewater treatment and control systems." *Yadkin Riverkeeper*, 141 F. Supp. at 446. "To interpret the removed substances provision as a requirement that [a polluter] comply with groundwater quality standards would be to misread the removed substances provision" of the NPDES permit, "which does not mention groundwater." *Id.* The same is true of the Sanitary Sewer Overflow Provision and the requirement for Proper Operation and Maintenance. These claims should not be dismissed on grounds of diligent prosecution.

As the Court has previously stated, despite the fact that the claims in this action and the State Action are closely connected, dismissing the Conservation Groups' claims here "is to treat the State's decision to proceed narrowly as an absolute bar on citizen enforcement against violations that the State complaint does not even consider. Such holding would run counter to the well-recognized role of citizen suits in supplementing government authority under the CWA." *Tenn. Clean Water Network*, 206 F. Supp. 3d at 1294. The Court should permit Conservation Groups' claims to go forward as previously determined.

## VI. TVA'S PAST POLLUTION IS NOT A BAR TO CONSERVATION GROUPS' CLAIMS, BUT INSTEAD ESTABLISHES A CONTINUING VIOLATION.

During the trial of this matter, TVA presented expert testimony that there were releases of coal ash into the Cumberland River adjacent to the NRS in the early 1970s. Through this

testimony, TVA attempts to establish that coal ash on the bottom of the river outside the NRS occurred in the past, and is not presently occurring. (Tr. v. 3, at 80:5-14). TVA maintains that the ash that it discharged in the past cannot be the basis for Conservation Groups' claims because it is impossible to discern the past contamination from any current contamination.

TVA is essentially asking the Court to reward it for failing to be a good steward of the environment repeatedly and over a long period of time. TVA cannot use its past contamination of the Cumberland River as a shield from liability from its current contamination. Permitting TVA to use its past violations of the law as a defense to actions for its current unlawful pollution would be anathema to the Clean Water Act and would reward polluters for their past transgressions.

TVA's past contamination of the Cumberland River that still remains in the River would, in fact, constitute a continuing violation of the Clean Water Act. *Greenfiled Mills, Inc. v. Goss,* No. 1:00-cv-0219, 2005 WL 1563433, at *5 (N.D. Ind. June 28, 2005); *Stillwater of Crown Point Homeowner's Ass'n, Inc. v. Kovich,* 820 F. Supp.2d 859, 895 (N.D. Ind. 2011) (the continued presence of pollution in the waterway constitutes a continuing violation); *Stepniak v. United Materials, LLC,* No. 03–CV–569A, 2009 WL 3077888, at *4 (W.D.N.Y. Sept.24, 2009) (the weight of authority supports the plaintiff's position that the continued presence of pollution constitutes a continuing violation); *Swinomish Indian Tribal Cmty. v. Skagit Cnty. Dike Dist. No. 22,* 618 F. Supp. 2d 1262, 1266 (W.D. Wash. 2008) ("The ongoing presence of [pollution] without a permit represents a continuing violation of the CWA."); *Mountain Park, Ga. V. Lakeside at Ansley, LLC,* 560 F. Supp. 2d 1288, 1296 (N.D. Ga. 2008) (holding that the continuing presence of pollution can constitute an "ongoing violation" under *Gwaltney*); *N.C. Wildlife Fed'n v. Woodbury,* No. 87–584–CIV–5, 1989 WL 106517, at *2 (E.D.N.C. Apr. 25,

23

1989) (holding that the failure to remove pollution constitutes a continuing violation of the CWA sufficient to confer federal jurisdiction under the CWA's citizen-suit provision). *Cf. Ogeechee–Canoochee Riverkeeper, Inc. v. T.C. Logging, Inc.,* No. 608CV064, 2009 WL 2390851, at *8 (S.D. Ga. Aug.4, 2009) (finding that an alleged CWA § 404 violation continues so long as pollution remains because the violation is "continuing in nature."). Accordingly, TVA's argument must fail and the continuing presence of coal ash pollution in the Cumberland River from the Gallatin Plant is a continuing violation of the Clean Water Act.

