# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  September 24, 2018

Mr. David Demar Ayliffe
Tennessee Valley Authority
Office of the General Counsel
400 W. Summit Hill Drive
Knoxville, TN 37902

Mr. F. William Brownell
Hunton Andrews Kurth
2200 Pennsylvania Avenue, N.W.
Washington, DC 20037

Mr. Larry L Cash
Miller & Martin
832 Georgia Avenue, Suite 1200
Chattanooga, TN 37402

Mr. James S. Chase
Tennessee Valley Authority
Office of the General Counsel
400 W. Summit Hill Drive
WT 6A-K
Knoxville, TN 37902

Mr. Briton Shea Collins
Kennerly, Montgomery & Finley
550 Main Street
Suite 400
Knoxville, TN 37902

Mr. Scott Doran
Kegler, Brown, Hill & Ritter
65 E. State Street, Suite 1800
Columbus, OH 43215

Ms. Margaret Kuhn Fawal
Venable
750 E. Pratt Street
Suite 900
Baltimore, MD 21202

Mr. Michael Heith Frost
Miller & Martin
832 Georgia Avenue
Suite 1200
Chattanooga, TN 37402

Ms. Amanda Garcia
Southern Environmental Law Center
1033 Demonbreun Street
Suite 205
Nashville, TN 37203

Ms. Angela Garrone
1735 Carruthers Place
Memphis, TN 38112

Mr. Austin D, Gerken Jr.
Southern Environmental Law Center
48 Patton Avenue
Suite 304
Asheville, NC 28801

Mr. Douglas Haber Green
Venable
600 Massachusetts Avenue, N.W.
Washington, DC 20001

Ms. Leslie Ann Griffith
Mr. Frank S. Holleman III
Southern Environmental Law Center
601 W. Rosemary Street
Suite 220
Chapel Hill, NC 27516

Mr. Michael S. Kelley
Kennerly, Montgomery & Finley
550 Main Street
Suite 400
Knoxville, TN 37902

Ms. Frances Regina Koho
Tennessee Valley Authority
Office of the General Counsel
400 W. Summit Hill Drive
Knoxville, TN 37902

Mr. William Levendusky
Kegler, Brown, Hill & Ritter
65 E. State Street
Suite 1800
Columbus, OH 43215

Mr. Elbert Lin
Hunton Andrews Kurth
951 E. Byrd Street
Richmond, VA 23219

Mr. Nash E. Long III
Hunton Andrews Kurth
101 S. Tryon Street
Suite 3500
Charlotte, NC 28280

Ms. Lane Elizabeth McCarty
Tennessee Valley Authority
Office of the General Counsel
400 W. Summit Hill Drive
Knoxville, TN 37902

Mr. Eric Michael Palmer
Office of the Attorney General
of Alabama
P.O. Box 300152
Montgomery, AL 36111

Mr. Robert Foust Parsley
Miller & Martin
832 Georgia Avenue
Suite 1200
Chattanooga, TN 37402

Ms. Anne E. Passino
Southern Environmental Law Center
1033 Demonbreun Street
Suite 205
Nashville, TN 37203

Mr. Brent Rosser
Hunton Andrews Kurth
101 S. Tryon Street
Suite 3500
Charlotte, NC 28280

Mr. Carlos Clifford Smith
Miller & Martin
832 Georgia Avenue
Suite 1200
Chattanooga, TN 37402

Mr. Mark W. Smith
Miller & Martin
832 Georgia Avenue
Suite 1200
Chattanooga, TN 37402

Mr. Roger P. Sugarman
Kegler, Brown, Hill & Ritter
65 E. State Street
Suite 1800
Columbus, OH 43215

Mr. Reed W. Super
Super Law Group
180 Maiden Lane
Suite 603
New York, NY 10038

Mr. Nicholas Steele Torrey
Southern Environmental Law Center
601 W. Rosemary Street
Suite 220
Chapel Hill, NC 27516

Ms. Leah Tulin
Office of the Attorney General
of Maryland
200 St. Paul Place
20th Floor
Baltimore, MD 21202

Ms. Emily Beth Vann
Office of the Attorney General
of Tennessee

P.O. Box 20207
Nashville, TN 37202

Re:  Case No. 17-6155, *Tennessee Clean Water Network, et al v. TVA*
Originating Case No. : 3:15-cv-00424

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Mr. Keith Throckmorton

Enclosures

Mandate to issue.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0214p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————————

TENNESSEE CLEAN WATER NETWORK; TENNESSEE
SCENIC RIVERS ASSOCIATION,

                  *Plaintiffs-Appellees*,

      *v.*

TENNESSEE VALLEY AUTHORITY,

                *Defendant - Appellant*.

No. 17-6155

———————————

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:15-cv-00424—Waverly D. Crenshaw Jr., District Judge.

Argued: August 2, 2018

Decided and Filed: September 24, 2018

Before: SUHRHEINRICH, CLAY, and GIBBONS, Circuit Judges.

———————————

#### COUNSEL

**ARGUED:** David D. Ayliffe, TENNESSEE VALLEY AUTHORITY, Knoxville, Tennessee, for Appellant. Frank S. Holleman, III, SOUTHERN ENVIRONMENTAL LAW CENTER, Chapel Hill, North Carolina, for Appellees. **ON BRIEF:** David D. Ayliffe, James S. Chase, F. Regina Koho, Lane E. McCarty, TENNESSEE VALLEY AUTHORITY, Knoxville, Tennessee, for Appellant. Frank S. Holleman, III, Nicholas S. Torrey, SOUTHERN ENVIRONMENTAL LAW CENTER, Chapel Hill, North Carolina, Anne E. Passino, SOUTHERN ENVIRONMENTAL LAW CENTER, Nashville, Tennessee, Michael S. Kelley, Briton S. Collins, KENNERLY, MONTGOMERY & FINLEY, P.C., Knoxville, Tennessee, Austin D. Gerken, Jr., SOUTHERN ENVIRONMENTAL LAW CENTER, Asheville, North Carolina, for Appellees. Douglas H. Green, Margaret K. Fawal, VENABLE LLP, Washington, D.C., Eric M. Palmer, OFFICE OF THE ATTORNEY GENERAL OF ALABAMA, Montgomery, Alabama, Carlos C. Smith, Larry L. Cash, Mark W. Smith, MILLER & MARTIN PLLC, Chattanooga, Tennessee, Robert F. Parsley, M. Heith Frost, MILLER & MARTIN PLLC, Chattanooga,

Tennessee, Nash E. Long, Brent A. Rosser, HUNTON & WILLIAMS LLP, Charlotte, North Carolina, Elbert Lin, HUNTON & WILLIAMS LLP, Richmond, Virginia, F. William Brownell, HUNTON & WILLIAMS LLP, Washington, D.C., Roger P. Sugarman, Scott M. Doran, William J. Levendusky, KEGLER BROWN HILL + RITTER CO., LPA, Columbus, Ohio, Reed W. Super, SUPER LAW GROUP, LLC, New York, New York, Angela M. Garrone, SOUTHERN ALLIANCE FOR CLEAN ENERGY, Knoxville, Tennessee, Emily B. Vann, OFFICE OF THE ATTORNEY GENERAL OF TENNESSEE, Nashville, Tennessee, Leah J. Tulin, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Amici Curiae.

SUHRHEINRICH, J., delivered the opinion of the court in which GIBBONS, J., joined. CLAY, J. (pp. 17–27), delivered a separate dissenting opinion.

————————————

**OPINION**

————————————

SUHRHEINRICH, Circuit Judge.