## VII.  REMEDIES FOR VIOLATIONS OF THE CLEAN WATER ACT.

Conservation Groups have asked the Court to grant permanent injunctive relief to stop the ongoing CWA and permit violations from coal ash pollution at the Gallatin Fossil Plant; to assess civil monetary penalties pursuant to 33 U.S.C. §§ 1319(d), 1365(a), and the Civil Monetary Penalty Inflation Adjustment Rule,  *see* 74 Fed. Reg. 626 (Jan. 2009), 81 Fed. Reg. 43091-01 (July 2016); to award Conservation Groups the costs of this action, as authorized by 33 U.S.C. § 1365(d); and to grant Conservation Groups such further and additional relief as the Court deems just and proper.

### A.  The Removed Substances Provision Requires Removal of the Ash.

TVA has accepted the terms of the Permit, has not administratively challenged those terms, and receives the benefits of the Permit: authorization to discharge pollutants in compliance with the Permit's terms, and a shield from Clean Water Act enforcement to the limited extent allowed by § 1342(k). By the same token, TVA must comply with all the provisions of its Permit, including the Removed Substances Provision. An order that excuses TVA from compliance would, in effect, be modifying the permit to remove or rewrite this provision, with none of the procedures and protections afforded by the Clean Water Act.

24

Under the Clean Water Act, federal courts have no authority to delete provisions of a permit, to disregard requirements of a permit, or to amend a permit. Congress explicitly provided that National Pollutant Discharge Elimination System permits would be issued either by the Administrator of the EPA, 33 U.S.C. §1342 (a) or, as in this case, the states that administer permitting programs that comply with the requirements of the Clean Water Act, 33 U.S.C. § 1342(b). Among other requirements, before a permit is issued, the public must be notified and have an opportunity to comment on the proposed permit. 33 U.S.C. § 1342 (b)(3). Congress set out many requirements for the issuance of permits, including a requirement that the discharger submit an application meeting the requirements of the Clean Water Act. 33 U.S.C. § 1342(p)(4). In this instance, the Clean Water Act permit was issued by TDEC, under an express delegation of authority from the EPA. *See* J. Ex. 102 (Permit issued, "Under authority of the Tennessee Water Quality Control Act of 1977 (T.C.A. 69-3-101 *et seq.*) and the delegation of authority from the United States Environmental Protection Agency under the Federal Water Pollution Control Act, as amended by the Clean Water Act of 1977 (33 U.S.C. 1251, *et seq.*)). Issuance of Clean Water Act permits in Tennessee is further governed by state statutes and regulations that guarantee public participation and the right of judicial review by affected members of the public. *See, e.g.*, Tenn. Code Ann. § 69-3-111 (setting forth "appeal and review" process pursuant to Tennessee Quality Control Act).

Nothing in the Clean Water Act authorizes federal courts to play any role in the issuance or modification of permits. If a federal court disregarded or refused to enforce a permit provision, it would be rewriting a permit without the public notice, public comment, and administrative process requirements that Congress set out in the Clean Water Act, that EPA set out in its delegation of authority to Tennessee, and that Tennessee has set out in its laws and

regulations. If Congress intended for federal courts to have the authority to amend, modify, or to refuse to enforce provisions of a permit, it would have set out that authority in the Clean Water Act. But Congress did not set out such a role for the federal courts.

Therefore, the Clean Water Act does not authorize the federal courts to refuse to enforce a permit provision because a permittee objects to its expense or claims difficulty in complying with the permit provision. The permittee had the opportunity to contest the permit through the state permitting process and also could have chosen not to accept the permit as written and operate without discharging into United States waters. But once the permit is final and the permittee has decided to accept it, then the permit governs the permittee's operations.

The role of the federal courts is to enforce the permit as written: "The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties under § 1319(d) of this title." 33 U.S.C. § 1365 (a)(2).