## I. INTRODUCTION

Defendant Tennessee Valley Authority ("TVA" or "Defendant") operates a coal-fired electricity-generating plant, the Gallatin Fossil Plant ("Gallatin plant"), on a part of the Cumberland River known as Old Hickory Lake, a popular recreation spot. The Gallatin plant generates wanted electricity (which it supplies to approximately 565,000 households in the greater Nashville area), as well as unwanted waste byproducts, in particular coal combustion residuals ("CCRs") or coal ash. The plant disposes of the coal ash by "sluicing" (mixing with lots of water) and allowing the coal ash solids to settle in a series of unlined man-made coal ash ponds adjacent to the river. The Gallatin plant has a permit to discharge some of this coal combustion wastewater, which contains heavy metals and other pollutants, into the river through a pipe, known as Outfall 001. Other wastewater is allegedly discharged through leaks from the ponds through the groundwater into the Cumberland River, a waterway protected by the Clean Water Act ("CWA"), 33 U.S.C. § 1251, *et seq*. The CWA indisputably regulates the first type of discharge. The issue on appeal is whether the CWA also regulates the latter type of discharge.

After a bench trial, the district court found that TVA violated the CWA because its coal ash ponds at the Gallatin plant leaks pollutants through groundwater that is "hydrologically

connected" to the Cumberland River without a permit. This theory of liability has been labeled the "hydrological connection theory" by the Federal Environmental Protection Agency ("EPA"). As explained in the companion decision also issued today, *Kentucky Waterways All., v. Kentucky Utilities Co.*, No. 18-5115, --- F. 3d ---, (6th Cir. -- , 2018) ("*Kentucky Waterways*"), we find no support for this theory in either the text or the history of the CWA and related environmental laws. We therefore hold that the district court erred in granting relief under the CWA.

## II. BACKGROUND

### A. Statutory Background

Some background on the CWA is helpful. As explained in *Kentucky Waterways,* Congress passed the CWA in 1972 with the stated purpose of "restor[ing] and maintain[ing] the . . . Nation's waters." 33 U.S.C. § 1251(a). To that end, the CWA requires a permit to "discharge . . . any pollutant." *Id.* §§ 1311(a), 1342(a). The discharge of a pollutant is defined as "any addition of any pollutant to navigable waters from any point source." *Id.* § 1362(12)(A). Navigable waters are broadly defined as "the waters of the United States." *Id.* § 1362(7). And a point source is a "discernible, confined and discrete conveyance." *Id.* § 1362(14). These permits are issued pursuant to the CWA's National Pollutant Discharge Elimination System ("NPDES"). *Id.* §1342. Therefore, in order to add a pollutant to the waters of the United States via a conveyance, an NPDES permit is required.

The CWA overhauled the 1948 Federal Water Pollution Control Act and the Water Quality Act of 1965 by shifting the focal point of liability from measuring excess pollution levels in the receiving water to capping effluent limitations from a discharging source. *See* S. Rep. No. 92-414 (1971), *as reprinted in* 1972 U.S.C.C.A.N. 3668, 3675 ("Under [the CWA] the basis of pollution prevention and elimination will be the application of effluent limitations. Water quality will be a measure of program effectiveness and performance, not a means of elimination and enforcement. . . . With effluent limits, the [EPA] . . . need not search for a precise link between pollution and water quality.").

With the CWA, Congress also sought to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution [and] to plan the

No. 17-6155            *Tenn. Clean Water Network, et al. v. TVA*            Page 4

development and use . . . of land and water resources." 33 U.S.C. § 1251(b). The CWA accomplishes this by allowing the states to administer the CWA's NPDES permitting program themselves, provided their regulations are at least as stringent as the federal limitations, *id.* § 1342(b)-(d), and most notably, by drawing a line between point-source pollution and nonpoint-source pollution, *id.* § 1362(12),(14). Point-source pollution is subject to the NPDES requirements, and thus, to federal regulation under the CWA. But all other forms of pollution are considered nonpoint-source pollution and are within the states' regulatory domain. *See id.* §§ 1314(f), 1362(12); *see also Nat'l Wildlife Fed'n v. Consumers Power Co.*, 862 F.2d 580, 588 (6th Cir. 1988). Similarly, the CWA is restricted to regulation of pollutants discharged into navigable waters, *id.* § 1362(12), leaving the states to regulate pollution of non-navigable waters.

The EPA has the power under the CWA to issue orders and to bring civil and criminal actions against those in violation of its provisions. *Id.* § 1319(a)-(c). The CWA also allows private citizens to file civil actions against violators, provided they give the EPA, the relevant state, and the alleged wrongdoer sixty-days' notice prior to filing the lawsuit. *Id.* § 1365(a)-(b); *see Sierra Club v. Hamilton Cty. Bd. of Cty. Comm'rs*, 504 F.3d 634, 637 (6th Cir. 2007) (noting private citizen suits "provide a second level of enforcement" and serve as a check on state and federal governments, who bear the primary enforcement responsibility for prosecuting CWA violations).

We have held that a CWA claim has five elements: "(1) a *pollutant* must be (2) *added* (3) *to navigable waters* (4) *from* (5) *a point source*." *Consumers Power Co.*, 862 F.2d 580 at 583 (quoting *Nat'l Wildlife Fed'n v. Gorsuch*, 693 F.2d 156, 165 (D.C. Cir. 1982)).

### B. Factual Background

As noted, the Gallatin plant is adjacent to the Cumberland River, a "water[] of the United States." 33 U.S.C. § 1362(7). TVA has two coal ash ponds or impoundments at the Gallatin plant: the Non-Registered Site ("NRS") and the Ash Pond Complex ("Complex"). The NRS is closed, and the Complex is in the process of being closed.

### 1. The NRS

From 1956 to 1970, the Gallatin plant sluiced CCRs to the NRS, an unlined 65-acre site along the western edge of the river. The NRS is situated atop alluvium (loose soil, silt, clay). By 1973, TVA had dewatered the NRS. TVA closed the NRS in 1998, pursuant to the State of Tennessee's solid waste program. For this reason the NRS does not have an NPDES permit. Instead, the Tennessee Department of Environment and Conservation ("TDEC") regulates the "closed dry ash disposal area" according to its solid waste landfill standards, which include ongoing groundwater monitoring. *See* Tenn. Code Ann. § 68-211 *et seq*. Approximately 2.3 million cubic yards of coal ash are stored at the NRS.

Based on expert testimony from both sides, the district court found that "it does appear more likely than not that some portions of [the NRS as well as the Complex] penetrate the water table." The court concluded that the NRS is contaminated; that it leaked historically; that there was "no evidence to suggest that the 'closure' of the site . . . wholly stopped the leaking."

### 2. The Complex

After 1970, TVA began treating its CCR in a series of unlined ponds, collectively known as the Complex. The ponds, which cover roughly 476 acres, treat sluiced wastewater by allowing CCRs to settle before releasing wastewater to the Cumberland River through Outfall 001. Approximately 11.5 million cubic yards of coal ash are stored at the Complex today. The parties agree that the Complex sits atop karst terrain, a landscape characterized by underground sinkholes, fissures, and caves caused by water-dissolving limestone. *See* 40 C.F.R. § 257.53. Groundwater flows easily through the factures and other conduits created by the dissolved rock.

Historically, the Complex leaked significant amounts of pollutants into the river. Between 1970 and 1978, approximately 27 billion gallons of coal ash wastewater flowed directly from the Complex into the karst aquifer and then into the Cumberland River. The district court found it "beyond dispute that sinkholes have been recently discovered in the area[] of the Gallatin plant site" and would likely continue to form, given the nature of karst terrain. Thus, the court concluded that "[i]t is simply implausible, based on the evidence before the Court, that the

No. 17-6155          *Tenn. Clean Water Network, et al. v. TVA*          Page 6

Complex has not continued to, and will not continue to, suffer at least some leaking through karst features."

### 3. The Permit

In 1976, the EPA issued an NPDES permit authorizing the Gallatin plant to discharge wastewater from the Complex to the Cumberland River through Outfall 001. Today, TDEC issues and oversees the federal permitting process for the Gallatin plant.[1]

TDEC issued the permit in question ("Permit") on June 26, 2012,[2] after a public comment period. See 40 C.F.R. § 124.8 (requiring the EPA or state authority to issue a fact sheet for every draft permit setting forth "the principal facts and the significant factual, legal, methodological and policy questions considered in preparing the draft permit"); Tenn. Comp. R. & Regs. 0400-40-05-.06 ("Notice and Public Participation"). The Permit establishes effluent limitations, as well as monitoring and reporting requirements for certain pollutants within the wastewater.