As courts in the Sixth Circuit have explained, a permittee must comply with all the terms of its NPDES permit, and cannot be excused from compliance without its permit officially being modified according to the proper procedures. "In light of the supremacy of federal law in this area," the operation of the terms and conditions of an NPDES Permit "cannot [be] suspend[ed]" "without following appropriate procedures." *United States v. City of Toledo*, 867 F. Supp. 603, 606-07 (N.D. Ohio 1994) (citing *United States v. Ohio Edison Co.*, 725 F. Supp. 928 (N.D. Ohio 1989) (state agency could not suspend cooling tower requirement of NPDES permit without first providing public notice and hearing); *United States v. Sharon Steel Corp.*, 30 Env't. Rep. 1778

(N.D. Ohio 1989); *United States v. City of Bedford*, 1988 WL 489746 (N.D. Ohio July 14, 1988)).

Accordingly, where a state agency entered into a consent order that "excused" the permittee from complying with its NPDES permit by putting in place interim limitations different from those in the permit, the court held that the permittee's NPDES permit "has not been properly modified" and that the NPDES permit remained in "full force and effect." *Frilling v. Vill. of Anna*, 924 F. Supp. 821, 829, 837 (S.D. Ohio 1996). The court held as a matter of law that compliance with lesser standards than those in the permittee's NPDES permit did not suspend the legal effect of the NPDES permit, and the permittee remained in violation of the permit and the Act. *Id.* at 844. The court noted that its reasoning was informed by "the Supreme Court's pronouncement that § 1365 has the 'central purpose of permitting citizens to abate pollution when the government cannot *or will not* command compliance.' *Gwaltney v. Chesapeake Bay Found.*, 484 U.S. 49, 62, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987) (emphasis added)." *Id.* Indeed, the premise of the citizen suit provision of the Clean Water Act is to ensure that if a specific permit provision is not being enforced by the agency, the violator may still be required to comply by a citizen suit such as this one, with the Court acting to ensure compliance when a violation of the permit has been established.

Moreover, this structure applies equally to all permit provisions, not just numeric effluent limitations. In denying a motion to dismiss a claim by a defendant city arguing that an upcoming renovation project of its sewer system would eliminate the pollution discharge problems, the Sixth Circuit noted that "even if the renovation project made it reasonably likely that the *discharge* violations would not recur [a conclusion the court rejected], this hypothetical situation tells nothing about the likelihood that the defendants' violations of the *monitoring* or *reporting*

requirements of the discharge permit would recur." *Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 543-44 (6th Cir. 2004) (emphasis in original). In other words, these additional requirements of the permit could not be ignored by the court and must be enforced. Here, of course, the Removed Substances Provision directly affects the entry of sludge and pollutants into protected waters. Because TVA has stored its coal ash in the subsurface waters, in direct violation of this provision, the ash must be removed in order to comply with the Permit.

**B. Excavation and Removal Is Required by the Clean Water Act Because It Is the Only Remedy That Will Stop the Unpermitted Discharges.**

The Clean Water Act allows a district court "to order that relief it considers necessary to secure prompt compliance with the Act." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982). "Congress has already balanced the equities and has determined that, as a matter of public policy, an injunction should issue where the defendant is engaged in . . . activity which the statute prohibits." *Burlington N.R.R.*, 957 F.2d at 602 (citation omitted). Because it must require compliance with the Clean Water Act in order to effectuate the Congressional intent of the Act, the Court need not engage in the traditional analysis of factors to determine whether a permanent injunction should be ordered.

The Removed Substances Provision prohibits TVA from allowing "[s]ludge or any other material removed by any treatment works," including the coal ash in the Gallatin pits, to "ent[er] into . . . any surface or subsurface waters." At Gallatin, the coal ash is stored in subsurface groundwater and would remain in the groundwater if left in place under a cap. This is a direct violation of the Permit and thus of the Clean Water Act.