Two additional provisions of the Permit are relevant to this lawsuit: (1) the "removed-substances" provision, which prohibits "[s]ludge or any other material removed by any treatment works" from causing "pollution of any surface or subsurface waters," and (2) the "sanitary-sewer overflow" provision, which prohibits the "discharge to land or water of wastes from any portion of the . . . treatment system other than through permitted outfalls."

On August 21, 2014 (JX 248), and again on, April 25, 2016 (JX 249, 250), TDEC deemed TVA in compliance with the Permit.

### 4. Procedural History

Plaintiffs, two Tennessee conservation groups whose members use and enjoy Old Hickory Lake, saw the matter differently. Dissatisfied with the State of Tennessee's

---

[1] The EPA delegated its permitting authority to TDEC in 1986. TDEC issued its first NPDES permit to TVA for the Gallatin plant, in 1993.

[2] The Permit expired on May 31, 2017, and was administratively continued until a new permit was issued. On May 1, 2018, TDEC issued a renewed NPDES Permit for the Gallatin plant. It became effective June 1, 2018, and is valid for five years.

enforcement efforts, they brought this CWA citizen suit on April 14, 2015, under to 33 U.S.C. § 1365, alleging that TVA violated the CWA and the Permit based on flows from the NRS and the Complex through hydrologically connected groundwater to the Cumberland River.[3]

On August 4, 2017, the district court entered judgment for Plaintiffs following a bench trial. First, the court ruled as a matter of law that the CWA applies to discharges of pollutants from a point source through hydrologically connected groundwater to navigable waters where the connection is "direct, immediate, and can generally be traced." The district court held that the NRS is a point source because it "channel[s] the flow of pollutants . . . by forming a discrete, unlined concentration of coal ash," and that the Complex is also a point source because it is "a series of discernible, confined, and discrete ponds that receive wastewater, treat that wastewater, and ultimately convey it to the Cumberland River."

The court then found as a matter of fact that both the NRS and the Complex are hydrologically connected to the Cumberland River by groundwater. As to the NRS, the court held that "[f]aced with an impoundment that has leaked in the past and no evidence of any reason that it would have stopped leaking, the Court has no choice but to conclude that the [NRS] has continued to and will continue to leak coal ash waste into the Cumberland River, through rainwater vertically penetrating the Site, groundwater laterally penetrating the Site, or both."

The district court similarly found that historical evidence established that the Complex leaked. The court stated that "none of the science presented was capable of definitively identifying when the relevant pollutants entered the water," and that the record was "silent with regard to detailed, credible evidence of whether the undisputed historical leakage is capable of justifying pollutant concentrations in the amounts observed today." However, the court decided that "[o]n balance . . . the evidence preponderates toward concluding that the discharges from the

---

[3]On January 7, 2015, the State of Tennessee filed an original enforcement action under applicable state statutes, the Tennessee Solid Waste Disposal Act and the Tennessee Water Quality Control Act, in state court. *See State of Tenn, et al. v. TVA*, No. 15-0023-IV (Davidson Cty. Chanc. Ct. Jan. 7, 2015). Plaintiffs intervened in that action. The state action remains pending, although TVA removed it to federal court in August 2017. *See Slate ex rel. Slatery v. TVA*, No. 3:17-cv-01139, ECF No. 1 (M.D. Tenn. Aug. 19, 2017).

In the present case the district court applied CWA's diligent prosecution bar, *see* 33 U.S.C. § 1365(b)(1)(B), and limited the trial's scope to the allegations it deemed non-overlapping with the state enforcement action.

. . . Complex are either ongoing or intermittent and recurring." The court therefore held that "the unanimous expert testimony is that sinkholes and other drainage features in karst terrain are not mere relics of some past geological event. Rather, the physical properties of the terrain itself make such areas prone to the continued development of ever newer sinkholes or other karst features." Thus, based on the contaminants flowing from the NRS and the Complex, the court found TVA to be in violation of the CWA. The district court further concluded that karst-related leakage from the Complex violated the Permit's removed-substances and sanitary-sewer overflow provisions.

As a remedy the court ordered TVA to "fully excavate" the coal ash in the Complex and the NRS (13.8 million cubic yards in total) and relocate it to a lined facility, rejecting TVA's proposal to dewater and put a cap on the unlined impoundments ("closure-in-place").[4] Although acknowledging that the burden of closure-by-removal "may be great," the court felt that it was "the only adequate resolution to an untenable situation that has gone on for far too long." Because of the costs associated with the injunctive remedy, the court did not assess civil penalties against TVA.

TVA appeals, arguing that the district court (1) erred in holding that the CWA's prohibition of unpermitted point source discharges applies to pollutants that migrate through groundwater to navigable waters; (2) lacked authority to override the TDEC's regulatory decision not to impose NPDES liability for seepage and leakage of coal ash leachate through groundwater at the Gallatin plant in the Permit; and (3) abused its discretion in ordering complete excavation and relocation of the 13.8 million cubic yards of coal ash stored at the Gallatin plant.

### III. ANALYSIS

We review a district court's decision to grant a permanent injunction "under several distinct standards." *S. Cent. Power Co. v. Int'l Bhd. of Elec. Workers, Local Union 2359*, 186

---

[4]Closure-in-place involves dewatering an impoundment and capping it with a geosynthetic liner, borrow material, soil, and vegetation to prevent water from flowing into and through it. Closure-by-removal involves dewatering the CCR, excavating it, drying it sufficiently to move it, and then moving it to a permitted and lined landfill. A third option, "on-site closure," strikes a middle ground: it requires removal to a lined impoundment at the same location.

F.3d 733, 737 (6th Cir. 1999). "Factual findings are reviewed under the clearly erroneous standard, legal conclusions are reviewed *de novo*, and the scope of injunctive relief is reviewed for abuse of discretion." *Id.* As always, review of statutory construction is de novo. *Bowling Green v. Martin Land. Dev. Co.*, 561 F.3d 556, 558 (6th Cir. 2009).

### A. Discharges from the NRS and the Complex

TVA first challenges the district court's ruling "that a cause of action based on an unauthorized point source discharge may be brought under the CWA based on discharges through groundwater, if the hydrologic connection between the source of the pollutants and navigable waters is direct, immediate, and can generally be traced." TVA contends that the district court impermissibly expanded CWA liability beyond what Congress authorized, and created an unnecessary conflict with regulation of coal ash under the Resource Conservation and Recovery Act, ("RCRA"), 42 U.S.C. § 6901 *et seq.*, and the CCR Rule, promulgated under RCRA, 80 Fed. Reg. 21,302 (Apr. 17, 2015).

### 1. Text and Structure of the CWA

TVA claims that the text and structure of the CWA demonstrate that the phrase "discharge of pollutants" excludes the migration of pollutants through groundwater. Plaintiffs maintain that the district court correctly concluded that the NRS and the Complex are point sources that add coal ash pollutants to the Cumberland River through groundwater with a direct hydrologic connection to the Cumberland River.[5] In finding TVA in violation of the CWA, the district court made two legal conclusions: first, that coal ash ponds are "point sources"; and second, that surface water pollution via hydrologically connected groundwater is actionable under the CWA. Because we conclude that the hydrological connection theory is not a valid theory of liability, we reverse the district court's finding of liability here.[6]

---

[5]Unlike the plaintiffs in *Kentucky Waterways*, Plaintiffs here do not argue that groundwater itself is a point source.