The Removed Substances Provision's prohibition against coal ash sludges and other materials entering subsurface waters means that in order to comply with the Permit, the coal ash

must be removed from the groundwater at Gallatin. To allow TVA to leave its coal ash sitting in subsurface waters would directly contradict the Removed Substances Provision's plain language. In effect, such an outcome would rewrite the Permit—which has been subject to public notice and comment and the opportunity for judicial review—to excuse TVA from compliance with its express terms. The Court will not excuse TVA from compliance with its Permit.

Thus, in order to comply with the plain language of the Removed Substances Provision of its NPDES Permit, TVA must remove all coal ash from the subsurface waters at Gallatin. This requirement applies independently of the equitable analysis set forth below.

Even if the Court were to engage in the analysis of traditional factors to determine whether a permanent injunction should be ordered, the Court should find that excavation and removal is warranted here. Traditionally, to obtain permanent injunctive relief, a plaintiff must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

As to the first factor, where a federal statute has been violated, and Congress has expressly provided for injunctive relief to prevent violations of the statute, the plaintiff need not demonstrate irreparable harm to secure an injunction. *Burlington N.R.R. v. Bair*, 957 F.2d 599, 601 (8th Cir. 1992) (citing *United States v. City of San Francisco*, 310 U.S. 16, 31 (1940)).

As to the second factor, environmental injury can seldom be adequately remedied by monetary damages and "is often permanent or at least of long duration, i.e., irreparable." *Amoco Prod. Co. v. Village of Gambell, A.K.*, 480 U.S. 531, 545 (1987).

Third, as to the balancing of the equities, as set forth above, "Congress has already balanced the equities and has determined that, as a matter of public policy, an injunction should issue where the defendant is engaged in . . . activity which the statute prohibits." *Burlington N.R.R.*, 957 F.2d at 602 (citation omitted). As set forth above, because Congress made a clear policy choice in favor of environmental protection through the Clean Water Act, "[t]here is no exception to permit compliance because such compliance is expensive." *Ohio Valley Environmental Coalition, Inc. v. Apogee Coal Co.*, 555 F. Supp. 2d 640, 649 (S.D.W.Va. 2008).

TVA argues that requiring it to comply with the Clean Water Act and its Permit is simply too expensive and is unnecessary. The Sixth Circuit has determined that these grounds are not sufficient to overturn a court's order requiring compliance with the Clean Water Act and remediation of pollution. In *United States v. Cundiff*, the Sixth Circuit affirmed the District Court's remedy requiring the polluter to restore wetlands, despite the fact that the polluter argued that sufficient remediation would have occurred with actions they were already taking and because it would negatively impact future profits. 555 F.3d 200, 216 (6th Cir. 2009). Finding that the District Court did not abuse its discretion, the Court cited "the Clean Water Act's goal of 'restoring and maintaining the chemical, physical, and biological integrity of the Nation's waters.'" 555 F.3d at 216. *See also Deaton*, 332 F.3d 698 (affirming permanent injunction to restore affected area to "pre-violation condition"); *United States v. Smith*, 149 F.3d 1172 (4th Cir. 1998) (affirming restorative permanent injunction); *U.S. Pub. Interest Research Grp. v. Atl. Salmon of Maine, LLC*, 339 F.3d 23 (1st Cir. 2003) (citizen suit enforcement provision authorizes injunctive relief to remedy harm caused by past violation, including removal of illegal pollutants and sources of pollution); *United States v. Ciampitti*, 615 F.Supp. 116, 122 (D.N.J. 1984), *aff'd sub nom. Appeal of Ciampitti*, 772 F.2d 893 (3d Cir. 1985), and *aff'd sub nom. United States v.*

*Diamond Beach Dev. Corp.*, 772 F.2d 897 (3d Cir. 1985) ("There can be no doubt that this court has the power under the Clean Water Act" to order complete restoration for violations of the Act); *United States v. Outboard Marine Corp.*, 549 F.Supp. 1036, 1042 (N.D. Ill. 1982) (Clean Water Act authorizes pollution cleanup remedies to prevent ongoing and future violations and to remove past illegal pollution).