[6]Although we do not base our decision today on TVA's first argument, we note that the Fourth Circuit recently held that a landfill and settling pond did not serve as point sources simply because they allowed arsenic from coal ash to leach into groundwater and then to navigable waters. *See Sierra Club v. Va. Elec. & Power Co.*, No. 17-1952, --- F.3d ---, 2018 WL 4343513 (4th Cir. Sept. 12, 2018):

As we explain in *Kentucky Waterways*,[7]

[t]he backbone of [the] argument in favor of the hydrological connection theory is that the relevant CWA provision does not contain the word "directly."  Because it only prohibits the discharge of pollutants "to navigable waters from any point source," 33 U.S.C. § 1362(12)(A), [proponents] argue that the CWA allows for

---

We conclude that while arsenic from the coal ash stored on Dominion's site was found to have reached navigable waters—having been leached from the coal ash by rainwater and groundwater and ultimately carried by groundwater into navigable waters—that simple causal link does not fulfill the Clean Water Act's requirement that the discharge be from a point source. By its carefully defined terms, the Clean Water Act limits its regulation under § 1311(a) to discharges from "*any discernible, confined and discrete conveyance.*" 33 U.S.C. § 1362(14) (emphasis added). The definition includes, "but [is] not limited to[,] any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft." *Id.*; *see also Consol. Coal Co. v. Costle*, 604 F.2d 239, 249–50 (4th Cir. 1979), *rev'd in part sub nom. EPA v. Nat'l Crushed Stone Ass'n*, 449 U.S. 64, 101 S.Ct. 295, 66 L.Ed.2d 268 (1980) (finding that "discharges which are pumped, siphoned or drained" fall within the definition of discharges from a "point source"); *Appalachian Power*, 545 F.2d at 1373 (concluding that "point source" pollution does not include "unchanneled and uncollected surface waters"). At its core, the Act's definition makes clear that some facility must be involved that functions as a discrete, not generalized, "conveyance."

"Conveyance" is a well-understood term; it requires a channel or medium—i.e., a facility—for the movement of something from one place to another. *See Webster's Third New International Dictionary* 499 (1961); *The American Heritage Dictionary of the English Language* 291–92 (1976); *see also S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 105, 124 S.Ct. 1537, 158 L.Ed.2d 264 (2004) ("[A] point source need not be the original source of the pollutant; it need only convey the pollutant to 'navigable waters'" (emphasis added)). If no such conveyance produces the discharge at issue, the discharge would not be regulated by the Clean Water Act, though it might be by the RCRA, which covers and regulates the storage of solid waste, including coal ash, and its effect on groundwater.

2018 WL 4343513, at *5.  The court felt that

[t]his understanding of the Clean Water Act's point-source requirement is consistent with the larger scheme of pollution regulation enacted by Congress. In regulating discharges of pollutants from point sources, Congress clearly intended to target the *measurable* discharge of pollutants. Not only is this revealed by the definitional text of "point source," but it is also manifested in the effluent limitation enforcement scheme that the Clean Water Act employs. The National Pollutant Discharge Elimination System Program and § 1311's enforcement scheme specifically rely on "effluent limitation[s]"—restrictions on the "quantities, rates, and concentrations" of pollutants discharged into navigable waters. 33 U.S.C. § 1362(11) (defining "effluent limitation"). And state-federal permitting programs under the Clean Water Act apply these precise, numeric limitations to discrete outfalls and other "point sources," *see [EPA v. California ex rel. Res. Control Bd.*, 426 U.S. [200,] 205–08 . . . (1976), at which compliance can be readily monitored. When a source works affirmatively to *convey* a pollutant, the concentration of the pollutant and the rate at which it is discharged by that conveyance *can be measured*. But when the alleged discharge is diffuse and not the product of a discrete conveyance, that task is virtually impossible.

*Id.* at *6.

[7]In *Kentucky Waterways*, the district court dismissed the plaintiffs' CWA claim, rejecting their argument that pollution via hydrologically connected groundwater could support CWA liability.

pollutants to travel from a point source *through* nonpoint sources en route to navigable waters. The CWA's text suggests otherwise.

First, the guidelines by which a CWA-regulated party must abide—the heart of the CWA's regulatory power—are known as "effluent limitations." 33 U.S.C. § 1362(11); §1314(b)  These are caps on the quantities of pollutants that may be discharged from a point source and are prescribed on an industry-by-industry basis. *See* 33 U.S.C. § 1314(b). The CWA defines effluent limitations as restrictions on the amount of pollutants that may be "discharged from point sources *into* navigable waters." *Id.* § 1362(11) (emphasis added). The term "into" indicates directness. It refers to a point of *entry*. *See Into*, Webster's Third New International Dictionary, Unabridged. 2018.. Web. 22 Aug. 2018. ("[E]ntry, introduction, insertion."); *Into*, Oxford English Dictionary (2d ed. 1989) ("Expressing motion to a position within a space or thing: To point within the limits of; to the interior of; *so as to enter*.") (emphasis added). Thus, for a point source to discharge *into* navigable waters, it must dump *directly* into those navigable waters—the phrase "into" leaves no room for intermediary mediums to carry the pollutants.

Moreover, the CWA addresses only pollutants that are added "*to* navigable waters *from* any point source." 33 U.S.C. § 1362(12) (emphasis added). Accordingly, the CWA requires two things in order for pollution to qualify as a "discharge of a pollutant": (1) the pollutant must make its way to a navigable water (2) by virtue of a point-source conveyance.

*Id.* at ---.

Like the defendant utility company in *Kentucky Waterways,* TVA "is discharging pollutants into the groundwater and the groundwater is adding pollutants to" the Cumberland River. *Id.* "But groundwater is not a point source. Thus, when the pollutants are discharged to the river, they are not coming *from* a point source; they are coming from groundwater which is a nonpoint-source conveyance. The CWA has no say over that conduct." *Id.* For this reason, any alleged leakages into the groundwater are not a violation of the CWA.

Also similar to the plaintiffs in *Kentucky Waterways Alliance*, Plaintiffs here rely on Justice Scalia's statement in *Rapanos v. United States*, 547 U.S. 715 (2006) that "[t]he [CWA] does not forbid the 'addition of any pollutant *directly* to navigable waters from any point source,' but rather the addition of any pollutant *to* navigable waters.'" *Id.* at 743 (plurality opinion) (quoting 33 U.S.C. § 1362(12)(A)). But, as we discuss in *Kentucky Waterways*, that quote has been taken out of context, and the courts and litigants that rely on it in support of the hydrological connection theory

No. 17-6155        *Tenn. Clean Water Network, et al. v. TVA*        Page 12

> have erred for a number of reasons. Not the least of which is that *Rapanos* is not binding here: it is a four-justice plurality opinion answering an entirely different legal question. *See id.* at 739 (concluding that certain wetlands and intermittent streams did not themselves fall within the CWA's definition of navigable waters). In any event, when Justice Scalia pointed out the absence of the word "directly" from § 1362(12)(A), he did so to explain that pollutants which travel through multiple *point sources* before discharging into navigable waters are still covered by the CWA. *Id.* at 743 ("[T]he discharge into intermittent channels of any pollutant that naturally washes downstream likely violates [the CWA], even if the pollutants discharged from a point source do not emit 'directly into' covered waters, but pass 'through conveyances' in between. (emphasis omitted)). Justice Scalia's reference to "conveyances"—the CWA's definition of a point source— reveals his true concern. He sought to make clear that intermediary point sources do not break the chain of CWA liability; the opinion says nothing of point-source-to-nonpoint-source dumping like that at issue here. And the facts in *Rapanos* confirm this to be true. The three wetlands that the Supreme Court defined out of the CWA in *Rapanos* were all linked to navigable waters by multiple different point sources (drains, ditches, creeks, and the like). *Id.* at 729-30. Thus, our holding today does not stand in conflict with the *Rapanos* plurality.

*Ky. Waterways All.*, --- F.3d ---, No. 18-5115, at ---. We further concluded that the CWA's other provisions and corresponding federal environmental laws strengthened this reading, which brings us to TVA's next argument—that the district court's hydrological connection holding directly conflicts with RCRA and the CCR Rule.

## 2. Statutory Context

Along with protecting the "Nation's waters," the CWA also protects the primary rights and responsibilities of the States to regulate pollution. 33 U.S.C. § 1251(a), (b). Congress specifically designed other environmental statutes to partner with the CWA:

> RCRA is designed to work in tandem with other federal environmental protection laws, including the CWA. *See* 42 U.S.C. § 6905(b) ("The [EPA] shall integrate all provisions of [RCRA] for purposes of administration and enforcement and shall avoid duplication, to the maximum extent practicable, with the appropriate provisions of . . . [the CWA].").  For that reason, RCRA and the CWA should be read as complementary statutes, each addressed at regulating different potential environmental hazards. *Cf. Erlenbaugh v. United States*, 409 U.S. 239, 243-44 (1972) (statutes that "pertain to the same subject" may be treated "as if they were one law," because "whenever Congress passes a new statute, it acts aware of all previous statutes on the same subject").