Finally, there is a clear public interest in environmental protection and protecting water quality and aquatic resources, and these interests will be furthered here by the issuance of a permanent injunction requiring TVA to cease its pollution of the Cumberland River. *See, e.g.*, *Ohio Valley Envtl. Coal., Inc. v. Fola Coal Co., LLC*, No. CV 2:13-5006, 2015 WL 5972430, at *3 (S.D.W.Va. Oct. 14, 2015) (Protecting water quality "a critical public interest that profoundly outweighs a company's bottom line.") (citations omitted).

Specific to evaluation of environmental remediation proposals, courts have considered the following factors: (1) whether the proposal would confer maximum environmental benefits, (2) whether it is achievable as a practical matter, and (3) whether it bears an equitable relationship to the degree and kind of wrong to be remedied. *Cundiff*, 555 F.3d at 216. Here, these factors weigh decidedly in favor of excavation and removal because it is the remedy that confers maximum environmental benefits. Indeed, it is the only remedy that will provide any benefits. Furthermore, excavation is achievable, as demonstrated by other utilities' closure of coal ash impoundments by excavation and removal.

Again, the Court must order TVA to come into compliance with the Clean Water Act and its Permit, and the Court need not engage in a balancing of equities in order to reach this conclusion. *Weinberger*, 456 U.S. at 320 (district court should "order that relief it considers necessary to secure prompt compliance with the Act.") Even if the Court were to weigh the

31

equitable factors, issuance of permanent injunctive relief to remedy the ongoing coal ash pollution at the Gallatin Fossil Plant is appropriate and consistent with longstanding Clean Water Act precedent.

### C. Based on the Statutory Penalty Factors Civil Penalties are Appropriate.

Clean Water Act Section 309(d) provides that violators of the Clean Water Act "shall be subject to a civil penalty." 33 U.S.C. § 1319(d). The Act further provides that:

> In determining the amount of a civil penalty the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require.

*Id*.

Penalties may be assessed against TVA up to $37,500 per violation per day pursuant to sections 309(d) and 505(a) of the Clean Water Act [33 U.S.C. §§ 1319(d), 1365(a)] and adjustments for inflation, *e.g.*, 74 Fed. Reg. 626 (Jan. 2009). The U.S. Environmental Protection Agency recently increased the maximum civil monetary penalties from $37,500 per day per Clean Water Act violation. *See* 40 C.F.R. § 19.2 ("Effective Date"); 40 C.F.R. § 19.4 ("Statutory civil penalties, as adjusted for inflation, and tables"). Specifically, violations that occur after November 2, 2015, where the penalties are assessed on or after January 15, 2017 are now $52,414 per day per violation. *Id.*

TVA's violations of the Clean Water Act are serious and have a long history. Despite TVA's knowledge of the violations, TVA has not undertaken efforts to stop the violations and comply with its NPDES permit and the Clean Water Act. Moreover, TVA has long benefitted economically from its noncompliance. For these reasons, the CWA requires the assessment of penalties.

32

## D. Conservation Groups are Entitled to an Award of Attorneys' Fees and Costs.

"The court, in issuing any final order in any action brought pursuant to this section, may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such award is appropriate." 33 U.S.C. § 1365(d). "Although determinations about whether to award attorney's fees are generally focused on the claims as they existed at the time the complaint was filed, 'fees also may be awarded on rare occasions where the plaintiff continued to litigate after [the claims] <u>clearly</u> became [frivolous, unreasonable, or groundless].'" *Torres–Santiago v. Municipality of Adjuntas,* 693 F.3d 230, 235 (1st Cir. 2012) (quoting *Ortiz–Vélez*, 630 F.3d at 241) (alterations and emphasis in original) (internal citations omitted).