*Ky. Waterways All.*, --- F.3d ---, No. 18-5115, at ---.  Moreover, allowing the CWA to cover pollution of this sort would disrupt the existing regulatory framework.  Because "RCRA explicitly exempts from its coverage any pollution that is subject to CWA regulation," *id.*, 42 U.S.C. §6903 (27), reading the CWA in this way would remove coal ash treatment and storage practices from RCRA's coverage.  "But coal ash is solid waste, and RCRA is specifically designed to cover solid waste."  *Id.*  Thus, the proposed CWA reading would be "problematic." *Id.*

> Even "more problematic"
>
> is the fact that, pursuant to RCRA, the EPA has issued a formal rule that specifically covers coal ash storage and treatment.  *See* 80 Fed. Reg. 21,302 (Apr. 17, 2015) (the "CCR Rule").  The CCR Rule was designed to regulate, among other things, coal ash ponds.  *Id.* at 21,303.  Yet because the EPA issued the CCR Rule under RCRA, reading the CWA to cover coal ash ponds would gut the rule.  Adopting Plaintiffs' reading of the CWA would mean that any coal ash pond with a hydrological connection to a navigable water would require an NPDES permit, thus removing it from RCRA's coverage and with it, the CCR Rule.  Almost all coal ash ponds sit near navigable waterways because of the large amounts of water needed to operate coal-fired power plants.  As such, adopting Plaintiffs' interpretation of the CWA would leave the CCR Rule virtually useless.  We decline to interpret the CWA in a way that would effectively nullify the CCR Rule and large portions of RCRA.

*Id.*, --- F.3d ---, No. 18-5115, at --- (citation omitted).

The CCR Rule "specifically addresses the 'disposal of coal [ash] as solid waste under [RCRA]." *Id.* at ---, (quoting 80 Fed. Reg. at 21,302).  The CCR Rule therefore "requires any existing unlined CCR surface impoundment that is contaminating groundwater above a regulated constituent's groundwater protection standard to stop receiving CCR and either retrofit or close." *Id.* (quoting 80 Fed. Reg. at 21,302).  The rule also establishes minimum criteria for CCR surface impoundments, requires groundwater monitoring, and further demands corrective action where groundwater contamination exceeds accepted levels.  *Id.*  (citing  80 Fed. Reg. at 21,396-408). In other words, the CCR Rule, not the CWA, is the framework envisioned by Congress (by delegating rulemaking authority to the EPA through RCRA) to address the problem of groundwater contamination caused by coal ash impoundments.

No. 17-6155            *Tenn. Clean Water Network, et al. v. TVA*            Page 14

For these reasons, we hold that the district court erred in adopting Plaintiffs' theory that the CWA prohibits discharges of pollutants through groundwater that is hydrologically connected to navigable waters.

### B. Removed-Substances and Sanitary-Sewer Overflow Provisions

Because the district court also held that TVA violated the CWA based on two other provisions of the Permit, our inquiry is not yet at an end. TVA challenges the district court's holdings that TVA violated the Permit's removed-substances and sanitary-sewer overflow provisions based on Plaintiffs' demonstration of unauthorized discharges of coal ash from the Complex. NPDES permits are interpreted like contracts. *Piney Run Pres. Ass'n v. Cty. Comm'rs of Carroll Cty.*, 268 F.3d 255, 269 (4th Cir. 2001).

### 1. Removed-Substances Provision

The removed-substances provision is found in Part I of the Permit, which sets forth "Effluent Limitations and Monitoring Requirements." It provides that "TVA Gallatin Fossil Plant is authorized to discharge" enumerated pollutants "through Outfall 001," including "ash transport water" and "ash sluice water leakage." These discharges are "limited and monitored by the permittee" according to specified "parameters," limitations on quantities, rates, and concentrations of specified chemicals. Part I.A(c) by its terms, is an "[a]dditional monitoring requirement[] and condition[]applicable to Outfalls 001, 002, and 004." It states that "[s]ludge or any other material removed by any treatment works must be disposed of in a manner, which prevents its entrance into or pollution of any surface or subsurface waters."

Noting that some of the ash waste produced as a result of the sluicing process escapes to the Cumberland River, the district court held simply that "Plaintiffs' demonstration of unauthorized discharges from the Ash Pond Complex" established "a violation of the facial terms of Part I.A(c)." But karst-related leaks are not discharges from "Outfalls 001, 002, and 004." Thus, this provision simply does not apply, and was therefore not violated by the conduct at issue in this case.

### 2.  Sanitary-Sewer Overflow Provision

The sanitary-sewer overflow provision, found in Part II of the Permit, prohibits "the discharge to land or water of wastes from any portion of the collection, transmission, or treatment system other than through permitted outfalls."  The district court held that, "[a]s with [the removed-substances provision], this allegation is resolved by Plaintiffs' demonstration that TVA improperly discharged coal ash waste through leaks to the . . . Complex."

But this provision also cannot be reasonably read to cover karst-related leaks.  While the Permit does not define sewage, it treats it as a distinct type of "Pollutant" distinct from "industrial wastes, or other wastes."  *See* 33 U.S.C. §1362(6) (defining "pollutant" as including "sewage" as well as "chemical wastes").  This distinction is consistent with the EPA definition of sanitary-sewer overflow as involving "[a]n untreated or partially treated *sewage* release from a sanitary sewer system."  The EPA's NPDES Permit Writers' Manual states that "occasional, unintentional spills of raw sewage from municipal sanitary sewers occur in almost every system.  Such types of releases are called sanitary sewer overflows (SSOs)."  The district court, by treating coal ash wastewater as a sanitary-sewer overflow, ignored the plain meaning of sewage.  Further, the Permit treats these types of pollutants differently.  Industrial wastes like "discharge ash transport water" and "ash sluice water leakage" are authorized with limitations while "Sanitary Sewer Overflows are prohibited."  Thus, karst-related leakage cannot be a violation of this provision.

Because the plain language of these two provisions does not apply to karst-related discharges from the Complex, there is no violation of the Permit.  Neither provision supports the district court's injunction.  Given this conclusion, we need not address TVA's arguments that that the collateral attack and permit shield doctrines shield it from liability.

### C.  Injunctive Relief

Without CWA liability, the district court's injunction has no foundation.  Its imposition was therefore an abuse of discretion.

No. 17-6155          *Tenn. Clean Water Network, et al. v. TVA*          Page 16

## IV.  CONCLUSION

As the district court rightly concluded, "an unlined [coal] ash waste pond in karst terrain immediately adjacent to a river" that leaks pollutants into the groundwater is a major environmental problem that the Permit does not adequately address.  But the CWA is not the proper legal tool of correction.  Fortunately, other environmental laws have been enacted to remedy these concerns.  For these reasons, as well as those articulated in *Kentucky Waterways*, we REVERSE the judgment of the district court imposing CWA liability on TVA.

———————————

**DISSENT**

———————————

CLAY, Circuit Judge, dissenting. Can a polluter escape liability under the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251–1387, by moving its drainage pipes a few feet from the riverbank? The Fourth and Ninth Circuits have said no. In two cases today,[1] the majority says yes. Because the majority's conclusion is contrary to the plain text and history of the CWA, and because I disagree with the majority's analysis of the permit's Sanitary Sewer Overflow provision, I respectfully dissent from the majority's position as to these issues.

## I.    Scope of the Clean Water Act

Plaintiffs have invoked the CWA's citizen-suit provision, which provides that "any citizen may commence a civil action . . . against any person . . . who is alleged to be in violation of . . . an effluent standard or limitation under this chapter[.]" 33 U.S.C. § 1365(a). "For purposes of this section, the term 'effluent standard or limitation under this chapter' means," among other possibilities, "an unlawful act under subsection (a) of section 1311 of this title." § 1365(f). In turn, § 1311(a) prohibits "the discharge of any pollutant by any person[.]"