Here, Conservation Groups have requested that the Court grant them attorneys' fees and costs as the prevailing party. Conservation Groups should be permitted to file a petition setting forth the amount of fees and costs to which they are entitled.

## VIII. APPOINTMENT OF AN EXPERT.

At the conclusion of the trial, the Court asked the parties to address the issue of whether it would be appropriate to appoint an expert to advise the Court on the issue of remedy under Federal Rule of Evidence 702. (Tr. v. 4, 164:15-18). Rule 706 governs the appointment of expert witnesses by the court and states that, "The court may appoint any expert that the parties agree on and any of its own choosing." Fed. R. Ev. 706(a).

Conservation Groups maintain, as stated above, that excavation and removal to a lined storage facility is the only appropriate remedy in this case, and no additional expert testimony will change this fact.

33

The mechanics of excavation and removal, such as the mode of transport, whether by barge, rail, or truck, and the location for disposal of the ash, can be determined by TVA without the Court's involvement.

If, however, the Court is not inclined at this point to rule on remedy based on the evidence presented at trial, it is possible that the advice of an appointed expert could be useful. If such an expert is to be appointed, Conservation Groups would like the opportunity to suggest the names of individuals whose experience would assist the Court. Conservation Groups further request that the Court not impose limits on the range of remedies to be considered by the appointed expert, apart from directing that no proposed remedy will be accepted if it does not achieve compliance with the Clean Water Act and the Permit, as required by law. Additionally, Conservation Groups request that the Court require TVA to provide any such expert with all data and information collected at the Gallatin Plant pursuant to the Agreed Injunctive Order in the State Action. Any such expert should also be permitted to engage in communications with the experts who opined in this case and the TDEC engineers involved in the work being conducted in conjunction with the Agreed Injunctive Order. Without access to this data and the expertise and experiences of these individuals, any recommendation that the expert might make to the Court would be based on incomplete information.

Respectfully Submitted,

s/ Elizabeth A. Alexander
Elizabeth A. Alexander, BPR No. 19273
Delta Anne Davis, BPR No. 010211
Anne E. Passino, BPR No. 027456
SOUTHERN ENVIRONMENTAL LAW CENTER
2 Victory Avenue, Suite 500
Nashville, TN 37213

34

Telephone: (615) 921-9470
Facsimile: (615) 921-8011
balexander@selctn.org
adavis@selctn.org
apassino@selctn.org

Jonathan M. Gendzier, pro hac vice
SOUTHERN ENVIRONMENTAL
LAW CENTER
201 West Main St.
Suite 14
Charlottesville, VA 22902-5065
jgendzier@selcva.org

*Attorneys for Tennessee Scenic
Rivers Association*

Shelby R.B. Ward (BPR No. 030394)
Tennessee Clean Water Network
P.O. Box 1521
Knoxville, TB 37901
Telephone: (865) 522-7007
Fax: (865) 525-4988
Shelby@tcwn.org

*Attorney for Tennessee Clean Water
Network*

35

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Post-Trial Brief was filed electronically on April 14, 2017, through the Court's Electronic Filing System. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

David D. Ayliffe
Tennessee Valley Authority
General Counsel's Office
400 W Summit Hill Drive
Knoxville, TN 37919
(865) 632-8964
(865) 632-6718 (fax)
ddayliffe@tva.gov

Lane E. McCarty
Tennessee Valley Authority
General Counsel's Office
400 W Summit Hill Drive
Knoxville, TN 37919
(865) 632-2396
(865) 632-6718 (fax)
lemccarty@tva.gov

James S. Chase
Tennessee Valley Authority
General Counsel's Office
400 W Summit Hill Drive
Knoxville, TN 37919
(865) 632-4239
(865) 632-3195 (fax)
jschase@tva.gov

*Attorneys for Tennessee Valley Authority*

/s Elizabeth A. Alexander
ELIZABETH A. ALEXANDER

36