The broad sweep of a defendant's potential CWA liability is limited in two ways. First, Congress included a list of exceptions in § 1311(a) itself: the discharge of a pollutant is unlawful "[e]xcept in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title." Second, Congress gave the phrase "discharge of a pollutant" a very specific definition: it means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A). Taken together, Congress thus authorized citizen suits to prevent the "addition of any pollutant to navigable waters from any point source," *see* § 1362(12)(A), but if a listed statutory exception applies, *see* § 1311(a).

The majority argues that this standard cannot be satisfied when, as here, pollution travels briefly through groundwater before reaching a navigable water. Plaintiffs counter that such an

---

[1]The other case is Case No. 18-5115, *Kentucky Waterways Alliance, et al. v. Kentucky Utilities Co.*

exception has no statutory basis and would allow polluters to shirk their CWA obligations by placing their underground drainage pipes a few feet away from the shoreline. This case could have profound implications for those in this Circuit who would pollute our Nation's waters. And the issue is novel. This Court has never before considered whether the CWA applies in this context.

However, the Fourth and Ninth Circuits have. Both courts determined that a short journey through groundwater does not defeat CWA liability. *See Upstate Forever v. Kinder Morgan Energy Partners, L.P.*, 887 F.3d 637, 649–51 (4th Cir. 2018); *Hawai'i Wildlife Fund v. Cty. of Maui*, 886 F.3d 737, 745–49 (9th Cir. 2018). The Second Circuit reached a similar conclusion where the pollutants traveled briefly through fields (which are not necessarily point sources) and through the air. *See Concerned Area Residents for Env't v. Southview Farm*, 34 F.3d 114, 118–19 (2d Cir. 1994) (fields); *Peconic Baykeeper, Inc. v. Suffolk Cty.*, 600 F.3d 180, 188–89 (2d Cir. 2010) (air). Until today, no Circuit had come out the other way. The reason is simple: the CWA does not require a plaintiff to show that a defendant discharged a pollutant from a point source *directly* into navigable waters; a plaintiff must simply show that the defendant "add[ed] . . . any pollutant *to* navigable waters *from* any point source." *See* §§ 1362(12)(A) (emphases added), 1365(a), 1311(a); *Upstate Forever*, 887 F.3d at 650; *Hawai'i Wildlife Fund*, 886 F.3d at 749.

The Supreme Court addressed this precise issue in *Rapanos v. United States*, 547 U.S. 715 (2006). There, Justice Scalia's plurality opinion was explicit:

> The Act does not forbid the "addition of any pollutant *directly* to navigable waters from any point source," but rather the "addition of any pollutant *to* navigable waters." [33 U.S.C.] § 1362(12)(A) (emphasis added); § 1311(a). Thus, from the time of the CWA's enactment, lower courts have held that the discharge into intermittent channels of any pollutant *that naturally washes downstream* likely violates § 1311(a), even if the pollutants discharged from a point source do not emit "directly into" covered waters, but pass "through conveyances" in between. *United States v. Velsicol Chemical Corp.*, 438 F. Supp. 945, 946–947 (W.D.Tenn. 1976) (a municipal sewer system separated the "point source" and covered navigable waters). See also *Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1137, 1141 (C.A.10 2005) (2.5 miles of tunnel separated the "point source" and "navigable waters").

*Id.* at 743 (plurality opinion) (emphasis in original). True, Justice Scalia's plurality opinion is not binding. But no Justice challenged this aspect of the opinion, and for good reason: the statutory text unambiguously supports it.

Further, applying the CWA to point-source pollution traveling briefly through groundwater before reaching a navigable water promotes the CWA's primary purpose, which is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). By contrast, the majority's approach defeats the CWA's purpose by opening a gaping regulatory loophole: polluters can avoid CWA liability by discharging their pollutants into groundwater, even if that groundwater flows immediately into a nearby navigable water. This exception has no textual or logical foundation. As one district court observed,

> it would hardly make sense for the CWA to encompass a polluter who discharges pollutants via a pipe running from the factory directly to the riverbank, but not a polluter who dumps the same pollutants into a man-made settling basin some distance short of the river and then allows the pollutants to seep into the river via the groundwater.

*See N. Cal. River Watch v. Mercer Fraser Co.*, No. C-04-4620 SC, 2005 WL 2122052, at *2 (N.D. Cal. Sept. 1, 2005). In addition, this exception has no apparent limits. Based on the majority's logic, polluters are free to add pollutants to navigable waters so long as the pollutants travel through any kind of intermediate medium—for example through groundwater, across fields, or through the air. This would seem to give polluters free rein to discharge pollutants from a sprinkler system suspended above Lake Michigan. After all, pollutants launched from such a sprinkler system would travel "in all directions, guided only by the general pull of gravity." *Kentucky Waterways Alliance*, 18-5115 at 11. According to the majority, this would defeat CWA liability.[2]

---

[2]The majority declines to reverse the district court's other finding that a coal ash pond is a point source under the CWA, but suggests disagreement in a footnote. The CWA defines "point source" as "any discernible, confined and discrete conveyance," including "any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). The majority cites a recent Fourth Circuit case, *Sierra Club v. Va. Elec. & Power Co.*, No. 17-1952, --- F.3d ---, 2018 WL 4343513 (4th Cir. Sept. 12, 2018), which held that a coal ash pond is not a point source because it was a "static recipient[] of the precipitation and groundwater that flowed through [it]." 2018 WL 4343513 at *6. Looking at the text of the CWA, however, shows that, *inter alia*, "ditch[es], well[s], container[s]," and "vessel[s]" are included in the definition. 33 U.S.C. § 1362(14). The canon of

No. 17-6155          *Tenn. Clean Water Network, et al. v. TVA*          Page 20

I have a very different view.  In cases where, as here, a plaintiff alleges that a defendant is polluting navigable waters through a complex pathway, the court should require the plaintiff to prove the existence of pollutants in the navigable waters and to persuade the factfinder that the defendant's point source is to blame—that the defendant is unlawfully "add[ing] . . . any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12)(A).  The more complex the pathway, the more difficult the proof.  Where these cases are plausibly pleaded, they should be decided on the facts.

Instead, the majority holds that a plaintiff may never—as a matter of law—prove that a defendant has unlawfully added pollutants to navigable waterways via groundwater.  For its textual argument, the majority refers us to the term "effluent limitations."  This term, the majority says, is defined as "restrictions on the amount of pollutants that may be 'discharged from point sources *into* navigable waters.'"  Maj. Op. at 11 (quoting with emphasis 3 U.S.C. § 1362(11)).  Seizing on the word "into"—which denotes "entry, introduction, insertion"—the majority concludes that the effluent-limitation definition implicitly creates an element of "directness."  In other words, the majority reasons, "for a point source to discharge *into*

---

*ejusdem generis* states that "the general term must take its meaning from the specific terms with which it appears."  *Retail Ventures, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 691 F.3d 821, 833 (6th Cir. 2012).  The common denominator between wells, containers, ditches, and vessels is that each is a man-made, defined area where liquid collects.  The canon of *ejusdem generis* thus suggests that man-made coal ash ponds are included in this definition.  The Fourth Circuit instead cites a dictionary definition of "conveyance" as "a facility—for the movement of something from one place to another" without explaining how items like wells, containers, and vessels fit this definition.  *Va. Elec. & Power Co.*, 2018 WL 4343513, at *5 (quoting *Webster's Third New International Dictionary* 499 (1961)).  The Fourth Circuit suggests that a container can be a point source only if it is in the act of conveying something, 2018 WL 4343513, at *7, ignoring that the statutory definition includes "*any* … container … from which pollutants are or may be discharged."  33 U.S.C. § 1362(14) (emphasis added).

The Fourth Circuit's approach is further misguided in that it conflicts with the broad interpretation that federal courts have traditionally given to the phrase "point source."  *See, e.g.*, *Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.*, 575 F.3d 199, 219 (2d Cir. 2009) (quoting *Dague v. City of Burlington*, 935 F.2d 1343, 1354–55 (2d Cir. 1991), *rev'd on other grounds*, 505 U.S. 557 (1992)) ("[T]he definition of a point source is to be broadly interpreted."); *Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 955 (9th Cir. 2002) (quoting *Dague*, 935 F.2d at 1354–55); *Cmty. Ass'n for Restoration of Env't (CARE) v. Sid Koopman Dairy*, 54 F. Supp. 2d 976, 980 (E.D. Wash. 1999) (citing *Dague*, 935 F.2d at 1354–55); *Yadkin Riverkeeper, Inc. v. Duke Energy Carolinas, LLC*, 141 F. Supp. 3d 428, 444 (M.D. N.C. 2015) (quoting *Dague*, 935 F.2d at 1354–55); *see United States v. Earth Scis., Inc.*, 599 F.2d 368, 373 (10th Cir. 1979) ("[T]he concept of a point source was designed to further [the CWA's regulatory] scheme by embracing the broadest possible definition of any identifiable conveyance from which pollutants might enter the waters of the United States.").  By embracing a restrictive definition of what constitutes a point source, the Fourth Circuit jettisons these long-standing principles.

navigable waters, it must dump *directly* into those navigable waters[.]" *Id.* (emphasis in original).

The majority is way off the rails. First of all, "Congress 'does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.'" *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1626–27 (2018) (quoting *Whitman v. Am. Trucking Assns., Inc.*, 531 U.S. 457, 468 (2001)). The majority should heed this commonsense advice. Congress did not hide a massive regulatory loophole in its use of the word "into."

But more importantly, the majority's quoted definition of "effluent limitation" from § 1362(11)—the supposed origin of the loophole—is not relevant to this case. The citizen-suit provision uses the term "effluent standard or limitation"—not the term "effluent limitation." *See* 33 U.S.C. § 1365(f). As the majority itself argues, minor distinctions in statutory language sometimes matter. This one does. The phrase "effluent standard or limitation" is a term of art and is wholly distinct from the term "effluent limitation." This conclusion is supported not by tea leaves or a carefully selected dictionary, but rather by the CWA itself. The citizen-suit provision of the CWA provides that "effluent standard or limitation" means, among other things, "an unlawful act under subsection (a) of section 1311 of this title." 33 U.S.C. § 1365(a). Turning to § 1311(a), we find that, absent certain exceptions, "the discharge of any pollutant by any person shall be unlawful," § 1311(a), and the "discharge of a pollutant" means "any addition of any pollutant *to* navigable waters from any point source," § 1362(12)(A) (emphasis added). Thus, even assuming the majority correctly parses the definition of "into"—a dubious proposition at best—the word "into" is not contained in any of the statutory provisions at issue. Rather, we find the word "to," which does not even arguably suggest a requirement of directness; the word "to" merely "indicate[s] movement or an action or condition suggestive of movement toward a place, person, or thing reached." *To*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/to.

It is therefore entirely unclear why the majority relies on the definition of "effluent limitation." That definition is simply irrelevant to this lawsuit. As a result, the majority's criticisms of the approach taken by the Fourth and Ninth Circuits miss the mark. Indeed, the

Fourth Circuit analyzed the correct statutory text when it rejected the argument that the citizen-suit provision requires directness:

> [t]he plain language of the CWA requires only that a discharge come "from" a "point source." *See* 33 U.S.C. § 1362(12)(A). Just as the CWA's definition of a discharge of a pollutant does not require a discharge directly to navigable waters, *Rapanos*, 547 U.S. at 743, 126 S.Ct. 2208, neither does the Act require a discharge directly from a point source, *see* 33 U.S.C. § 1362(12)(A). The word "from" indicates "a starting point: as (1) a point or place where an actual physical movement . . . *has its beginning*." Webster's Third New International Dictionary 913 (Philip Babcock Gove et al. eds., 2002) (emphasis added); *see also* The American Heritage Dictionary of the English Language 729 (3d ed. 1992) (noting "from" indicates a "starting point" or "cause"). Under this plain meaning, a point source is the starting point or cause of a discharge under the CWA, but that starting point need not also convey the discharge directly to navigable waters.

*Upstate Forever*, 887 F.3d at 650 (footnote omitted). In short, if the majority would like to add a "directness" requirement to § 1311, it must fight the statutory text to get there.

In addition, the majority fails to meaningfully distinguish Justice Scalia's concurrence in *Rapanos*, which made clear that the CWA applies to indirect pollution. It is true that *Rapanos* dealt with different facts. But it is irrelevant that the pollution in *Rapanos* traveled through point sources before reaching a navigable water, whereas the pollution in this case traveled through groundwater, which, according to the majority, is not a point source. In both cases, the legal issue is the same: whether the CWA applies to pollution that travels from a point source to navigable waters through a complex pathway. *See Rapanos*, 547 U.S. at 745 (asking whether "the contaminant-laden waters ultimately reach covered waters"). Indeed, Justice Scalia favorably cited the Second Circuit's discussion in *Concerned Area Residents for the Environment*. *Rapanos*, 547 U.S. at 744. In that case, pollutants traveled across fields—which "were not necessarily point sources themselves"—before reaching navigable waters. *Hawai'i Wildlife Fund*, 886 F.3d at 748. Given the Supreme Court plurality's endorsement of the Second Circuit's approach, the majority's attempt to distinguish *Rapanos* collapses.

Next, the majority warns that imposing liability would upset the cooperative federalism embodied by the CWA. On this view, the states alone are responsible for regulating pollution of groundwater, even if that pollution later travels to a navigable water. Wrong again. To be sure,

the CWA recognizes the "primary responsibilities and rights of States" to regulate groundwater pollution.  33 U.S.C. § 1251(b).  But imposing liability in this case would not marginalize the states.  To the contrary, the district court made clear that it was *not* regulating the pollution of groundwater itself.  *See Tennessee Clean Water Network*, 273 F. Supp. 3d at 826 ("The Court agrees with those courts that view the issue not as whether the CWA regulates the discharge of pollutants into groundwater itself but rather whether the CWA regulates the discharge of pollutants to navigable waters via groundwater." (quotation marks, alteration, and citation omitted)).  Instead, the district court was addressing pollution of a navigable water—specifically, the Cumberland River—via groundwater.  This distinction was clear to the Fourth and Ninth Circuits.  *See Upstate Forever*, 887 F.3d at 652 ("We do not hold that the CWA covers discharges to ground water itself.  Instead, we hold only that an alleged discharge of pollutants, reaching navigable waters . . . by means of ground water with a direct hydrological connection to such navigable waters, falls within the scope of the CWA."); *Hawai'i Wildlife Fund*, 886 F.3d at 749 ("[T]he County's concessions conclusively establish that pollutants discharged from all four wells emerged at discrete points in the Pacific Ocean . . . .  We leave for another day the task of determining when, if ever, the connection between a point source and a navigable water is too tenuous to support liability under the CWA.").  Accordingly, imposing liability in this case fits perfectly with the CWA's stated purpose: to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).

Finally, the majority offers a narrow reading of the CWA because, in its view, a more inclusive reading would render "virtually useless" the Coal Combustion Residuals ("CCR") Rule under the Resource Conservation and Recovery Act ("RCRA").  Maj. Op. at 13.  The majority notes that if a polluter's conduct is regulated through a CWA permit, then RCRA does not also apply.  The majority therefore suggests that a straightforward reading of the CWA is incompatible with RCRA.  The majority would gut the former statute to save the latter.

But the EPA has already dismissed the majority's concern.  Indeed, the EPA issued federal regulations on this issue many decades ago.  The EPA's interpretation is that the industrial discharge of waste such as CCR is subject to regulation under both RCRA and the CWA:  RCRA regulates the way polluters store CCR, and the CWA kicks in the moment CCR

enters a navigable waterway. *See* 40 C.F.R. § 261.4(a)(2). The EPA first articulated this approach in a set of regulations from 1980, which provide that "[i]ndustrial wastewater discharges that are point source discharges subject to regulation under section 402 of the Clean Water Act" "are not solid wastes for the purpose of" the RCRA exclusion. 40 C.F.R. § 261.4(a)(2). This exclusion, the regulation explains, "applies only to the *actual point source discharge*. It does not exclude industrial wastewaters while they are being collected, stored or treated before discharge, nor does it exclude sludges that are generated by industrial wastewater treatment." § 261.4(a)(2) (comment) (emphasis added). Thus, under the EPA's reading, a polluter can be liable under RCRA for improperly storing CCR—even if the CCR never enters a navigable waterway. *See id.* Conversely, a polluter can be liable under the CWA for adding CCR to a navigable waterway—even if the polluter's storage methods comport with RCRA. *See id.* And of course, a polluter can be liable under both statutes if the polluter both improperly stores CCR and discharges it to a navigable waterway. *See id.*

The EPA settled any doubts on this matter by publishing a detailed description of its rationale in the Federal Register. *See* 45 Fed. Reg. 33098. The EPA explained that 40 C.F.R. § 261.4(a)(2) reflects the EPA's interpretation that regulation of a polluter's discharge of industrial waste to a navigable waterway pursuant to the CWA does *not* trigger the 42 U.S.C. § 6903(27) exclusion and therefore does *not* exempt that polluter's storage of CCR from regulation under RCRA:

> The obvious purpose of the industrial point source discharge exclusion in Section 1004(27) was to avoid duplicative regulation of point source discharges under RCRA and the Clean Water Act. Without such a provision, the discharge of wastewater into navigable waters would be "disposal" of solid waste, and potentially subject to regulation under both the Clean Water Act and Subtitle C [of RCRA]. These considerations do not apply to industrial wastewaters prior to discharge since most of the environmental hazards posed by wastewaters in treatment and holding facilities—primarily groundwater contamination—cannot be controlled under the Clean Water Act or other EPA statutes.

> Had Congress intended to exempt industrial wastewaters in storage and treatment facilities from all RCRA requirements, it seems unlikely that the House Report on RCRA would have cited, as justification for the development of a national hazardous waste management program, numerous damage incidents which appear to have involved leakage or overflow from industrial wastewater impoundments. *See, e.g.*, H.R. Rep. at 21. Nor would Congress have used the term "discharge" in

> Section 1004(27).  This is a term of art under the Clean Water Act (Section 504(12)) and refers only to the "addition of any pollutant to navigable waters", not to industrial wastewaters prior to and during treatment.
>
> Since the comment period closed on EPA's regulations, both Houses of Congress have passed amendments to RCRA which are designed to provide EPA with more flexibility under Subtitle C in setting standards for and issuing permits to existing facilities which treat or store hazardous wastewater.  *See* Section 3(a)(2) of H.R. 3994 and Section 7 of S.1156.  *See also* S. Rep. No. 96-173, 96th Cong., 1st Sess. 3 (1979); Cong. Rec. S6819, June 4, 1979 (daily ed.); Cong. Rec. H1094–1096, February 20, 1980 (daily ed.).    These proposed amendments and the accompanying legislative history should lay to rest any question of whether Congress intended industrial wastewaters in holding or treatment facilities to be regulated as "solid waste" under RCRA.

45 Fed. Reg. 33098.  Congress ratified the EPA's interpretation when it enacted amendments to RCRA, which the EPA said would "lay to rest" any concerns about whether industrial wastes like CCR are subject to regulation under both RCRA (in terms of their storage and treatment) and the CWA (in terms of their discharge to navigable waters).  *Id.*; *see* Public Law 96-482. From this history, and from the text of the statutes, we can surmise that Congress intended to delegate to the EPA the power "to speak with the force of law" on this aspect of the interplay between RCRA and the CWA.  *See United States v. Mead Corp.*, 533 U.S. 218, 229 (2001). Exercising this authority, the EPA reached an interpretation that is different from—and incompatible with—that of the majority.

Contravening bedrock principles of administrative law, the majority bulldozes the EPA's interpretation of its own statutory authority without even discussing the possibility of deference. But "[w]e have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations."  *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984).

> In *Chevron*, this Court held that ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion.  Filling these gaps, the Court explained, involves difficult policy choices that agencies are better equipped to make than courts.  467 U.S., at 865–866, 104 S.Ct. 2778.  If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal

No. 17-6155               *Tenn. Clean Water Network, et al. v. TVA*               Page 26

court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation.

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005). The EPA says that imposing CWA liability for the discharge of CCR to navigable waterways does not eliminate the possibility of RCRA liability for the storage and treatment of CCR. The majority suggests the exact opposite. Unfortunately for the majority, but fortunately for those who enjoy clean water, the majority lacks the authority to override longstanding EPA regulations on a whim. *See id.*

For all these reasons, I believe the CWA clearly applies to the pollution in this case. Accordingly, I would join our sister circuits in holding that the CWA prohibits all pollution that reaches navigable waters "by means of ground water with a direct hydrological connection to such navigable waters[.]" *Upstate Forever*, 887 F.3d at 652; *see Hawai'i Wildlife Fund*, 886 F.3d at 745–49. Under this standard, the unpermitted leaks from NRS and Complex are clearly unlawful.

## II.     The Permit's Sanitary Sewer Overflow Provision

The permit prohibits "Sanitary Sewer Overflows," which it defines as "the discharge to land or water of wastes from any portion of the collection, transmission, or treatment system other than through permitted outfalls." (R. 1-2, permit, PageID# 79.) The district court found, and TVA no longer disputes, that the Complex discharges coal ash waste to groundwater through its unlined, leaking sides and bottoms. These discharges are not authorized by the permit. Therefore, Plaintiffs have proven a permit violation.

The majority avoids this result by overcomplicating the issue. Ignoring the plain text of the permit, the majority instead champions the EPA's standard definition of "Sanitary Sewer Overflow," which is narrow and arguably saves TVA from liability. This reasoning is perplexing. The EPA's definition should play no role in the legal analysis here because the permit itself defines "Sanitary Sewer Overflow." Indeed, TVA's permit expert conceded in the district court that the permit's definition is broader than the EPA's definition. Accordingly, this Court should apply the plain text of the permit's definition, as it would apply the plain text of

No. 17-6155          *Tenn. Clean Water Network, et al. v. TVA*          Page 27

any contract.  This Court has no plausible authority or reason to substitute a definition provided in the permit with one drafted in a different context by a nonparty who has no relation to this case.

Further, the EPA's standard definition makes little sense in this context.  As the majority recognizes, that definition applies only to sewage from sanitary sewer systems.  But a coal ash pond is not a "sanitary sewer system."  It does not contain "sewage."  Consequently, interpreting the Sanitary Sewer Overflow provision to regulate sewage alone would render the provision meaningless.  This Court should avoid such an interpretation, especially when the permit itself provides a definition that does not trigger any such concerns.  *See Gallo v. Moen Inc.*, 813 F.3d 265, 273 (6th Cir. 2016) (noting the general rule that "courts should interpret contracts to avoid superfluous words").

For these reasons, I would hold that the district court correctly ruled that the Complex's karst-related leaks violate the sanitary-sewer provision.

### Conclusion

As set forth above, I believe that the CWA applies to TVA's indirect pollution of navigable waters and that TVA violated the permit's Sanitary Sewer Overflow provision. Because the majority disagrees as to both issues, I respectfully dissent.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 17-6155

TENNESSEE CLEAN WATER NETWORK;
TENNESSEE SCENIC RIVERS ASSOCIATION,

    Plaintiffs - Appellees,

      v.

TENNESSEE VALLEY AUTHORITY,

    Defendant - Appellant.

```
┌─────────────────────────────────┐
│             FILED               │
│         Sep 24, 2018            │
│      DEBORAH S. HUNT, Clerk     │
└─────────────────────────────────┘
```

Before:  SUHRHEINRICH, CLAY, and GIBBONS, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court imposing Clean Water Act liability on the Tennessee Valley Authority is REVERSED.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk